**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| LUIS GALARZA,<br><br>Plaintiff,<br><br>- against -<br><br>THE CITY OF BRIDGEPORT; LYNN KERWIN, THOMAS LULA, AND VINCENT INGRASSIA, Individually and in Their Official Capacities as Bridgeport Police Officers,<br><br>Defendants. | ) | **Complaint No. 3:26-cv-00588 (VDO)**<br><br>**AMENDED COMPLAINT AND JURY DEMAND** |


**LAW OFFICES OF JOEL B. RUDIN, P.C.**

Joel B. Rudin (ct25097)*
David E. Rudin (ct209360)*
Sam Thypin-Bermeo (ct209359)*
Sam Kuhn (ct209361)*
Partha Sharma (ct209362)*
152 West 57th Street, 8th Floor
New York, New York 10019
jbrudin@rudinlaw.com
david@rudinlaw.com
samtb@rudinlaw.com
skuhn@rudinlaw.com
psharma@rudinlaw.com
Telephone: (212) 752-7600
Fax: (212) 980-2968
*Admitted *pro hac vice*
***Attorneys for Plaintiff Luis Galarza***

**THE LAW OFFICE OF KENNETH ROSENTHAL**

Kenneth Rosenthal (ct05944)
One Audubon Street, 3rd Floor
New Haven, Connecticut 06511
krosenthal@gs-lawfirm.com
Telephone: (203) 285-8545

Plaintiff Luis Galarza, by and through his attorneys, The Law Offices of Joel B. Rudin, P.C. and the Law Office of Kenneth Rosenthal, respectfully alleges as follows based on information and belief:

## I. INTRODUCTION

1. This is a civil action, brought pursuant to 42 U.S.C. §§ 1983 and 1988, and Connecticut law, seeking monetary damages for the wrongful prosecution, conviction, and imprisonment of Plaintiff, Luis Galarza, on capital murder charges.

2. Fabricating evidence through coercion and trickery and suppressing *Brady* material, City of Bridgeport detectives tried to use the system, literally, to kill him.

3. While the jury ultimately spared Galarza the death penalty, his false conviction resulted in a mandatory life sentence, of which he ultimately served more than 22 years.

4. Not a single piece of forensic evidence connected Galarza to the homicide. He was not identified by any eyewitness. He did not confess to the police. Indeed, numerous witnesses gave statements implicating other suspects while exonerating Galarza.

5. Nevertheless, when Galarza would not help police in their investigation, they threatened to and then did frame him, using the most unreliable type of proof known to the criminal justice system: "jailhouse snitch" testimony.

6. Through a combination of coercion and secret promises of benefits, the Defendants caused a series of prisoners to falsely implicate Galarza and then furthered their scheme by preparing false or misleading reports and withholding *Brady* material.

7. Ultimately, on December 8, 2023, after most of these witnesses had recanted, a Connecticut Superior Court judge granted Galarza's motion, joined by the State's Attorney's

Office, to vacate his conviction, on the basis of the prosecution's failure to turn over *Brady* material. Shortly thereafter, with the case having fallen apart, the prosecution agreed to dismiss the case. But the *Brady* violation that the prosecution conceded was just one of many instances of police misconduct that permeated this case.

8. This lawsuit seeks to hold the individual detectives and their supervising officers liable for their misconduct, as well as the City of Bridgeport.

9. This is because the Bridgeport Police Department's unlawful policies and practices, together with the deliberate indifference of City policymakers to investigative misconduct, caused these detectives to violate Galarza's federal and state constitutional rights and to continue to conceal what they had done during the years when Galarza was attempting to overturn his conviction.

## II. PARTIES

10. Plaintiff LUIS GALARZA is a 52-year-old man who resides in Trumbull, Connecticut.

11. Defendant CITY OF BRIDGEPORT (the "City") is a municipal corporation organized under the laws of the State of Connecticut. It is a resident of the District of Connecticut. The Bridgeport Police Department ("BPD") is an agency of the City for whose torts the City is responsible.

12. Defendant LYNN KERWIN at all relevant times was a captain employed by the BPD acting within the scope of her employment and under color of law. She is sued in her individual and official capacities.

13. Defendant THOMAS LULA at all relevant times was either a sergeant or a lieutenant employed by the BPD acting within the scope of his employment and under color of law. He is sued in his individual and official capacities.

14. Defendant VINCENT INGRASSIA at all relevant times was either a detective or a sergeant employed by the BPD acting within the scope of his employment and under color of law. He is sued in his individual and official capacities.

## III. JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

15. This Court has jurisdiction under 28 U.S.C. § 1331 over claims arising under 42 U.S.C. §§ 1983 and 1988 and under 28 U.S.C. § 1343 over claims arising under the statutory and common law of the State of Connecticut.

16. Venue is proper in the District of Connecticut under 28 U.S.C. § 1391(b) because that is the judicial district in which Galarza's claims arose.

17. On or about September 27, 2024, which was within six months after the foregoing causes of action had accrued, Plaintiff filed with the City's City Clerk, in accordance with Conn. Gen. Stat.§ 7-465, C.G.S. § 52-577n, C.G.S.§ 7-101a, and other applicable statutes, notice of the present claims under Connecticut Law, as well as the time when and the place where the damages were incurred or sustained. Plaintiff thus has met all conditions precedent to the filing of State law claims.

## IV. JURY DEMAND

18. Pursuant to the Seventh Amendment of the United States Constitution, Galarza requests a jury trial on all issues and claims set forth in this Amended Complaint.

## V. FACTUAL ALLEGATIONS

**The fatal shootings of Magdiel Rivera and Luis Velez**

19. On October 15, 1999, at approximately 1:48 a.m., someone shot and killed Magdiel Rivera, Jr. ("Rivera") and Luis Velez ("Velez") outside a residence at 116 Corn Tassel Road in Bridgeport, Connecticut.

20. Just before they were murdered, Rivera and Velez emerged from 116 Corn Tassel Road in possession of a quantity of cocaine cooked into freebase and entered Rivera's van.

21. There, they were shot multiple times by an unknown assailant or assailants.

22. The occupants of the residence immediately called 911.

23. When members of the BPD arrived minutes later, they found Rivera and Velez in Rivera's van, dead.

24. Rivera was in the driver's seat with a set of keys in his right hand, and Velez was found between the two front seats, as if he had been trying to flee to the rear of the vehicle.

25. The gunshots were determined to have come from one gun fired through the passenger side of the vehicle.

26. A beeper, cell phone, knife, and approximately $1,000 were found on the victims.

**The Individual Defendants' initial investigation fixates on Galarza and ignores ample evidence implicating other suspects**

27. Defendant Thomas Lula, a veteran Bridgeport homicide detective and supervisor, was assigned as the lead detective in the investigation of the shooting.

28. He was responsible for being and was fully familiar with the investigation.

29. Defendant Vincent Ingrassia was his partner and helped lead the investigation.

30. The detectives kept Captain Kerwin informed about the progress of their investigation, submitted their reports to her for her approval, and took guidance from her.

31. Although these detectives continually received information implicating various potential suspects, when Galarza did not assist in their investigation, they began to focus on developing a case against him.

32. Days after the shooting, the detectives received information that an individual named Edwin "Pee Wee" Bonilla had set up Magdiel Rivera to be killed.

33. The deceased's father, Magdiel Rivera, Sr., told the detectives that, at his son's wake, Bonilla and Rafael Colon approached him and Bonilla told him he was with Magdiel Rivera, Jr., on the night he was killed.

34. Rivera, Sr., said that Colon had revealed to him that Colon had thousands of dollars in cash, four weapons, a bulletproof vest, and 125 grams of cocaine that had belonged to Rivera's son, which he wanted to return to Rivera, Sr.

35. Following up on this information, on November 1, 1999, detectives arrested Colon with approximately $90,000 of narcotics and several weapons.

36. Lula and Ingrassia questioned Colon after his arrest.

37. Even though Colon had been arrested with Rivera's drugs and guns, Lula and Ingrassia did not ask him about his whereabouts on the night of the murders.

38. Colon told Lula and Ingrassia that he had overheard two men, whom he later identified as Jose "Lefty" Alvarado and Roberto "Bobby" Hernandez, talking with a third man about killing someone. He did not identify the third man.

39. According to Colon, Alvarado and Roberto Hernandez then put on bulletproof vests, carried guns, and told Colon they were going to kill "some nigga named Magdiel."

40. Colon told Lula and Ingrassia that he warned Magdiel Rivera, Jr.

41. Later that same day, Rivera burned Alvarado's car, providing a motive for Alvarado to retaliate.

42. Bonilla was further implicated by another witness named Simona Moman.

43. She admittedly had worked with Rivera, Velez, and Bonilla to bag crack cocaine.

44. She told Defendant Ingrassia that, at 3 or 4 a.m. on the night of the murders, Bonilla arrived at her house and told her that the victims were dead.

45. Moman told Ingrassia that Bonilla was wearing all black—"[black] glasses on, black gloves, black jeans, black sweatshirt, black sneaks, black jacket"—seemed scared, and was carrying a gun that "looked like the same gun Magdiel [Rivera]" often carried.

46. Two other alleged drug dealers rumored to have been involved in the killings were Jose Arciniega, also known as "Indio" or "Ho," and Plaintiff, Luis Galarza.

47. Defendants Lula and Ingrassia had heard that Galarza dealt drugs with Arciniega, Alvarado, Roberto Hernandez, and others whose names had come up in the investigation.

48. In early November 1999, detectives, including Defendant Ingrassia, pulled over Galarza, who was driving an automobile, under a false pretext.

49. They threw and held Galarza on the ground and searched his car.

50. Defendant Ingrassia told Galarza that detectives investigating the double murder planned to visit Arciniega at Walker Correctional Center, where he was incarcerated, and asked Galarza to tell Arciniega to cooperate with them.

51. When Galarza refused, Ingrassia became furious.

52. Ingrassia threatened to frame Galarza for the murders if he was unable to find the actual killers.

53. In or about the middle of November, Ingrassia repeatedly spoke with another drug dealer, Carlos Hernandez.

54. Carlos Hernandez was a confidential informant who at that time had criminal charges pending against him in state court and was highly motivated to cooperate with the police.

55. Ingrassia described for Hernandez how the crime occurred and showed him photographs of the victims at the crime scene.

56. He brought up Galarza, using his nickname, "Chano."

57. He described the traffic stop of Galarza and invited Hernandez to implicate Galarza as the killer.

58. However, Hernandez told Ingrassia that it was an individual named David (aka "AWAK") Clemons who had been paid to kill the two victims.

59. The detectives knew AWAK had been killed on October 28, 1999, less than two weeks after the murder of Rivera and Velez.

60. He had been found with a gun that was the same caliber and model as the gun used in the Rivera and Velez homicides.

61. Despite knowing the evidence against AWAK and other suspects, Ingrassia pressured Hernandez to implicate Galarza.

62. Their call was recorded.

63. The recording shows that Hernandez, despite his motive to ingratiate himself with the detectives, refused their pressure to implicate Galarza.

64. The recorded call contains the following exchange:

> Ingrassia: You don't think it's Chano?
>
> C. Hernandez: No. I don't think it was him 'cuz Chano…

Ingrassia: You know. 'Cuz I kept running that by, you know I kept running that by Chano. You know. I kept telling Chano, man, I said 'You're going down.' I said, I don't care whether you pulled the trigger or not, you know, because conspiracy falls underneath a big range, you know, and I told him, I said, 'Whether you pulled the trigger or not, that don't matter. You're in on it. Your name comes up for conspiracy. Next time I see you, you're gonna be doing twenty-five years on top of your other four cases.' Because see he's jammed…

C. Hernandez: The contract was thirty-thousand dollars and, and Luis [Galarza] don't got that much.

65. Ingrassia told Hernandez that the latter's cooperation must be kept secret from the Bridgeport prosecutors handling the case and Hernandez's own attorney:

Ingrassia: But now we can't do it through the lawyer, right?

C. Hernandez: No.

Ingrassia: So it's gotta be, without the lawyer, without your, without Jack Cohane knowing about it.

C. Hernandez: You're probably gonna have to talk to the State's Attorney or something.

Ingrassia: No. I know what to do, but I just want to make sure that we're not going through your lawyer.

C. Hernandez: No. No. You know? Because my lawyer was like, you know. He might not know nothing. You know. He's not gonna know nothing, you know, but…

Ingrassia: You can't let nobody know about this.

66. On or about November 17, 1999, Ingrassia took a sworn statement from Rivera's cousin, Alvis Gonzalez.

67. Ingrassia tried to get Gonzalez to implicate Galarza, but instead Gonzalez provided information showing Jose Alvarado had a motive to commit the murders.

68. Gonzalez described how he was with the two victims a few weeks before the murders when they menaced Jose Alvarado with a gun on Bridgeport's Main Street, chased him out of his car, and burned it.

69. When asked who he thought killed Rivera and Velez, Gonzalez replied, "[t]he dude from Main Street," referring to Alvarado.

70. On or about December 1, 1999, Ingrassia interviewed Alvarado's girlfriend, Milagros Khan Rodriguez.

71. She confirmed that Alvarado's car was burned, but the Individual Defendants never produced her full statement to the prosecutor or Galarza.

72. Although Khan Rodriguez did not mention Galarza, Ingrassia asked her to identify him from a mugshot.

73. In or about December 2, 1999, Ingrassia interviewed Alvarado himself.

74. Alvarado admitted that the murder victims had pointed guns at him, chased him from his vehicle, and burned it.

75. Still single-mindedly pursuing Galarza, Ingrassia asked Alvarado if Galarza had "anything to do with the deaths of Magdiel and Luis."

76. But Alvarado replied, "nope."

77. He said he was willing to take a polygraph to that effect.

78. Alvarado told Ingrassia that he heard that the killer was "a kid from East Main named Negro Negrito," whom Rivera had previously robbed for drugs.

79. Inexplicably, Ingrassia did not follow up, in his interrogations of Alvarado and his girlfriend, with any questions about Alvarado's whereabouts on the night of the murders.

80. On or about December 7, 2000, Defendants Lula and Ingrassia interviewed Rolando Pesquera at the Bridgeport Correctional Center.

81. At the time, Pesquera was detained pending charges of assault, unlawful possession of a firearm, and threatening.

82. Pesquera described two incidents in which two Dominican men approached him menacingly and asked if he knew Rivera.

83. He said that he then warned Rivera.

84. Rivera responded to Pesquera that he had problems with an "old man" whom Rivera had robbed at the "Byamon store" and that "everyone knows about [it]."

85. True to form, the Individual Defendants did not follow up on this tip.

86. Instead, they tried to steer Pesquera toward Galarza, asking him, without prompting, "Who is Chano?" Pesquera responded that "Chano is somebody who had a reputation in the street as a drug dealer. You showed me Chano's picture earlier today."

87. The Individual Defendants did not make any record of their earlier interview with Pesquera, nor of showing Galarza's photograph to Pesquera.

88. Upon information and belief, the Individual Defendants offered to help Pesquera with his pending criminal case if he would implicate Galarza.

89. Primed as he was by the Individual Defendants to implicate Galarza, Pesquera told the Individual Defendants that Rivera had a "feud" with Galarza's associate, Sammy Gonzalez. Six days later, on December 13, 2000, Pesquera's attorney filed a motion for bond reduction.

90. One week after that, the motion was granted, and Pesquera's bond was reduced.

91. This occurred even though Pesquera's previous motion for bond reduction, filed on October 17, 2000—before Lula and Ingrassia intervened on his behalf—was rejected.

92. On December 28, 2000, Pesquera filed a motion to modify the conditions of his release, which was also granted.

93. On March 16, 2001, Ramon DeJesus, an alleged drug associate of Galarza's, was arrested in Bridgeport on narcotics and other criminal charges.

94. Because DeJesus was facing substantial imprisonment, Lula saw an opportunity to gain his cooperation against Galarza.

95. But DeJesus told Lula that he had personal knowledge that Galarza was *innocent.*

96. DeJesus told Lula that he was with Galarza the entire evening when the murders occurred and Galarza was *not* involved in them.

97. DeJesus told Lula that he was present when Galarza received a phone call from Jose Alvarado informing Galarza that Rivera, whom they both knew, had been murdered.

98. Galarza was so shocked that he kept on saying, "get out of here, get out of here."

99. DeJesus signed a sworn, handwritten statement containing this account, which he gave to Lula.

100. He never heard again from Lula or any of the other homicide detectives investigating Galarza.

101. Neither Lula nor the other Individual Defendants disclosed DeJesus's statement to the prosecutor.

102. Later, when Galarza's attorney learned about DeJesus and sought disclosure of his written statement, Lula lied to Galarza's prosecutor and his own supervisors in falsely denying its existence.

103. Lula falsely claimed that, rather than saying "get out of here," Galarza said, "get out of there," as if he was urging Alvarado to flee because he had been involved in the crime.

104. He created a memorandum to the police file, addressed to Defendant Kerwin and Captain Joseph Gaudett, containing this and other falsities, including that DeJesus *refused* to give him a written statement.

105. Bridgeport police training and practice was to make a record of all statements and information that inculpated a suspect.

106. Lula's claim that he made no record of DeJesus's statement, even though he contended it inculpated Galarza, was inconsistent with departmental training and practice.

107. Moreover, if DeJesus directly implicated *Alvarado* in the murder, as Lula contended, then Lula's lack of interest in prosecuting Alvarado was inexplicable.

108. On June 24, 2001, the Individual Defendants obtained a recorded call, dated June 4, 2001, between Galarza, who was incarcerated, and one Sammy Gonzalez.

109. In this recorded call, Gonzalez told Galarza that detectives had interviewed Gonzalez about Galarza's alleged involvement in the double homicide.

110. Galarza responded incredulously that it was Jose Alvarado and Roberto Hernandez who had been fighting with the victims and that it also might have been AWAK who committed the murders.

111. On or about August 17, 2001, Lula interviewed Luis Sostre at Northern Correctional Center.

112. Sostre told Lula that his cousin, Thomas Garcia, had told him that Jose Arciniega killed the victims.

113. While Lula wrote a report of this interview, he filed it under the case number "00D-840" and described the case status as "closed."

114. The case number for the Rivera and Velez Murders was "99D1151."

115. Defendant Kerwin reviewed this report.

116. Thomas Garcia was incarcerated and would have been easy to find and interview.

117. However, none of the detectives ever questioned Thomas Garcia to find out his source of knowledge that it was Arciniega who committed the murders.

118. In fact, the source of the information implicating Arciniega in the murders was Arciniega himself.

119. Following the murders, Garcia was approached by Arciniega's mother, who was concerned that homicide detectives had come looking for Arciniega regarding his alleged connection to two murders. Garcia agreed to talk to Arciniega, and when he did, Arciniega began screaming and yelling that he "f'ed up" and "went to do a favor for somebody."

120. While Garcia understood this to be a reference to the murders, he stopped Arciniega before he explicitly confessed.

121. The report about the interview with Sostre was never disclosed to the prosecutor or the defense despite its obvious nature as *Brady* material.

**The Individual Defendants manufacture a case against Galarza through coerced statements, evidence fabrication, and undisclosed benefits.**

122. There are no police reports in the Rivera-Velez case file, presently disclosed to Plaintiff, that are dated between January and November 2000.

123. What, if anything, the detectives were doing regarding this investigation during that period is unknown.

124. However, their continual focus on Galarza as their suspect in the murder investigation predictably became widely known in the drug-dealing and prison communities in Connecticut and led the detectives to Alan Lane.

125. In or about October 2000, Alan Lane, a state prisoner, knowing of law enforcement authorities' interest in Galarza, wrote a letter to the State's Attorney's Office that he had information about the Rivera and Velez double-homicide.

126. Specifically, he wrote that he had information about the "unsolved murders at *Beardsley*" in the "*summer* of 1999" (emphasis added).

127. In fact, the murders had taken place in the *fall* of 1999, not during the summer. And they occurred nearly four miles from *Beardsley* Park in Bridgeport and nearly five miles from *Beardsley* Street.

128. On November 16, 2000, Lula and Ingrassia questioned Lane for an hour before taking a statement.

129. Lane initially provided a vague story about Galarza's purported involvement in the murders in the hope of securing a benefit in his criminal case.

130. Lula and Ingrassia then encouraged him to manufacture a more detailed account, telling him that "Galarza was 'going down anyway, so why not help yourself?'"

131. They offered to speak with Lane's own prosecutor to obtain leniency for him.

132. Lane then claimed for the first time that, during the *fall* of 1999, Galarza confessed to him that he and his associate, Sammy Gonzalez, had killed "some motherfuckers that tried to take over my block."

133. Hearing what they wanted to hear, the detectives did not ask Lane why, if Galarza was truly involved in the crime and had confessed it to him, he would have said the crime occurred at "Beardsley" and in the summer rather than the fall.

134. Nor did they question Lane's claim that Galarza had admitted committing the crime with Sammy Gonzalez.

135. Galarza, they learned, could not have committed the crime with Gonzalez because Gonzalez was incarcerated when the murders occurred.

136. Lula and Ingrassia made no record of, and did not disclose, how they induced Lane to change his story.

137. After speaking with Lane, Lula and Ingrassia reached out to Lane's prosecutor, State's Attorney Richard Colangelo, located in Stamford.

138. On behalf of Lane, they worked out a secret deal that Lane would receive a sentence reduction if he testified against Galarza.

139. This was consistent with the practice of Bridgeport police detectives.

140. Their practice was to make deals on behalf of their cooperators directly with outside prosecutors' offices.

141. They would do so without the knowledge of the prosecutor handling the case that the cooperator would be testifying in.

142. Lane pleaded guilty to first-degree robbery on February 2, 2001.

143. When he did so, he was aware that his initial sentence would be nine years in prison but understood, due to his cooperation, that he would be resentenced to three years.

144. To make such a resentencing possible, as part of Lane's plea, the State waived its right to object to any future application for a sentence reduction that Lane might make.

145. Shortly after Lane testified at Galarza's trial, and pursuant to Lane's agreement with the State's Attorney in Stamford, Richard Colangelo, Lane's defense counsel and Colangelo filed a joint motion for sentence reduction, and Lane's sentence was reduced to three years, just as he had expected.

146. But Lane and the Individual Defendants Lula and Ingrassia falsely testified at Galarza's trial that Lane had *not* received any consideration in exchange for his testimony.

147. The Galarza prosecutor was ordered by the trial judge to disclose all cooperation agreements and all consideration promised to or received by the State's witnesses, including Lane.

148. Galarza's prosecutor did not disclose Lane's agreement and expectation of a benefit because the Individual Defendants had not revealed to Galarza's prosecutor the deal they had made directly with Lane's prosecutor.

149. On June 27, 2001, Rafael Colon was reinterviewed by Ingrassia at the Bridgeport Police Department.

150. He still faced the serious narcotics charges that he had faced in 1999 when, despite being incentivized to help detectives to obtain leniency for himself, he had implicated Roberto Hernandez and Alvarado in an incriminating phone call, but not Galarza.

151. This time, facing trial and the potential for a long prison sentence, and offered sentencing consideration by Lula, he changed his story and claimed that he understood Galarza was on the other side of that call.

152. Lula and Ingrassia then wrote a letter to Colon's sentencing court supporting his request for leniency due to his cooperation with the detectives.

153. After they did so, and as a reward for his cooperation, all but three years of Colon's 10-year sentence were suspended, and he was eventually released on parole after serving just 18 months.

154. But, when Colon testified against Galarza at the latter's trial, under questioning by Assistant State's Attorney C. Robert Satti, Jr., Colon falsely *denied* that any Bridgeport Police officer wrote a letter on his behalf in connection with his cooperation against Galarza.

155. Because the Individual Defendants had not disclosed to Satti the letter they had written to Colon's prosecutor, Satti did not correct his witness's false testimony.

156. After speaking with Colon, the Individual Defendants decided to again interrogate Jose Alvarado and Roberto Hernandez, even though they previously had exculpated Galarza.

157. This time, though, the Individual Defendants utilized a deceptive stratagem to pressure and motivate these drug dealers, both suspects in their own right in the murders, to falsely incriminate, and be willing to testify against, Galarza.

158. The Individual Defendants had obtained Galarza's recorded calls from the prison where he was serving a sentence on a drug conviction.

159. They found a call by Galarza to the FBI office.

160. Galarza had cooperated with the FBI and a joint state-federal narcotics task force after his own narcotics arrest.

161. In his recorded call, Galarza complained to the FBI agent that he was being set up on the murder case even though he was innocent, and he sought the agent's assistance.

162. In a second call, Galarza had complained to his friend Sammy Gonzalez that detectives were investigating him for the murders even though he believed that Roberto Hernandez and Jose Alvarado had committed them. *See* ¶110, *supra.*

163. The Individual Defendants edited and combined the two calls in order to make it appear that Galarza was cooperating with the FBI in the murder case specifically against Roberto Hernandez and Alvarado.

164. On August 10, 2001, Defendants Ingrassia and Lula interrogated Roberto Hernandez, who was at the time incarcerated at the Radgowski Correctional Center.

165. Although Hernandez told them he had no personal knowledge about the murders, they threatened to charge him with conspiracy to commit murder and to take away his daughter unless he agreed to tell them that Luis Galarza was responsible for the murders.

166. They told Hernandez, falsely, that they already *knew* that Galarza had killed Rivera and Velez and that all he needed to do was to confirm what they already knew.

167. To further pressure and inflame Hernandez into confirming this, they lied to him that Galarza already was cooperating with federal authorities and pinning the murders on him and Alvarado.

168. To prove this, they played the doctored tapes for him, which made it appear that Galarza in fact was doing so.

169. To help Hernandez concoct a story that Galarza had admitted details of the murder to him, they provided Hernandez information about the circumstances of the crime, including displaying for him crime scene photos showing the condition of the bodies when they were found by police in Rivera's van.

170. The detectives then prepared a lengthy written statement accusing Galarza and had Hernandez sign it.

171. The statement, which purported to be a complete record, in question-and-answer format, of their interview of Hernandez, omitted all that the police had done to pressure and motivate him to falsely accuse Galarza.

172. This was consistent with Bridgeport police training and practice to include inculpatory information in police reports and omit exculpatory and impeaching information.

173. After his meeting with the detectives, Hernandez discussed what had occurred with another inmate, Jesus Lugo.

174. Lugo had been Galarza's cellmate.

175. Lugo had pleaded guilty to second-degree robbery and third-degree burglary charges in New London, Connecticut, and was serving a sentence on those charges.

176. After telling Lugo what he had agreed to tell detectives implicating Galarza, Hernandez informed the detectives that Lugo was willing to meet with them and cooperate against Galarza, too.

177. On or about August 21, 2001, Lula and Ingrassia met with Lugo at the prison without first notifying or asking the permission of Lugo's lawyer.

178. To motivate Lugo to cooperate with them, they offered to contact his prosecutor on his behalf to obtain a sentence reduction.

179. To make sure they received a story consistent with that of Hernandez and with the crime scene evidence, Lula and Ingrassia fed Lugo information, including where the murders occurred, the number of dead, and that the keys to the van had been found in Rivera's hands.

180. On or about August 22, 2001, Lula and Ingrassia briefly reinterviewed Lugo and obtained a second sworn statement.

181. In his two statements, Lugo accused Galarza of having confessed personally that he committed the murders with a second person.

182. In neither statement did the detectives reveal the manner in which they had influenced Lugo's account, including their offer to assist him in obtaining a sentence reduction.

183. Upon information and belief, Lula did contact Lugo's New London prosecutor and requested consideration for him.

184. Following his testimony against Galarza at the latter's trial, Lugo's 10-year sentence, which required him to serve at least 3 ½ years, was fully suspended and he was released from custody.

185. During his testimony at Galarza's trial, Lugo falsely denied any expectation he would receive a sentence modification, that Hernandez had told him anything about the case when they were in prison together, and that the police had shown him crime scene photos.

186. Because the detectives had omitted this information from Lugo's formal statements and not disclosed it to the prosecutor, he did not correct Lugo's false testimony.

187. On August 14, 2001, Jose Alvarado reported to his parole officer, pursuant to a pre-arranged appointment, in Bridgeport.

188. Lula and Ingrassia were waiting for him.

189. For five hours, these detectives interrogated Alvarado.

190. They played the doctored tape, making it appear that Galarza was cooperating against him in the murder case with the FBI.

191. They threatened to charge him with the double murder and to take away his children unless he signed a statement accusing Galarza.

192. They fed him information by showing him crime scene pictures.

193. Eventually, they took him to the police station.

194. There, he signed a 13-page statement, prepared and witnessed by Defendants Lula and Ingrassia, falsely claiming that Galarza admitted to him a plan to pay Jose Arciniega to commit the murders.

195. Although Alvarado clearly had a motive to commit the murders, the detectives had evidence he had done so, and they had threatened him with prosecution, they did not arrest him or recommend that he be arrested, and he was never charged with the crime.

196. They omitted from his signed statement the tactics they had used to cause him to change his story and accuse Galarza.

197. Although they had reason to believe that Colon, Alvarado, and Roberto Hernandez were each involved in the murders, and questioned each of them multiple times, Lula and Ingrassia never questioned any of them about their whereabouts on the night of the incident.

198. On November 1, 2001, the Individual Defendants Lula and Kerwin signed an arrest warrant, charging Galarza with capital murder.

199. This became the charging instrument against Galarza in court.

200. The document was based primarily on the false, coerced statements of Alan Lane, Roberto Hernandez, and Jose Alvarado.

201. The Defendants omitted from it virtually all the exculpatory and impeachment information, described in the preceding paragraphs, that they had gathered during their investigation and that eviscerated probable cause for Galarza's arrest and prosecution.

202. Deceived by this document concerning the strength of the case against Galarza, the court set bail at $1 million.

203. The Individual Defendants also omitted most of the exculpatory and impeachment information from a 30-page comprehensive report, dated August 24, 2001, purporting to completely detail the investigative steps they had taken and the information they had learned during the course of their investigation.

204. They provided this report to the State's Attorney's Office with the expectation that it would become the basis for the prosecution and would be relied upon both by the prosecutor and, potentially, by the defense.

205. This report was written by Defendant Lula and reviewed by his captain, Defendant Kerwin.

206. Galarza remained in custody for the next 22 1/2 years.

**Even after Galarza's arrest, the Individual Defendants fabricate and withhold evidence in advance of trial.**

207. Aware of the weakness of a prosecution founded upon jailhouse snitch or accomplice testimony, Defendant Ingrassia, several months after Galarza's arrest on murder charges, recruited another snitch witness: Carlos Hernandez.

208. Carlos Hernandez was the confidential informant who, interviewed in 1999, had denied any knowledge that Galarza was involved in the crime.

209. However, in April 2002, Hernandez had even more reason to help the Bridgeport police than he had in 1999: he was under federal indictment for conspiracy to distribute cocaine and faced a sentence under the Federal Sentencing Guidelines of 188 to 235 months in prison.

210. Carlos Hernandez met with Ingrassia on at least two occasions: April 2 and 9, 2002.

211. Ingrassia prepared a statement for Hernandez to sign on April 9, which accused Galarza of having confessed to the murder on the day after it occurred.

212. The report omitted any mention of the details of his earlier statement, any explanation for it, or any explanation of why he was changing his story.

213. It omitted any discussion of the interrogations Ingrassia conducted on April 2 and 9 which led Hernandez to change his original story.

214. It omitted any mention of any promise of consideration or benefit.

215. In fact, Ingrassia had promised to assist Carlos Hernandez in obtaining a lower federal sentence.

216. On or about July 15, 2002, Hernandez's attorney filed a successful motion to delay his federal sentencing until after he testified for the State authorities against Galarza.

217. The reason was so that Hernandez could use his testimony against Galarza as a basis for a downward departure under the Federal Sentencing Guidelines from the harsh Guidelines sentence that he otherwise was certain to receive.

218. On August 1, with sentencing scheduled for the next day, Hernandez's counsel wrote to the court that his client had met with Ingrassia at least twice more and wished to delay his sentencing.

219. Counsel wrote that he intended to "seek from the Court and the government . . . some understanding, if possible, that would permit the defendant to return to Court at a future date and to have a hearing as to any downward departure he might be entitled to for his future assistance to the state government."

220. On August 2, 2002, Defendant Ingrassia assisted Carlos Hernandez by submitting a letter directly to the Hon. Stefan Underhill, the federal district judge presiding over Hernandez's case, in support of Hernandez's application to delay his sentencing due to Hernandez's cooperation with State authorities against Galarza.

221. Ingrassia copied his supervisor, Defendant Kerwin, on this letter.

222. But he did not copy the State's Attorney's Office or Galarza's attorney.

223. Galarza's prosecutor did not disclose the letters to Galarza prior to his trial.

224. On December 30, 2002, Galarza's attorney Mastronardi filed a motion to dismiss the prosecution premised on the government's failure to disclose DeJesus's sworn alibi statement, *see* ¶ 101, *supra*, which the attorney had learned about from DeJesus.

225. As noted above, Lula falsely denied such a statement was made and, as a result, the motion was denied.

226. Mastronardi also continually demanded, in vain, disclosure of all documents and information showing benefits received by the prosecution's witnesses as well as all cooperation agreements.

227. The Individual Defendants recruited one more jailhouse witness before trial: Steven Necaise.

228. On April 24, 2003, a jury had just convicted Steven Necaise, a career criminal, of first-degree assault, and he faced 27 to 35 years of incarceration.

229. Less than three weeks after learning that he would be receiving the longest sentence of his life, Steven Necaise contacted the BPD from jail.

230. In fact, Necaise knew only what he had heard in prison through rumors about the case involving Galarza, but Lula and Ingrassia, over the course of several meetings, helped him construct a false story about how Galarza had vaguely admitted he had something to do with the murders and that Necaise had observed Galarza throw a gun off a bridge shortly after the crime.

231. On May 20, 2003, less than a month after his conviction, Necaise gave Lula and Ingrassia a statement in which he swore to that false story.

232. The statement, which purported to be a complete record, in question-and-answer format, of their interview of Necaise, omitted all that the police did to pressure and motivate him to falsely accuse Galarza.

233. In exchange for Necaise's agreement to testify against Galarza, detectives promised him they would assist him in trying to obtain a sentencing reduction.

234. However, at Galarza's trial, uncorrected by the prosecutor, he denied that any promise had been made to him and he only had a vague hope.

235. On July 16, 2003, about one month after testifying against Galarza, Necaise was sentenced to 20 years in prison—seven years less than the lower end of his original sentencing exposure.

236. Necaise later acknowledged that this reduced sentence was given in exchange for the false testimony that the Individual Defendants fabricated.

237. Around the time that Defendants Lula and Ingrassia investigated the Rivera and Velez murders, they employed similar improper tactics in another case.

238. In the prosecution of Rusty Rodriguez for a June 1999 murder, Lula, Ingrassia, and other detectives framed Rodriguez on false murder charges to pressure him to cooperate against another suspect.

239. In that case, they followed a playbook similar to the one they followed here: They omitted impeachment material from a police document, they coerced a witness to falsely claim he heard a co-conspirator's confession, and they memorialized, and embellished with additional false information, that coerced statement in a false report.

240. Based upon the false story they had coerced from the witness, Lula then told Rodriguez's attorney, in essence, "your client was a gun dealer and he'd better tell us who he sold the guns to otherwise he's going down for this homicide."

241. In other words, just as they were doing to Galarza, they were framing Rusty Rodriguez to turn him into a cooperator or "snitch."

242. The witness they had coerced—the only witness they claimed had heard a confession—recanted, the case fell apart, and, on March 27, 2002, the judge granted Rusty Rodriguez's motion for a judgment of acquittal.

243. Later in 2002, well before Galarza's trial, Rodriguez filed a notice of claim accusing the detectives of the above misconduct.

244. Pursuant to the practice to receive all notices of claim involving his department, the Bridgeport Police Chief received this notice.

245. Neither the Chief nor the detectives disclosed Rodriguez's notice of claim or the underlying misconduct alleged in it to Galarza's prosecutor so that he could disclose it to Galarza as impeachment evidence.

246. Meanwhile, signaling that the misconduct was fine with him, the Chief took no remedial action against the detectives, Lula and Ingrassia, for their misconduct, which was essentially identical to their misconduct in the Galarza case.

247. The Department failed to disclose additional impeachment evidence about members of the investigative team to the prosecutors.

248. On November 28, 2001, Defendant Lula was charged with "repeating a racial, ethnic, or sexist slur," a charge that was substantiated.

249. A special master monitoring the Bridgeport Police Department criticized the department for not acting "promptly" on the allegation and for improperly failing to even investigate Lieutenant David Hoyt, the supervisor who said the slur that Defendant Lula repeated.

250. On July 19, 2002, Pasquale Feola, who testified at Galarza's trial, received a written warning for "failure to use sound judgment."

251. The Chief knew about all these disciplinary actions, which he was specifically obligated to monitor under a consent decree, but failed to disclose them, or to cause them to be disclosed, to Galarza's prosecutor.

252. Lula and Ingrassia similarly failed their obligation under *Brady* to disclose them.

**Galarza is convicted at trial based on fabricated evidence and improperly withheld *Brady* material.**

253. In June 2003, Galarza was tried for the murders of Rivera and Velez.

254. The State sought the death penalty.

255. The evidence against Galarza consisted primarily of testimony from the six jailhouse informants: Alan Lane, Carlos Hernandez, Rafael Colon, Roberto Hernandez, Jesus Lugo, and Steven Necaise.

256. The prosecution's case was weak.

257. There was no forensic or scientific evidence linking Galarza to the shooting.

258. There was no eyewitness testimony.

259. There were no admissions by Galarza to police.

260. All the inculpatory evidence consisted of testimony by jailhouse snitch witnesses who had serious criminal histories and were significantly impeached.

261. Due to the weakness of the case, disclosing how the detectives had coerced, manipulated, or assisted the various snitch witnesses to manufacture their stories likely would have resulted in a more favorable outcome of the trial.

262. But the Individual Defendants suppressed this information by omitting it from their misleading reports.

263. Meanwhile, evidence they had fabricated—Jose Alvarado's sworn statement falsely accusing Galarza—was admitted into evidence as proof of Galarza's guilt after Alvarado, on cross-examination, admitted that officers had coerced him and attempted to recant his accusation.

264. The non-disclosure to the defense of the letters and overtures the detectives had made to outside prosecutors to obtain leniency for the witnesses they had recruited also likely affected the outcome of the trial.

265. Defendants Lula, Ingrassia, and Kerwin avoided such disclosure by not fulfilling their obligations to reveal these overtures to Galarza's prosecutor.

266. As a result, when Alan Lane falsely denied in his testimony that anyone but his lawyer had spoken to his prosecutor about obtaining a sentence modification, prosecutor Satti did not correct this false testimony because he was unaware that Defendant Lula had directly written to Lane's prosecutor supporting modification.

267. When Carlos Hernandez testified falsely that he merely hoped he'd receive some benefit in exchange for his testimony, prosecutor Satti, unaware of Ingrassia's communications with the federal authorities, did not correct his testimony or disclose the communications.

268. Galarza's counsel had no evidence with which to cross-examine Rafael Colon about any promise he had received, because Defendant Lula had suppressed from the prosecutor, and thus from the defense, that he had written a letter of support to Colon's prosecutor.

269. When Jesus Lugo denied he had received any promise of assistance in obtaining a sentencing reduction in his own case, Galarza's counsel was not informed of and could not impeach him with Defendant Lula's assistance on Lugo's behalf.

270. Prosecutor Satti then unknowingly enhanced the prejudice caused by the detectives' disclosure violations by arguing in summation that these witnesses had not received sentencing benefits or promises of benefits in exchange for their testimony.

271. The Individual Defendants also influenced the outcome of the trial by suppressing witness statements that accused others of the crime or directly exculpated Galarza.

272. On June 20, 2003, Galarza was found guilty of two counts of murder, both with the use of a firearm, and capital felony, and was acquitted of two counts of felony murder.

273. The prosecution then sought the death penalty.

274. The stress on Galarza was unimaginable.

275. On June 27, 2003, after a death penalty trial, the jury declined to impose the ultimate punishment.

276. Instead, on September 12, 2003, after reaffirming his innocence in his remarks to the court, Galarza was sentenced to life in prison without any hope of parole.

**Galarza maintains his innocence and fights to overturn his convictions.**

277. Following his conviction, Galarza continued to maintain his innocence.

278. Even before Galarza was sentenced, the evidence upon which he had been convicted began to crumble.

279. As noted above, Jose Alvarado, at trial, had admitted how detectives had coerced him.

280. On July 31, 2003, Roberto Hernandez submitted an affidavit repudiating his testimony as false and as the product of pressure from Lula and Ingrassia.

281. On August 28, 2003, Hernandez submitted a second affidavit repudiating Jesus Lugo's testimony and revealing, contrary to Lugo's denials, that it had resulted from information Hernandez had provided to him, which in turn Hernandez had been given by the detectives.

282. On September 12, 2003, after Galarza was sentenced to life in prison in the morning, Carlos Hernandez was sentenced in federal court to just 78 months, a departure of 11-13 years from the sentence he would have received but for his testimony against Galarza.

283. During sentencing proceedings, then-AUSA Kari Dooley set forth information regarding Carlos Hernandez's credibility that should have been disclosed to Galarza before trial—namely, that he had previously perjured himself in his grand jury testimony in a separate federal case pursuant to a federal cooperation agreement, which the government had then revoked.

284. AUSA (now Judge) Dooley had disclosed this fact to State authorities but it was not disclosed to Galarza's defense.

285. In 2023, Steven Necaise recanted under oath.

286. In 2024, Alan Lane recanted during an interview with a private investigator employed by Galarza's defense counsel.

287. On August 23, 2025, Jesus Lugo also recanted, attributing his statement implicating Galarza to pressure by Roberto Hernandez and by the detectives.

288. Consistent with his innocence, Galarza filed numerous appeals and petitions for writs of habeas corpus seeking to overturn his conviction, including applications filed in December 2003, January 2005, September 2009, May 2010, December 2012, January 2016, and July 2021. All were unsuccessful.

289. Finally, on November 30, 2023, based upon recantation evidence and disclosures during a State habeas corpus proceeding of *Brady* violations the State's Attorney in Bridgeport filed a motion to set aside Galarza's conviction.

290. The motion indicated that, based on the totality of the evidence developed in the habeas proceeding, the State's confidence in Galarza's conviction had been "sufficiently undermined…such that justice is done by setting the judgment aside and restoring the case to the superior court docket."

291. On December 6, 2023, a joint motion for entry of judgment was filed in the habeas docket of the Superior Court, stipulating that Galarza's constitutional rights had been violated under *Brady v. Maryland* and that Galarza's convictions should be vacated.

292. The court entered an order granting the habeas petition and vacating Galarza's convictions two days later, but the underlying prosecution continued.

293. On January 12, 2024, Galarza's counsel filed a motion to dismiss the prosecution.

294. In an April 12, 2024 hearing, counsel provided an overview of the grounds for dismissal, including the recantations of Alvarado, Roberto Hernandez, and Necaise, and Roberto Hernandez's impugning of Lugo's jailhouse testimony; the *Brady* evidence showing the falsity of the trial testimony of Alan Lane and Carlos Hernandez denying such consideration for testifying; and Galarza's unwavering claims of innocence.

295. On April 18, 2024, the Bridgeport State's Attorney consented to the dismissal of the prosecution.

296. He stated that he no longer had confidence in the reliability of the evidence that supported the original verdict and he did not believe the State would prevail at a retrial.

297. He noted the recantations, the lack of direct inculpatory evidence, postconviction DNA testing that tended to support Galarza's defense, and other factors.

298. The court dismissed Galarza's case.

299. It told him he was "free to go."

300. And so, Galarza's nightmarish imprisonment and status as a convicted murderer ended.

301. But his decades of trauma will haunt him for the rest of his life.

## VI. **GALARZA'S DAMAGES**

302. Galarza's injuries and damages include, but are not limited to:

(a) his pretrial and posttrial incarceration totaling approximately 22 years;

(b) severe restrictions upon his liberty, privacy, and personal autonomy during his pretrial release totaling another four months and during his years in prison;

(c) physical injuries he suffered during assaults upon him by other inmates, as well his lack of adequate medical care for such injuries;

(d) the mental and emotional effects of such assaults and of the gruesome, terrifying, homicidal, and disfiguring assaults on other inmates that he witnessed;

(e) the mental and emotional effects of verbal harassment by guards;

(f) the mental and emotional effects of his devastating sentence to life in prison without the possibility of parole, which subjected him to unusually harsh conditions of confinement and, among other things, daily 7 a.m. cell shakedowns and the denial for three years of contact visits;

(g) past and future mental and emotional suffering;

(h) the loss of the services, society, companionship, and consortium of his family members, including his fiancée (now wife) and four children;

(i) the loss of employment income and diminution of future earning ability in an amount to be determined;

(j) legal fees and expenses for which he is responsible, including trial and post-trial representation; and

(k) interest to the extent available under controlling law.

## CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth, Fifth, and Fourteenth Amendments by the Individual Defendants

303. Galarza repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

304. The Individual Defendants individually and/or in concert with each other and others unnamed, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal proceedings against Galarza, without probable cause to believe that Galarza was guilty of any crime or could be successfully prosecuted, and caused him to be deprived of his liberty, in violation of his rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

305. The criminal proceedings were terminated in Galarza's favor.

306. By virtue of the foregoing, pursuant to 42 U.S.C. § 1983, the Individual Defendants are liable for the violations of Galarza's constitutional rights and his resulting injuries.

**COUNT II**

**42 U.S.C. § 1983 Unreasonable Seizure under the Fourth Amendment, and Denial of Due Process and a Fair Trial under the Fifth, Sixth, and Fourteenth Amendments, Due to the Fabrication of False or Misleading Evidence by the Individual Defendants**

307. Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

308. The Individual Defendants, acting individually and/or in concert with each other and with others, acted deliberately, willfully, recklessly, and/or with deliberate indifference to the truth, to fabricate or knowingly manufacture, or knowingly cause the manufacturing, of false or materially misleading evidence ("the Fabricated Evidence").

309. The Individual Defendants forwarded, or caused to be forwarded, the Fabricated Evidence to prosecutors, intending that it be used against Plaintiff during a criminal prosecution.

310. The Individual Defendants knew that the Fabricated Evidence, if considered by a jury, would be likely to influence a jury's decision at trial to convict Plaintiff and it in fact did so.

311. As a result of the Individual Defendants' conduct in forwarding, or causing to be forwarded, the Fabricated Evidence to the prosecutor, prosecutors initiated and continued a criminal prosecution of Galarza, and he lost his liberty and suffered additional grievous damages.

312. The Individual Defendants' conduct violated Galarza's right to be free from unreasonable seizure, as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution, and his rights to procedural and substantive due process and a fair trial, as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

313. The above misconduct was outrageous and shocking to the conscience.

314. By virtue of the foregoing, the Individual Defendants are liable to Galarza under 42 U.S.C. § 1983 for the violation of his constitutional rights and his resultant injuries.

## COUNT III

### 42 U.S.C. § 1983 Denial of Due Process and a Fair Trial under the Fifth, Sixth, and Fourteenth Amendments by Withholding Evidence Favorable to the Defense ("*Brady* Claim") by the Individual Defendants

315. Galarza repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

316. At all relevant times, Galarza had a clearly established right—under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny—to timely disclosure to him, by the prosecution, of all evidence in its actual or constructive possession, custody or control that was favorable to his defense, either because it tended to show his innocence, tended to impeach the credibility of the prosecution's witnesses against him, or both ("*Brady* material").

317. In furtherance of this right, police officers, including the Individual Defendants, had a clearly established duty to timely disclose, either directly to the defense or to the prosecutor's Office, all such *Brady* material.

318. The Individual Defendants violated this duty by knowingly, willfully, intentionally, recklessly, and/or negligently failing to timely disclose to the prosecutors in charge of Galarza's criminal prosecution numerous items of "*Brady*" material, including, but not limited to, the items described in ¶¶ 52, 71, 87, 101, 121-123, 136-141, 148, 152-155, 171, 182-186, 196, 201, 203, 212-214, 223, 226, 232-233, 245, 247-252, 261-262, 271, and 283-284, *supra*.

319. These items were favorable to the defense under *Brady* and its progeny.

320. Considered individually as well as collectively, these items were material to the outcomes of the pretrial suppression hearing and the trial at which Plaintiff was convicted and to his sentencing.

321. The misconduct of the Individual Defendants in failing to disclose the *Brady* material was a substantial cause of Galarza's conviction.

322. But for the Individual Defendants' failure to disclose or cause the disclosure of the *Brady* material, there is a reasonable likelihood that Galarza would have been acquitted or otherwise received a more favorable outcome to his trial.

323. By virtue of the foregoing, the Individual Defendants are liable, pursuant to 42 U.S.C. § 1983, for the violation of Galarza's constitutional rights and his resultant injuries.

**COUNT IV**
**42 U.S.C. § 1983 Failure to intervene by the Individual Defendants**

324. Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

325. Alternatively, the individual defendants had an affirmative duty to Plaintiff to protect his above-mentioned constitutional and statutory rights from infringement by other government officials.

326. Each of the Individual Defendants knew that Plaintiff's constitutional and statutory rights would be violated if he or she did not intervene to prevent such violations.

327. Each of the Individual Defendants had reasonable opportunities to intervene to prevent such infringement of Plaintiff's constitutional and statutory rights.

328. Nevertheless, each of the Individual Defendants deliberately, willfully, recklessly, and/or with deliberate indifference failed to take reasonable steps to intervene.

329. As a result of the Individual Defendants' failure to intervene, Plaintiff's liberty was curtailed, in violation of his Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights.

## COUNT V
## 42 U.S.C. § 1983 and *Monell* Municipal Liability for the Conduct of Employees of the BPD Against the City of Bridgeport

330. Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

331. At all relevant times, the Bridgeport Police Commissioners, Chief, captains, sergeants, lieutenants, detectives, patrolmen, and other police officers and personnel were agents and employees of the Defendant City of Bridgeport.

332. Under the principles of municipal liability for federal civil rights violations, during all times relevant to this Amended Complaint, the City's Police Commissioners, Police Chief, or their authorized delegates had responsibility for training, instructing, supervising, and disciplining police officers and other employees of the BPD with respect to the investigation and prosecution of criminal matters, including homicides.

333. The areas in which the Police Commissioners, Police Chief, or their authorized delegates were responsible for establishing official or de facto policies, customs, and practices and for training, instructing, supervising, and disciplining police officers and other employees of the BPD included but were not limited to:

(a) the constitutional obligation, pursuant to the Fourth and Fourteenth Amendments to the Constitution, not to initiate or continue, or cause the initiation or continuation of, a prosecution without probable cause to believe the suspect has committed a crime;

(b) the constitutional obligation, pursuant to the Fourth, Fifth, Sixth, and Fourteenth Amendments, not to knowingly fabricate or manufacture or cause the fabrication or manufacturing of false, misleading or unreliable evidence, including false confessions, false witness statements, and false or misleading police reports and documentation likely to be relied upon by prosecutors, defense lawyers, judges and jurors during criminal prosecutions;

(c) the constitutional obligation, pursuant to the Fourth, Fifth, Sixth, and Fourteenth Amendments, to make timely disclosure of evidence favorable to the defense to the prosecution so that such evidence may be disclosed to the defense in compliance with *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny; and

(d) the constitutional obligation, pursuant to the Fourth, Fifth, Sixth, and Fourteenth Amendments, not to give or to induce others to give false or misleading testimony.

334. During all times material to this Amended Complaint, the City, through its policymaking officials in the BPD, owed a duty to the public at large and to Plaintiff to implement policies, procedures, training, discipline, customs, regulations, and practices sufficient to prevent, deter, and avoid conduct by BPD employees that would violate or result in the violation of the above-mentioned constitutional obligations.

335. During all times material to this Amended Complaint, policymaking officials at the BPD or their designees knowingly and intentionally breached, or were deliberately indifferent to the breach of, this duty.

336. The failure to properly instruct, train, supervise, and/or discipline employees with regard to the constitutional obligations enumerated in ¶ 333 was the fault of policymaking officials for the Defendant City—including but not limited to the Police Commissioners, Police Chief, and their designees—who knew, or should have known:

(a) to a moral certainty that such policies, procedures, practices, and/or customs concerned issues that regularly arose during criminal investigations and prosecutions;

(b) that such issues presented BPD employees with difficult choices of the sort that instruction, training, supervision, and discipline would have made less difficult;

(c) that BPD employees facing such issues had strong incentives to make the wrong choices, including pressure to make arrests, close cases, and secure prosecutions and convictions and the practice of promoting or rewarding officers who did so;

(d) that the wrong choice by BPD employees concerning such issues would be highly likely to cause the deprivation of the constitutional rights of an accused person and cause him constitutional injury; and

(e) that BPD employees had a history of making wrong choices in such matters.

337. The indifference of policymaking police officials to misconduct during criminal investigations and prosecutions was so pervasive that it resulted in judicial orders over decades requiring or installing outside monitors or masters to try to bring about compliance with federal constitutional requirements.

338. Notwithstanding a history of misconduct in these areas and the inherent obviousness of a need for training and supervision so that police officers would recognize their obligations and the importance of conforming to them, BPD policymakers provided no training concerning proper interrogation techniques so that false confessions and witness statements would not be manufactured for use against criminal suspects and defendants, no training concerning the obligation to avoid the creation of false or misleading reports, and no training regarding the requirements of *Brady.*

339. The general lack of training and supervision was so obvious that Bridgeport policymakers and a consultant spoke openly about it:

(a) In 1985, the Mayor of Bridgeport wrote that "those on the force received little supervision and virtually no training";

(b) In 1989, an independent report written by consultant Police Development Services, according to a newspaper, "concluded, in part, that the department suffers from a lack of training among its most senior officers, who pass on their outdated methods";

(c) In 1990, the Board of Bridgeport Police Commissioners admitted that from July 1987 to July 1990, Bridgeport Police officers had not completed state-mandated training and that "among those who are furthest behind are some of the most senior officers in the Department";

(d) A former Chief of Police subsequently testified at trial in *Jerome Pfeffer v. City of Bridgeport*, *et al*., 5:87-00172 (WWE) that, under Bridgeport's policies, senior officers (like Defendant Lula) required no supervision even though, as the Board of Police Commissioners had acknowledged, they had received the least training;

(e) In 1990, a court-appointed special master complained that there was "an almost total lack of training for supervisors performing critical departmental functions"; and

(f) Despite this complaint, the same special master later found that the Department showed "a continuing indifference to the need to train, and hold accountable, supervisors performing critical departmental functions."

340. The Department's policymakers also knew but failed to investigate, let alone remedy, a chronic lack of discipline for investigative misconduct:

(a) In a 1980 response to interrogatories in *Hector Torres*, *P.P.A*, *et al.*, *v. Joseph A. Walsh*, *et al.*, Civ. No. B 79-367, Bridgeport's Chief of Police affirmed that the Department had never disciplined an officer for violating someone's civil rights, even after judicial findings, and that the Department had never considered an officer's past violations when deciding whether a promotion was appropriate;

(b) In 1990, an Acting Chief agreed with an assessment that the "Department's discipline system had broken down";

(c) In 2003, shortly before Mr. Galarza's trial, with reference to the Board of Police Commissioners' decision not to punish two officers when they were convicted of criminal offenses, a senior police official said, "I have never been this disgusted in my 35 years of police service!"; and

(d) Also in 2003, a court-appointed special master wrote: "Despite changes in chiefs, the officer corps, discipline procedures and reporting requirements, discipline of errant Bridgeport Police Officers is neither swift, certain nor evenhanded."

341. The continual failure of Bridgeport police policymakers to take their constitutional obligations seriously—even while federal courts were monitoring the Department's performance and finding misconduct by police personnel—resulted in a culture of indifference and toleration of all forms of misconduct.

342. Not only were Bridgeport police policymakers indifferent to constitutional violations of the sort described above, but they deliberately trained police personnel to follow unlawful policies, customs or practices relating to criminal investigations, including but not limited to the following:

(a) Using lies, deceit, trickery, threats, suggestion, improper promises, and other manipulative tactics to cause suspects and witnesses to falsely confess or to manufacture false accusations against police suspects;

(b) Only recording inculpatory information in police documents and omitting or destroying exculpatory or impeaching materials and information, thereby misleading prosecutors, defense lawyers, judges and potentially jurors about the strength of the evidence against a criminal suspect or defendant and frustrating compliance with *Brady*;

(c) Defining the police obligation to disclose evidence favorable to a suspect or defendant as applying only to exculpatory, and not to impeachment, evidence, in violation of *Giglio v. United States*, 405 U.S. 150 (1972), and its progeny; and

(d) Seeking benefits for and making deals on behalf of witnesses with outside law enforcement agencies, including outside prosecutors' offices, without informing the local prosecutor in Bridgeport who was relying on or using the witness's testimony, thereby causing violations of *Brady*, *Giglio*, and their progeny.

343. The unlawful policies, customs, and widespread practices of the BPD, as well as the deliberate indifference of BPD policymakers to constitutional violations by BPD officers and

detectives, were a direct and proximate cause of the violations of Plaintiff's rights that occurred in this case and of his constitutional injuries and damages.

**The Consent Decrees**

344. There were two long-term consent decrees involving misconduct by Bridgeport police officers that were still in effect from 1999–2003 due to decades of indifference by BPD policymaking officials.

345. In *Raphael Barros*, *et al. v. Joseph Walsh*, *et al.*, 5:72-cv-00482 (RNC), a group of citizens sued the City of Bridgeport's Chief of Police, Mayor, Police Commissioners, and others, alleging that they had engaged and were engaging in "a pattern of conduct consisting of violence, intimidation and humiliation in denial of rights, privileges and immunities guaranteed to plaintiffs and members of their class by the Constitution of the United States." [1]

346. The citizens complained about "official indifference to their demands for redress of grievances" and that their complaints to the BPD "have either not been acted upon or have been acted upon in such a cursory manner, as to deny . . . any adequate remedy." [2]

347. The case involved numerous known false arrest reports as to which the BPD took no disciplinary action.

348. On December 21, 1973, a federal court entered a consent decree in the *Barros* matter which provided a detailed procedure for responding to civilian complaints about, among other things, arrests without probable cause, illegal detentions, excessive force and brutality, and other illegalities by Bridgeport police.

---

1. Compl., *Raphael Barros, et al. v. Joseph Walsh et al.*, U.S.D.C. Civil Action B 482 (D. Conn. Apr. 6, 1972).

2. *Id.* at ¶¶ 1, 16.

349. While the consent decree required Bridgeport police to promptly investigate and issue findings concerning civilian complaints, just before the investigation of Plaintiff began, records showed that, due to policymakers' continuing indifference, there were still hundreds of unresolved complaints.

350. The BPD acknowledged that almost twice as many civilian complaints had been filed during 2001-2003 as there were police officers, that is, an average of almost two per officer.

351. As a result of the Department's failure to redress such complaints, the consent decree remained in force until well after Mr. Galarza's trial in 2003.

352. In *Bridgeport Guardians*, *Inc. v. Delmonte*, 553 F. Supp. 601, 614 (D. Conn. 1982), a federal court found that the BPD had a history and practice of failing to discipline white police officers, including for civil rights violations, while disproportionately disciplining minority officers.

353. To remedy this practice, the court appointed a special master.

354. He remained on the job for more than 20 years because the unlawful practice was so entrenched that it still had not been remedied by the time of the Galarza investigation and prosecution.

355. As the court wrote in 2005: "The history of this case tells a sad story of public officials repeatedly disregarding and failing to comply with federal Court orders. Neither the assessment of fines nor the threat of more fines has had any measurable impact on more than twenty years of continued violations." Case No. 5:78-cv-00175 (JBA), Dkt. No. 1353 (D. Conn. Apr. 6, 2005) at 2.

356. The court wrote this about two years after Plaintiff Galarza was tried and convicted based upon an investigation that was led by white officers.

357. The Individual Defendants were hired, and they remained on the job, while these consent decrees, and policymakers' indifference to them, set the tone for the Department.

358. Policymakers' indifference to racial bias in policing contributed to racially biased attitudes of police detectives, including Lula and his colleagues, including their view that Black and Hispanic residents of Bridgeport were unworthy of constitutional rights.

359. The special master in the *Guardians* case repeatedly documented this culture and the Department's role in fostering it, making the following findings:

(a) On November 28, 1980, in retaliation for the fatal shooting of a white BPD officer, a group of 30 to 40 police officers closed Black-owned businesses, ticketed legally parked cars owned by Black citizens, and warrantlessly searched apartments occupied by Black residents, to force "someone [to] call downtown" with information about the shooting. The Board of Police Commissioners convened a meeting to allow the public to air its grievances but disbanded without investigating or disciplining any officers.

(b) In the late 1980s, "[A] rash of racial epithets and slurs appeared including the notorious and infamous graffiti 'KKK the answer, try it' in the men's locker room at Police Headquarters" and the "Supervisors failed to investigate properly a number of racially-charged incidents."

(c) In 1990, Sergeant Michael Novia made an "at least covertly racial" remark about a Black officer and his supervisor "effectively covered up the incident."

(d) In 1997, "The entire investigation [of Detective Raymond Sherwood's racial discrimination claim] was conducted in an unprofessional and biased manner,"

and "the record indicates other serious violations of the policy and procedures prohibiting slurs."

(e) As explained more below, the special master found in 1997 that the Department's investigation of the racist retaliation Officer David Daniels experienced was itself characterized by further harassment.

(f) In 2003, "after twenty years of working with the parties to eliminate discrimination in disciplinary actions by the Department, the Special Master is deeply troubled by the blatant disparities in the treatment of the African American female officer as compared with the white male officer."

360. In 1999, just months before the investigation into the Rivera-Velez murders began, the District Court judge who oversaw the *Guardians* case and approved the special master's recommendations summarized some of these and other white supremacist acts and wrote: "While the defendant characterized these violations of court orders as honest mistakes, such 'mistakes' occurred in the absence of any program, plan or steps taken to ensure compliance, and must then be viewed as a form of disrespect for or defiance of the court order and the importance of its underlying purpose of developing a work environment in the Police Department free of race discrimination and harassment."

361. Knowledge that the BPD tolerated racist attitudes in policing encouraged the Individual Defendants in withholding *Brady* material and fabricating a case against Plaintiff, a Hispanic-American.

362. Lula's white supremacist attitudes are indisputable.

363. He repeatedly made racist posts on social media that reinforced racial stereotypes and supported white-nationalistic symbols and ideology.

364. Other Bridgeport Police officers echoed his racist sentiments with comments and likes.

365. In one example, Defendant Lula posted a picture of a fictional neo-Nazi smiling about driving a car with swastikas on it:




366. Former Bridgeport Detective Lynn Gorman liked this post.

367. In another post, Defendant Lula liked comments that suggested that there was a "need to release the dogs" on a group of Black people who were fighting.

368. On this same post of Black people fighting, retired Detective James Lyons commented, "Reminds me of a 50s song. Meanwhile back in the jungle"—an apparent reference to "Stranded in the Jungle," a 1956 song about cannibals.

369. In 2010, Defendant Lula posted on social media that the Black man who was acquitted in the officer's killing 30 years before, referenced in ¶ 359(a) *supra*, had just been released from prison after serving a sentence in a different case. Lula, who was still employed by BPD, was adamant that he and his fellow officers should exact vigilante justice on the man because he was certain that the former defendant committed the murder, despite the man's acquittal. He wrote: "We should track him down!"

370. In another post, Defendant Lula posted a picture that implied that asking a group of Black men, "Are you my dad?" would break up a Black Lives Matter protest.

371. Retired Bridgeport Lieutenant Paul Wargo liked this post.

372. Defendant Lula posted another picture with the words, "When an Indian man marries he scratches the dot off his wife's forehead to see if he's won a gas station, a motel, or a Subway restaurant."

373. Retired Bridgeport Lieutenant Paul Wargo, Sergeant Bruce Belco, Detective Lynn Gorman, Officer John Fiorini, Officer Joseph Savino, and Officer Alexander Wilde all liked the post.

374. A proponent of the white-nationalistic "Great Replacement Theory," Defendant Lula posted a picture of a group of Hispanic men with the text, "Meet the news [sic] citizens that replaced you all."

375. Retired Officers Peter Demotses and Michael Otero liked this post.

376. The Department's unchecked white supremacist culture contributed to the belief of many officers, including the Individual Defendants, that they could violate the rights of minority suspects like Plaintiff Galarza with impunity.

**Fabricating Evidence Through Coercive Interrogation Techniques**

377. For nearly a hundred years, prosecutors, U.S. courts and academics have recognized the dangers of coercive and manipulative interrogation techniques.

378. Knowledge of the dangers of such practices in Connecticut went back to at least 1924. In that year, Homer Cummings, the State's Attorney for Fairfield County, Connecticut, explained that he had decided to dismiss a case, despite a confession extracted by BPD, because "[i]t was the opinion of the physicians that any confession made by the accused was totally without value, and they were of the opinion also that if they cared to subject the accused to a continuous and fatiguing line of interrogation, accusation and suggestion[,] in due course he would be reduced to such a mental state that he would admit practically anything that his interrogators desired." *State v. Harold Israel*, 15 J. of Crim. L. and Criminology 406, 416 (1924).

379. In 1966, in *Miranda v. Arizona*, the Supreme Court described a practice similar to the interrogation technique used by BPD to fabricate evidence here and focused on the following tenets:

(a) "To be alone with the subject is essential to prevent distraction and to deprive him of any outside support";

(b) "The aura of confidence in his guilt undermines his will to resist";

(c) "He merely confirms the preconceived story the police seek to have him describe"; and

(d) "When normal procedures fail to produce the needed result, the police may resort to deceptive stratagems." 384 U.S. 436, 455 (1966).

380. As the Court noted, even less coercive practices "exact[] a heavy toll on individual liberty and trade[] on the weakness of individuals." *Id.*

381. It further warned, "Interrogation procedures may even give rise to a false confession." *Id.* at 445 n. 24 (citing academic work on the topic).

382. In 1997, a leading psychological expert on coerced confessions wrote: "The police often use deception, trickery, and psychologically coercive methods of interrogation" and "these methods, at times, cause innocent people to confess to crimes they did not commit." Saul M. Kassin, *The Psychology of Confession Evidence*, 52 Am. Psychologist 221, 230 (1997).

383. Such practices not only cause innocent suspects to falsely confess their own criminal conduct but also to falsely accuse others.

384. During all relevant times in this case, the BPD required detective to take Police Officer Standards and Training Council courses that trained detectives to utilize such techniques, even though they were highly likely to produce false or unreliable statements and testimony, including the following:

(a) "Reduc[e] their feeling of security";

(b) Make the person feel "trapped, both physically and mentally";

(c) Say they "may be here for a long time";

(d) Hold a person in a "small, plain room (8 x 10) no windows";

(e) Seat them in a chair lower but within two feet of the interrogator to create "a sense of dominance";

(f) Refuse to accept "negative responses," i.e., a subject's protestation of innocence or lack of knowledge;

(g) "Present damaging evidence whether real or false";

(h) Falsely threaten subjects with arrest and prosecution despite lacking evidence necessary to do so;

(i) "[C]reate a feeling of reciprocity—giving water, cigarettes, etc. tends to put him in your debt";

(j) Manipulate subjects into adopting less threatening accounts of their own involvement in order to minimize their own exposure to negative consequences, while implicating the police target of investigation, as a way out of trouble; and

(k) Provide details of the crime to subjects so they can incorporate such details into their statements and reject statements that do not fit into the narrative desired by the detective.

385. Not only did Bridgeport detectives employ such tactics to coerce witnesses, but they also improperly promised leniency, or the hope of leniency, as an additional tool to induce witnesses to adopt a police-suggested version of events, and then would fail to disclose such promises despite their *Brady* obligations.

386. The BPD knew or should have known that such interrogation techniques produced false statements and resulted in the prosecution of innocent suspects, but they endorsed them as a matter of departmental policy, custom, and practice.

387. The endorsement of such behavior communicated to departmental personnel that closing cases was far more important to executives than arresting the right individual and complying with constitutional requirements.

388. When the use of such techniques resulted in credible complaints of coercion, falsification of evidence, and bad faith arrests, Bridgeport police officials took no remedial action due to their indifference.

389. In 1991, a jury found that the City was liable under a *Monell* theory, for falsely arresting an individual without probable cause due to his refusal to consent to a warrantless search of a home. *Pfeffer v. City of Bridgeport*, *et al.*, 5:87-cv-00172 (WWE).

390. An officer involved in the arrest testified that she had received no training on the Fourth Amendment and that no supervisor had told her that it violated Department policy to falsely arrest someone simply because they refused to consent to a search.

391. None of the officers involved in the false, retaliatory arrest in question were investigated or disciplined for the incident, even after a jury found the City liable for their misconduct.

392. Nor did the City change its training, policies, or practices, even after it was found liable under *Monell.*

393. A federal complaint filed in 1989 by Anthony Gonsalvez [3] alleged that Bridgeport Officer Robert Halpin, working with Officer William Bailey, held a gun to his head and ordered another individual to make a false accusation against him. *Gonsalvez v. Bridgeport*, *et al.*, 5:89-cv-00616 (AHN).

394. While the lawsuit was pending, Officer Bailey sent Gonsalvez's lawyer a threatening letter.

395. Gonsalvez amended his complaint to add this additional brazen act of coercion to his lawsuit.

396. The case settled favorably for the plaintiff in 1994.

397. The BPD did not appropriately investigate Halpin's and Bailey's alleged misconduct.

---

[3] The parties in the action interchangeably refer to plaintiff as "Gonsalvez" and "Gonsalves." "Gonsalvez" is used for the sake of consistency.

398. Instead, it promoted Halpin to sergeant in 1992.

399. Halpin was in the same sergeant class as Defendant Lula.

400. In 2001, the Department promoted Halpin to lieutenant.

401. He was in the same lieutenant class as Defendant Lula.

402. In 2002, Halpin was arrested for illegally possessing anabolic steroids and placed on criminal probation.

403. Rather than take any disciplinary action, the Department rewarded him, despite his poor history, with a disability pension.

404. The other officer involved in the Gonsalvez case, William Bailey, also remained in the Department without any negative ramification and, in 2003, together with Defendant Ingrassia, was promoted to sergeant.

405. Bridgeport Police officer Michael Novia filed a federal lawsuit against various Department employees and officials alleging that they attempted to convince another officer to testify falsely against him.

406. There was sufficient credible evidence supporting this accusation that, in 1994, the City agreed to more than double Novia's annual pension and pay him more than $20,000 as a lump sum.

407. No disciplinary action was taken against any of the officers who were named in the lawsuit.

408. In 1998, a jury acquitted criminal defendant Travis Satawhite after the state's key witness denied the police claim that he had given them a formal statement implicating Satawhite.

409. The detectives' conduct was not investigated, and no disciplinary action against them was taken.

410. In 2000, the State dismissed murder charges against Danny Flores after multiple witnesses recanted.

411. No investigation was conducted into why so many witnesses—as would soon happen in the Galarza case—recanted statements obtained from them by the investigating detectives.

412. In 2001, a jury acquitted Marybeth Coover of murder after she recanted her confession to police. Again, the Department conducted no investigation into why she had confessed in the first place and the circumstances of her recantation, even though it had been credited by the jury.

413. In 2001, the Bridgeport State's Attorney dismissed a murder case against Luke Jones and Lyle Jones after learning that one of the prosecution's primary witnesses had recanted.

414. No investigation by the BPD was conducted into the underlying police interrogation.

415. During the 2003 murder trial of Ramon Lopez, a key witness lied because Bridgeport police officers had improperly promised him that, if he lied, "[h]e could go home."

416. Because this conduct was consistent with their practice and policies, after this misconduct was exposed, the BPD conducted no investigation and took no disciplinary action.

417. In the case of Christopher Russo, in August 2002, an officer lied to a defendant that a surveillance videotape in police possession incriminated him and tried to convince him to falsely confess. The officer then failed to disclose the videotape to the prosecutor until many months later, shortly before trial. When the prosecutor finally obtained the video, he had to dismiss the case.

418. The Second Circuit described this misconduct as "shocking." *Russo v. City of Bridgeport*, 479 F.3d 196, 210 (2d Cir. 2007).

419. Sergeant Joseph[4] Sherbo supervised the investigation.

420. The Department did not investigate this misconduct.

421. The officer testified that no supervisor ever discussed the misconduct with him, let alone took any disciplinary action against him, for attempting to cause the false confession or concealing exculpatory evidence.

422. No supervisor discussed this matter with the officer because his actions were consistent with the Department's policies and practices.

423. During the 2003 murder trial of Michael Holbrook, a witness testified falsely against the defendant because a detective said to him, "I know you have this attempted murder case pending, do you want to help yourself?" and "we know you was (sic) at [the murder scene] that night of the homicide," even though the detective knew or should have known the witness wasn't there.

424. No investigation was conducted into the behavior of the detective.

425. As explained above, ¶¶ 238 – 242, *supra*, in the 2002 case of Rusty Rodriguez, Defendants Lula and Ingrassia produced a false statement and a false prosecution utilizing the same coercive interrogation practices that they used in Galarza's case.

426. Before trial, the witness recanted, the case fell apart, and, on March 27, 2002, the judge granted Rusty Rodriguez's motion for acquittal.

[4]The Second Circuit uses the first name "John" for Joseph Sherbo. This is a typographical error. There are multiple references to Joseph Sherbo in the *Bridgeport Post* during this time but no reference to John Sherbo.

427. None of Lula, Ingrassia, or the other detectives faced any negative consequence despite their having knowingly caused a witness to adopt a false story and the prosecution of an innocent man.

428. Indeed, for Vincent Ingrassia the opposite occurred: he was promoted to sergeant in the beginning of 2003.

429. Evidently, the detectives' conduct represented the policy and practice of the Department.

**Fabricating Evidence by Including False Information in Police Documents**

430. BPD policymakers were deliberately indifferent to the police practice of misleading prosecutors and the defense by including false information in police reports and preparing reports that were materially misleading because they omitted information favorable to the police suspect.

431. In many of the aforementioned cases in which officers coerced witnesses into providing false statements, they documented the false statements without including the coercive tactics and inducements they used to cause them, thereby making the statements appear far more credible than they in fact were. And there were numerous additional documented instances of officers creating false or misleading reports.

432. In 1984, Bridgeport Officer William Perez used an unregistered firearm to unconstitutionally shoot and kill Carlos Santos as he fled.

433. Perez at first falsely minimized his conduct, claiming in his report that he had fired just one shot.

434. However, four days later, he was forced to admit that in fact he had fired two shots.

435. Notwithstanding his initial falsification, he was not disciplined.

436. That same year, Perez was embroiled in another controversy because he failed to stop another officer from beating a woman outside of a store she owned.

437. Despite these two troubling incidents, Perez was promoted to detective.

438. In May of 1986, the Board of Police Commissioners found that Perez had violated department policy in his shooting of Carlos Santos by using an unregistered firearm, but it imposed no penalty.

439. In 1988, the City of Bridgeport settled the Santos case, on behalf of Officer Perez, for more than $100,000.

440. Even then, the BPD conducted no adequate investigation into him and imposed no discipline.

441. Just two years later, Perez made the news again for another false police report.

442. In May of 1990, a restaurant owner and a customer sued various Bridgeport police officers, including Perez, for beating, falsely arresting, and robbing them the previous year. The complaint also alleged that the officers hid their misconduct by failing to accurately document the seizure of property. A criminal investigation was opened.

443. Although the Bridgeport Police Chief later testified that the officers refused to cooperate with the investigation, no remedial action of any kind was taken.

444. Assistant State's Attorney Jonathan Benedict was so frustrated with the Department's refusal to cooperate with the investigation that he wrote the Board of Police Commissioners a letter to complain about it.

445. While the civil lawsuit related to this incident was pending, the *Bridgeport Post* reported that Perez was involved in multiple lawsuits, with settlements totaling $399,250, but was never disciplined.

446. Rafael Villegas, another officer involved in the restaurant incident, testified that he was the subject of multiple complaints but no one from the Department ever took the basic investigatory step of asking him about the incident.

447. Another major case with credible allegations of fraud in police reports involved the beating of John Colquit.

448. On October 16, 1984, James Halpin and Robert Christy arrested Colquit.

449. They then beat him behind police headquarters.

450. They beat him so badly that he spent 10 days in the hospital and received treatment for a broken jaw, fractured left eye orbital, concussion, shoulder sprain, right eye injuries, and blood loss.

451. An incident report submitted by Halpin and Christy falsely claimed that Colquit somehow hurt himself by simply falling against a parked police van.

452. On January 23, 1985, a Superior Court judge opened a grand jury investigation into the incident.

453. In October of that year, Colquit sued Halpin and Christy for excessive force and alleged that Christy, Halpin, and others falsified police paperwork to cover it up.

454. In September of 1987, while the lawsuit was pending, Christy and Halpin pleaded guilty in the Superior Court to first-degree reckless endangerment and were fined $1,000 each.

455. Despite these criminal convictions and credible allegations, the BPD allowed the officers to continue to work for the Department and even permitted them to resume work earlier than expected.

456. On December 5, 1989, the District Court granted summary judgment against Officers Christy and Halpin.

457. In 1990, Colquit filed a third amended complaint that alleged that Sergeant David Hoyt had lied to Internal Affairs to cover up the crimes.

458. Despite the criminal convictions and serious allegations of falsifying police records, on January of 1992, the BPD *promoted* Christy and Halpin to sergeant.

459. Defendant Lula was in their sergeant's class.

460. In November of 1992, the Colquit lawsuit settled for $180,000 (nearly half a million dollars in today's dollars).

461. A year later, despite this extraordinary settlement and his attempt to cover up criminal conduct by the officers under his supervision, Sergeant David Hoyt was promoted to lieutenant to supervise patrol.

462. In 2000, during the investigation of Plaintiff Galarza by the Detective Bureau, Lieutenant David Hoyt supervised the entire bureau.

463. In 2001, Robert Christy, despite the settlement and criminal conviction, was promoted to Lieutenant, in the same class with Defendant Lula.

464. Robert Christy then supervised a portion of the investigation of the Rivera-Velez murders.

465. In 1991, as explained at ¶¶ 389 – 391, *supra*, a jury found the City liable, under a *Monell* theory, after officers falsely arrested an occupant of a home for refusing to consent to a search of a home. *Pfeffer v. City of Bridgeport*, *et al.*, 5:87-cv-00172 (WWE).

466. The case also involved false reporting because, in documenting the incident in a manner blaming the civilian victim, the reports omitted that the officers had beaten him and broken his rib.

467. In the 1992 suit filed by Bridgeport Officer Michael Novia referenced above, *supra* at ¶ 405, Officer Novia alleged that various Department employees and officials submitted falsified records against him. The City paid him substantial compensation, but none of the police employees were investigated or disciplined.

468. In 1994, Grace and Emma Calovine sued various Bridgeport Police officers, including Louis C. Piccirillo, Paul F. Carlson, and Ada Curet for, among other things, illegally searching their apartment and providing false information in police reports to cover up their misconduct.

469. In 1997, during trial, Officer Curet admitted that she had written a report about the search that contained false information.

470. Officer Curet testified that no one from the Department told her that her fabricated report violated the Department's policies and she believed her report did not violate Department policy.

471. Two supervisors who testified agreed with her.

472. Evidently, she was right—she was not investigated or disciplined.

473. In 1998, Fernando Botelho sued Officer Elias DeLaRosa for, among other things, falsely accusing Mr. Botelho of a crime.

474. Specifically, Botelho alleged that DeLaRosa had unjustifiably punched him in the face so hard that he fractured his nose, cheeks, and jaw and that DeLaRosa had tried to cover up his misconduct by falsely charging Botelho with assaulting an officer.

475. There was sufficient credible evidence supporting this accusation that the City settled the case for $27,500, or approximately $56,432 in today's dollars.

476. Officer DeLaRosa was neither investigated nor disciplined for this misconduct.

477. In 1998, a Bridgeport police *lieutenant*, John Carraro, improperly chased Jerome Hill in his car before other officers beat him. To cover up his misconduct, Carraro ordered other officers to change the speeds in their reports to make the chase look lawful.

478. Shortly after he made that false report, Lieutenant Carraro was arrested for asking a detective to check criminal and motor vehicle records for information about a former girlfriend and her boyfriend. He tried to cover it up by falsely telling the detective who performed the search that it was for a case.

479. Despite the multiple allegations of fraud, Lieutenant John Carraro was allowed to retire on disability instead of facing investigation or discipline.

480. In another example of falsehood made by a supervising Bridgeport Police officer from 1998, a District Court judge approved of a special master's finding that Captain John Donovan had not testified credibly to the Court.

481. The Department never investigated this incident or retrained and disciplined anyone for it.

482. On June 13, 2003, Dolores Fonseca sued Bridgeport Officers Jason Alterio and Jorge Larregui for maliciously prosecuting her based on false information in police reports.

483. There was sufficient credible evidence supporting this accusation that the City settled the case.

484. The officers sued by Fonseca were not disciplined or even investigated for the false report.

485. The practice of creating false reports was so pervasive within the Department that it even filed inaccurate reports with the special master in one of the longstanding consent decrees described above.

486. There, just weeks after Mr. Galarza's trial, the special master reported: "Despite the Court's order and the sanctions the Department paid for its non-compliance, the Department continues to file late, incomplete, and inaccurate reports."

**Withholding *Brady* Material**

487. The BPD had unlawful *Brady* policies and practices and policymakers were deliberately indifferent to whether officers complied with the *Brady* rule or not.

488. Training materials on taking witness statements defined as "irrelevant and immaterial" witness information that failed to supply "proof of criminal violations [and] . . . substantiate[] the elements of the crime being investigated."

489. Consistent with this training, Defendant Lula testified that he was trained to "just put enough to secure an arrest warrant" and that he would not include exculpatory information.

490. Defendant Ingrassia testified that supervisors reviewed warrants and the only supervisor requirement for warrants he identified was proof of probable cause.

491. Meanwhile, BPD had no official or published policy or procedure affirmatively requiring compliance with *Brady.*

492. The only rule it had regarding disclosure of evidence favorable to a suspect or defendant appeared in a Police Officer Standards and Training Council training and concerned a state statute requiring disclosure of "exculpatory evidence."

493. A policy of only requiring disclosure of exculpatory evidence by definition violated *Brady* because *Brady* also requires disclosure of impeachment evidence.

494. The Department's policy of not disclosing impeachment evidence was furthered by its practice of having detectives deal directly with outside prosecutors to make deals and to obtain leniency for cooperating witnesses, without notifying the assigned Bridgeport prosecutor or prosecutors who would be using the witnesses involved against the defendant.

495. This practice, followed by Lula and Ingrassia in this case, was the widespread practice in the Department.

496. The case of Eric Floyd illustrates this point.

497. In 1995, a jury convicted Eric Floyd of murder and other offenses.

498. Michael Younger, who was facing criminal charges himself, testified against Floyd.

499. After Floyd's conviction, his attorney learned that Younger's prosecutors had provided multiple benefits to Younger, including leniency in his own separate case, and a hearing was held into whether the prosecution had violated *Brady* by not disclosing the benefits or promises of benefits.

500. During that hearing, held in 1998, it was revealed that Sergeant Sherbo had written a letter to Younger's prosecutor seeking leniency but had not disclosed it to Floyd's prosecutor.

501. Sergeant Sherbo testified in a related proceeding that this was normal procedure.

502. The Connecticut Supreme Court, while upholding the lower court's decision declining to overturn the conviction, condemned as "inexcusable" the prosecutor's failure to disclose records exposing a prosecution witness's likely expectation of leniency in exchange for testifying favorably for the prosecution. *See State v. Floyd*, 253 Conn. 700, 748 (2000).

503. Under this decision, handed down shortly before the investigation of Mr. Galarza was conducted, it should have been obvious to BPD policymakers that the BPD's policy and practice not to disclose such impeachment material was unconstitutional.

504. The Department never investigated Sherbo's failure to turn over the letter and he remained a sergeant, later supervising the even more "shocking" misconduct in *Russo*, *see* ¶ 417, *supra*.

505. The policy and practice of failing to produce cooperation letters remained unchanged during the prosecution of Plaintiff.

506. Indeed, consistent with this unlawful practice, Defendant Lula testified, during a 2024 hearing to dismiss the indictment against Galarza, that he did not discuss with Galarza's prosecutor what cooperators against Galarza had "going on in their respective cases."

507. As a result, the prosecutor did not learn about the impeachment information that his office had a duty to disclose to the defense.

508. The Department's policy and practice not to require *Brady* material to be disclosed at all, particularly impeachment information, its willingness to tolerate such misconduct, and its deliberate indifference to it, was shown by its failure to take any remedial action in numerous other cases.

509. On March 16, 1994, the Connecticut Supreme Court reversed the murder convictions of Roy White and Winston Watkins for *Brady* violations. *See State v. White*, 229 Conn. 125 (1994).

510. The Court found that Bridgeport police had failed to turn over both exculpatory evidence and impeachment material.

511. The exculpatory evidence consisted of proof that someone else committed the crime.

512. The impeaching evidence consisted of a prior inconsistent statement by a significant prosecution witness.

513. The court noted that the suppressed evidence had been "in the police files rather than the prosecutor's files." *Id.* at 135.

514. A couple months later, the State dropped the case and White and Watkins walked free.

515. The *Connecticut Post* announced the result in an article and this court decision could not have escaped the attention of BPD policymakers.

516. Yet, none of officers responsible were either investigated for misconduct or disciplined; rather, they were promoted.

517. One of the officers involved, John Uliano, was promoted to sergeant in 1992 while the case was being appealed and remained a sergeant after the reversal.

518. Another officer, Robert Evans, was promoted to sergeant in 1997 and became a lieutenant in 2001.

519. When Evans was promoted to lieutenant, Defendant Kerwin became a captain at the same time.

520. Another member of the investigative team in the White-Watkins case was Detective Joseph Procaccini. He had been convicted of federal civil rights criminal violations in 1977 and 1991.

521. After the first violation, Procaccini remained on the force.

522. Procaccini avoided discipline for the second crime by retiring before he entered his plea.

523. He kept his pension.

524. Another murder prosecution, that of a defendant named Leonel Diaz, collapsed in 2001 due to the Department's withholding of exculpatory evidence.

525. In that case, Bridgeport police failed, during three trials over nine years, all of which ended in mistrials, to disclose a police report that included four witness statements.

526. The undisclosed witness statements in the Diaz case either inculpated third parties or impeached the prosecution's witnesses by describing events inconsistent with the key witnesses' testimony.

527. This fiasco, too, was covered by The *Connecticut Post* and thus was known to policymakers.

528. Yet the author of the report and the officer who failed to disclose it, Sergeant James Remele, was never investigated or disciplined for withholding this crucial report.

529. Remele was another member of Defendant Lula's 1992 sergeant's class.

530. In the case of Ambrose Gooden, a police officer omitted from her report that the perpetrator had walked with an unusual gait—his foot was turned in.

531. Although Gooden had no such unusual gait, he was arrested.

532. When he provided an alibi, the assigned investigator, an acting detective, omitted the alibi from his report and never bothered to investigate it.

533. It took 10 months for the exculpatory facts to come to light and for the judge to finally dismiss the case.

534. In 1999, a jury awarded Gooden more than a million dollars in damages.

535. Providing further notice to police policymakers, *The Connecticut Post* published an editorial entitled, “Plaintiff deserves every cent of award,” and told its readers, “True, city taxpayers will ultimately have to foot the bill, but maybe this fiasco will show police officials that officers need better training and supervision.”

536. Presciently, the editorial concluded, “reforms must take place before another innocent citizen suffers needlessly at the hands of those who are supposed to protect and serve.”

537. None of the police officers involved in the Gooden case were investigated or disciplined. Instead, the officer who omitted the unusual gait of the perpetrator from her report and thereby caused Gooden to be falsely arrested, Nina Thomas, was promoted, in 1991, to sergeant in the same class as Defendant Lula; in 1998 she became a lieutenant.

538. The investigator in the Gooden case was promoted to full detective and remained a detective until at least 2009.

539. Based on information and belief, the BPD never provided the training, supervision, and discipline that the *Connecticut Post* had so fervently demanded.

540. The aforementioned *Russo* case is another example of a flagrant *Brady* violation committed by Bridgeport police.

541. Christopher Russo was arrested in September 2002 for a Bridgeport gas station robbery that occurred in August.

542. Shortly after the robbery, Bridgeport police officers retrieved a videotape of the crime which showed that Russo was not the perpetrator, but they refused to provide it to Russo or the prosecutor.

543. In April 2003, after Russo had been in custody for seven months, the prosecutor finally was able to obtain the videotape and dismissed the case because it showed the robber was not Russo.

544. During Russo's subsequent lawsuit, one of the officers acknowledged during his deposition that he had never been told that he had an obligation to disclose even exculpatory evidence. *Russo v. City of Bridgeport*, No. 3:03-cv-01792 (RNC), 2008 WL 2167881, at *2 (D. Conn. May 21, 2008).

545. In a 2010 social media post, Defendant Lula, while still employed by the Department, appeared to joke openly with others about the Department's practice of withholding exculpatory evidence about suspects the Department investigated but never successfully charged.

546. He wrote, "Office wisdom: If at first you don't succeed, remove all evidence you ever tried!"

547. Indicating that Lula's view had been widespread at the Department, former Bridgeport Police Union President Frank Cuccaro signaled his agreement.

548. Bridgeport Police Officer Gabe Meszaros responded, "Spoken like a true Bridgeport PD Veteran!! Lol!!"




**Code of Silence**

549. The fabrication and suppression of evidence and related investigative misconduct was further encouraged and perpetuated by a "code of silence" followed by BPD officers with the knowledge and acquiescence of policymakers.

550. This code of silence encouraged the Bridgeport Police Department's culture of impunity for officer misconduct of all kinds, including the fabrication of evidence and *Brady* violations such as occurred in Plaintiff Galarza's case.

551. The existence of the Department's code of silence was widely known:

(a) In 1990, the President of the Board of Police Commissioners testified that the Board assumed it could not prove misconduct because officers would refuse to testify against other officers.

(b) Also in 1990, State's Attorney Benedict complained that more than a dozen officers had refused to participate in his office's criminal investigation of a complaint of police misconduct, and decried this "spirit of non-cooperation" for effectively killing the investigation.

(c) A year later, Chief Sweeney wrote, "I recognize that there is a strong bond and closeness between officers that fosters a 'code of silence.' The existence of that code however may encourage some officers to believe that they will not be reported for a serious wrongdoing when it occurs."

552. Despite knowing about the dangers posed by the code of silence and claiming to disfavor it, the Department, in reality, *enforced* it.

553. In 1994, a jury awarded John Dobosz over $100,000 because the Department had retaliated against Officer Dobosz for testifying against a fellow officer in a federal civil rights case.

554. After Dobosz's testimony, someone in the Department drew swastikas and wrote "rat" and "FBI rat" next to his name.

555. The Department *punished Dobosz* for his testimony—not his tormentors for their misconduct—by transferring him to a less desirable unit and, eventually, suspending him.

556. Three years later, a court-appointed special master reiterated a finding that Officer David Daniels faced a similar fate for testifying in another federal civil rights case.

557. The special master held that the officer's "harassment, which spanned more than five years, took the form of ostracism, repeated radio interference, harassing telephone calls, and racially-pointed vandalism to his car."

558. As the special master wrote in 1997, "Efforts by the Department to respond to Officer Daniels's complaints were marked by poor communication, and, sometimes, further harassment."

559. Just as the Chief had predicted in 1990, this code of silence, the special master wrote, "encourage[d] some officers to believe that they will not be reported for a serious wrongdoing when it occurs."

560. In combination with BPD's failure to investigate or discipline officers accused of misconduct, the code of silence emboldened officers, including the Individual Defendants in this case, to fabricate evidence, to suppress *Brady* material, and, ultimately, to cause Galarza's wrongful conviction.

561. The aforementioned unconstitutional or deliberately indifferent policies, procedures, training, discipline, customs, regulations, and/or practices of the BPD were a direct, foreseeable, proximate, and/or substantial cause of the violations of Plaintiff Galarza's federal constitutional rights in this case by employees of the BPD, including the Individual Defendants, and of his resulting injuries.

562. By virtue of the foregoing, the Defendant City is liable to Plaintiff pursuant to 42 U.S.C. § 1983.

## STATE LAW CLAIMS

### COUNT VI
### Negligent Infliction of Emotional Distress by the Individual Defendants

563. Plaintiff repeats and realleges the above paragraphs as if fully set forth here.

564. The Individual Defendants knew or should have known that their negligent conduct in investigating Plaintiff and pursuing his criminal prosecution, as set forth in the

Seventh Cause of Action, carried an unreasonable risk of causing emotional distress and that such distress might result in illness or bodily harm.

565. Plaintiff suffered severe and extreme emotional distress which was reasonable and foreseeable in light of the conduct of the Individual Defendants.

566. As a result, Plaintiff suffered the damages hereinbefore alleged.

## COUNT VII
## Negligence, in Violation of Plaintiff's Civil Rights under Connecticut Law by the Individual Defendants

567. Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

568. The Individual Defendants were police personnel acting within the scope of their employment and under color of law.

569. They had a duty to Galarza to exercise reasonable care in the investigation and arrest of Galarza for the Rivera and Velez murders, in documenting their investigation, and in disclosing evidence related thereto.

570. They had a duty to Galarza to protect him from the unlawful and negligent conduct of other BPD personnel, to prevent and/or rectify the fabrication of evidence, and to fulfill their ongoing duty to disclose all exculpatory and impeachment evidence pursuant to Plaintiff's civil rights entitlements under the federal and Connecticut constitutions, Conn. Gen. Stat. § 54-86c(c), and Connecticut common law.

571. Defendants negligently failed to fulfill those duties by their conduct set forth above.

572. It was and should have been apparent to Defendants that said negligent conduct was likely to violate Plaintiff's civil rights, and to subject him, a specifically identifiable victim of their negligent misconduct, to severe and imminent harm on a continuing basis.

573. As a direct and proximate result of the negligence and breach of duty of the Defendants as aforesaid, Plaintiff suffered severe and ongoing damages as described above.

## COUNT VIII
## Indemnification under Conn. Gen. Stat. §7-465 against the City of Bridgeport

574. Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

575. As described in the preceding paragraphs and Counts, the Individual Defendants were police personnel acting within the scope of their employment and under color of law.

576. As set forth above, said Defendants infringed upon Plaintiff's federal and state civil rights and Connecticut statutory and common law rights and caused him personal injuries and damages while performing their duties and acting within the scope of their employment.

577. As a direct and proximate result of this conduct, Plaintiff suffered severe and ongoing damages as hereinbefore alleged.

578. Within six months after the foregoing causes of action accrued, pursuant to Conn. Gen. Stat. § 7-465, Plaintiff filed with the City Clerk for the City of Bridgeport written notice of his intention to commence this action and of the time when and the place where the damages were incurred or sustained.

579. To the extent the Individual Defendants are determined to be liable to Galarza and are obligated to pay damages, under any of Counts VI or VII, Defendant City of Bridgeport is liable to pay any such damages on behalf of the Individual Defendants pursuant to the City of Bridgeport's statutory liability imposed by Conn. Gen. Stat. §7-465.

**COUNT IX**

**Direct Action under Conn. Gen. Stat. § 52-557n against the City of Bridgeport**

580. Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

581. The City of Bridgeport, its police department, and their employees, officers and agents, including the Individual Defendants, had a duty to Galarza to exercise reasonable care in the investigation and arrest of Plaintiff for the Rivera and Velez murders and in the investigation, reporting and disclosure of evidence related thereto, to protect him from the unlawful and/or negligent conduct of BPD personnel, and to prevent and/or rectify the violation of his civil rights, statutory rights and common law rights, including the suppression of exculpatory and impeachment evidence.

582. As discussed above, the City, the BPD, and their employees, officers and agents, including the Individual Defendants, breached these duties in a number of ways, thereby directly and proximately causing Galarza's wrongful arrest, prosecution, conviction, and incarceration.

583. In addition, the City of Bridgeport and its police department failed to exercise reasonable care in preventing and/or rectifying the fabrication of inculpatory evidence, in the misuse of a coercive and confrontational interrogation tactics and the failure to document, preserve and disclose any record thereof, in the failure to supervise or discipline or thereafter rectify the misconduct of the Individual Defendants, and in its ongoing failure to establish adequate procedures and oversight for preservation and disclosure of exculpatory evidence and for compliance with the mandatory provisions of Conn. Gen. Stat. § 54-86c(c), and thereby itself proximately causing Galarza's wrongful arrest, prosecution, conviction, and continued incarceration.

584. Even to the extent the City, its police department, and their employees, officers and agents were performing discretionary functions in some of the foregoing respects, they disregarded the risk of imminent harm to Plaintiff, an identifiable person.

585. Pursuant to the statutory liability imposed by Conn. Gen. Stat. § 52-557n, the City of Bridgeport is liable for the damages caused by the acts and omissions of its employees, officers and agents, including the Individual Defendants, and by its own acts and omissions as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Galarza demands judgment against Defendants as follows:

(a) compensatory damages for the damages described above of not less than $75,000,000;

(b) punitive damages of not less than $75,000,000;

(c) reasonable attorneys' fees, together with costs and disbursements, under 42 U.S.C. § 1988 and the inherent powers of this Court;

(d) pre-judgment interest as allowed by law; and

(e) such other and further relief as this Court may deem just and proper.

LAW OFFICES OF JOEL B. RUDIN, P.C.

/s/ *Joel B. Rudin*
Joel B. Rudin (ct25097)*
David E. Rudin (ct209360)*
Sam Thypin-Bermeo (ct209359)*
Sam Kuhn (ct209361)*
Partha Sharma (ct209362)*
152 West 57th Street, 8th Floor
New York, New York 10019
jbrudin@rudinlaw.com
david@rudinlaw.com
samtb@rudinlaw.com
skuhn@rudinlaw.com
psharma@rudinlaw.com
Telephone: (212) 752-7600
Fax: (212) 980-2968
*Admitted *pro hac vice*

THE LAW OFFICE OF KENNETH ROSENTHAL

/s/ *Kenneth Rosenthal*
Kenneth Rosenthal (ct05944)
One Audubon Street, 3rd Floor
New Haven, Connecticut 06511
krosenthal@gs-lawfirm.com
Telephone: (203) 285-8545

*Attorneys for Plaintiff Luis Galarza*

Dated: New Haven, Connecticut
July 21, 2026