**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| LUIS GALARZA,<br><br>Plaintiff,<br><br>- against -<br><br>THE CITY OF BRIDGEPORT; LYNN KERWIN, THOMAS LULA, AND VINCENT INGRASSIA, Individually and in Their Official Capacities as Bridgeport Police Officers,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No. 3:26-cv-00588 (VDO)** |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COUNT V OF THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ ii

TABLE OF AUTHORITIES ........................................................................................ iv

INTRODUCTION ........................................................................................ 1

STANDARD OF REVIEW ........................................................................................ 2

STATEMENT OF FACTS ........................................................................................ 4

A. The Galarza Investigation ........................................................................................ 4

B. *Monell* ........................................................................................ 6

1. Bridgeport's Unlawful *Brady* Policies and Practices ........................................ 6

2. Bridgeport's Unlawful Evidence Fabrication Policies and Practices .......... 8

3. Bridgeport's Practice of, and Deliberate Indifference to, Initiating Arrests and Prosecutions Without Probable Cause (Malicious Prosecution) .......... 9

4. BPD's Deliberate Indifference to Investigative Misconduct Generally .... 10

ARGUMENT ........................................................................................ 11

I. Because the City Fails to Dispute Many of Plaintiff's Legal Theories, Its Motion Must be Denied. ........................................................................ 11

II. The Amended Complaint Plausibly Pleads That the City is Liable Under *Monell* for *Brady* Violations.. ........................................................................ 13

A. An express written policy caused Galarza's *Brady* violations ........................... 13

B. Three BPD practices caused Galarza's *Brady* violations. ................................ 13

1. BPD had a practice of withholding letters about cooperators' benefits..... 15

2. BPD had a written policy and practice of withholding all impeachment information. ........................................................................ 16

3. BPD had a practice of withholding exculpatory information.. .................. 18

4. The City ignores Galarza's most powerful allegations and misconstrues *Connick v. Thompson*. ........................................................................ 19

C. Policymakers were deliberately indifferent to *Brady* violations ........................ 22

1. Policymakers were deliberately indifferent to the need to supervise or discipline BPD officers with respect to *Brady*. .......... 22

2. Policymakers were deliberately indifferent to the need to train officers about *Brady*. .......... 28

III. The Amended Complaint Plausibly Pleads That the City is Liable Under *Monell* for Evidence Fabrication. .......... 30

A. Express written policies caused detectives to fabricate evidence against Galarza. .......... 31

B. Three BPD practices caused detectives to fabricate evidence against Galarza. .......... 32

1. BPD had a policy and practice of fabricating evidence by writing reports with material omissions. .......... 32

2. BPD had a policy and practice of fabricating evidence by coercing and improperly motivating witnesses. .......... 34

3. BPD had a practice of fabricating evidence by writing false information in reports. .......... 35

C. Policymakers were deliberately indifferent to the need to supervise, discipline and train officers to prevent evidence fabrication. .......... 37

CONCLUSION .......... 40

# TABLE OF AUTHORITIES

**Cases**

*Agosto v. New York City Dept. of Educ.*,
982 F.3d 86 (2d Cir. 2020) .......... 11, 12

*Aguilar v. City of S. Gate*,
2013 WL 300914 (C.D. Cal. Jan. 25, 2013) .......... 21

*Amnesty Am. v. Town of West Hartford*,
361 F.3d 113 (2d Cir. 2004) .......... *passim*

*Anderson News, LLC v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012) .......... 3

*Archie v. Covington County*,
2021 WL 1182370 (M.D. Ala. Mar. 29, 2021) .......... 20

*Arista Records LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2010) .......... 3

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 2, 3

*Connick v. Thompson,*
563 U.S. 51 (2011) .......... 19, 20, 21, 29

*Cristini v. City of Warren*,
2012 WL 5508369 (E.D. Mich. Nov. 14, 2012) .......... 21

*DiPippo v. Cnty. of Putnam*,
2019 WL 1004152 (S.D.N.Y. Feb. 28, 2019) .......... 12

*Dixon v. City of Syracuse*,
493 F. Supp. 3d 30 (N.D.N.Y. 2020) .......... 4

*Est. of Osuna v. County of Stanislaus*,
392 F. Supp. 3d 1162 (E.D. Cal. 2019) .......... 3

*Farvardin v. Santos*,
2014 WL 7150023 (E.D. Pa. Dec. 15, 2014) .......... 21

*Ferrari v. County of Suffolk*,
2013 WL 4017022 (E.D.N.Y. Aug. 6, 2013),
*rev'd on other grounds*, 845 F.3d 46 (2d Cir. 2016) .......... 15

*Floyd v. City of New York*,
813 F. Supp. 2d 417 (S.D.N.Y. 2011),
*on reconsideration*, 813 F. Supp. 2d 457 (S.D.N.Y. 2011) .................................................... 36

*Gentile v. Cnty. of Suffolk*,
926 F.2d 142 (2d Cir. 1991)........................................................................................................ 37

*Giglio v. United States*,
405 U.S. 150 (1972)............................................................................................................... 6, 13

*Goode v. Newton*,
2013 WL 1087549 (D. Conn. Mar. 14, 2013) (Arterton, J.)...................................................... 3

*Gravelet-Blondin v. Shelton*,
728 F.3d 1086 (9th Cir. 2013) .................................................................................................. 15

*Jackson v. City of New Haven*,
No. 3:19-CV-0388 (RNC) (D. Conn. Feb. 15, 2024) (Chatigny, J.) ....................................... 22

*Jeffes v. Barnes*,
208 F.3d 49 (2d Cir. 2000)......................................................................................................... 27

*Jenkins v. City of New York*,
478 F.3d 76 (2d Cir. 2007)......................................................................................................... 12

*Jimenez v. City of New York*,
2026 WL 2617389 (2d Cir. Sept. 4, 2026) ................................................................................ 27

*Jones v. City of New York*,
603 F. App'x 13 (2d Cir. 2015) .................................................................................................. 15

*Jones v. Town of East Haven*,
493 F. Supp. 2d 302 (D. Conn. 2007) (Thompson, J.),
*reversed on other grounds*, 691 F.3d 72 (2d Cir. 2012) .......................................................... 37

*Knipe v. Skinner*,
999 F.2d 708 (2d Cir. 1993)........................................................................................................ 13

*Morant v. City of New Haven*,
2025 WL 2821260 (D. Conn. Oct. 3, 2025) (Nagala, J.)................................................. *passim*

*Lewis v. City of New Haven*,
2017 WL 101304 (D. Conn. Jan. 10, 2017) (Underhill, J.) ............................................... 23, 38

*Lucente v. Cnty. of Suffolk*,
980 F.3d 284 (2d Cir. 2020)........................................................................................... *passim*

*Lynch v. Town of Amherst*,
2026 WL 1758176 (W.D.N.Y. June 18, 2026) ........................................................ 12

*Maldonado v. City of Hammond, Ind.*,
2015 WL 1780133 (N.D. Ind. Apr. 20, 2015) ........................................................ 21

*Matusick v. Erie Cnty. Water Auth.*,
757 F.3d 31 (2d Cir. 2014) ........................................................ 14

*Parkinson v. Desormeau*,
2024 WL 4973490 (E.D.N.Y. Dec. 4, 2024) ........................................................ 36

*Pembaur v. City of Cincinnati*,
475 U.S. 469 (1986) ........................................................ 12

*Poventud v. City of New York*,
2015 WL 1062186 (S.D.N.Y. Mar. 9, 2015) ........................................................ 20

*Reynolds v. Giuliani*,
506 F.3d 183 (2d Cir. 2007) ........................................................ 28, 29

*Safepath Sys. LLC v. N.Y.C. Dep't of Educ.*,
563 F. App'x 851 (2d Cir. 2014) ........................................................ 3

*Sledd v. Lindsay*,
102 F.3d 282 (7th Cir. 1996) ........................................................ 26

*Sorlucco v. N.Y.C. Police Dep't*,
971 F.2d 864 (2d Cir. 1992) ........................................................ 14

*Sornberger v. City of Knoxville*,
434 F.3d 1006 (7th Cir. 2006) ........................................................ 15

*Stern v. City of New York*,
2015 WL 918754 (E.D.N.Y. Mar. 3, 2015) ........................................................ 20

*Tahbaz v. Vigilant Ins. Co.*,
778 F. Supp. 3d 480 (D. Conn. 2025) (Dooley, J.) ........................................................ 2, 12

*Torcivia v. Suffolk County*,
17 F.4th 342 (2d Cir. 2021) ........................................................ 15

*Trujillo v. City & Cnty. of Denver*,
2017 WL 1364691 (D. Colo. Apr. 14, 2017) ........................................................ 21

*Turpin v. Mailet*,
619 F.2d 196 (2d Cir. 1980) .......... 12, 29

*Vann v. City of New York*,
72 F.3d 1040 (2d Cir. 1995) .......... 22

*Walker v. City of New York*,
974 F.2d 293 (2d Cir. 1992) .......... 28, 29

*Williams v. City of Hartford*,
2026 WL 309602 (D. Conn. Feb. 5, 2026) (Russell, J.),
*adhered to on reconsid.,* 2026 WL 1750390 (D. Conn. June 17, 2026) .......... 15, 21, 23, 24

## INTRODUCTION

On October 15, 1999, Magdiel Rivera, Jr., and Luis Velez were murdered in Bridgeport. Initial interviews focused police on several likely suspects, but when Plaintiff, Luis Galarza, declined to assist the assigned detectives, they threatened to, and then did, frame him for the murders. There was no forensic evidence linking Galarza to the crime, but the detectives, Defendants Lt. Thomas Lula and Sgt. Vincent Ingrassia, pressured *seven v*ulnerable jailhouse witnesses to fabricate accusations and then concealed the benefits they had promised these witnesses. Galarza was wrongfully incarcerated for over 22 years because these detectives initiated his prosecution without probable cause, fabricated evidence, and withheld *Brady* material from the State's Attorney's Office—and thereby from the defense. Ultimately, after most of the witnesses recanted and the S.A.'s Office admitted that Galarza's *Brady* rights had been violated, his conviction was vacated and his case was dismissed, all on the prosecution's consent.

Galarza now brings this lawsuit, pursuant to 42 U.S.C. § 1983 and state law, seeking damages against the detectives responsible for his wrongful conviction—Lula, Ingrassia, and their supervisor in this investigation, Capt. Lynn Kerwin—and the City of Bridgeport. The Individual Defendants do not move against the Amended Complaint, but the City moves to dismiss the *Monell* claim against it, suggesting that somehow these veteran, high-level detectives all suddenly went rogue. At this stage, it bears a heavy burden to succeed, and it fails by a long shot, to the extent it tries at all.

As discussed below, at this stage, Plaintiff's allegations must be presumed to be true, and he is entitled to the benefit of all reasonable inferences flowing from such allegations. The City must establish that *each* of Plaintiff's theories of recovery, based upon such presumed facts and

inferences, is *implausible*. But its motion fails to do so. Indeed, the City's motion, for the most part, does not even try.

As explained below, *see* pp. 11 – 13, *infra,* the law is clear that a motion to dismiss a *Monell* claim must be denied where it fails to challenge each theory of recovery. "A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." *Tahbaz v. Vigilant Ins. Co.*, 778 F. Supp. 3d 480, 492 n.5 (D. Conn. 2025) (Dooley, J.) (citation omitted). But the City's motion does not even note, let alone challenge, Plaintiff's malicious prosecution practice and deliberate indifference theories; his claims that the City's police department ("BPD") had unlawful express *Brady* policies; and his evidence fabrication claim based upon the Department's unlawful express policies to omit unfavorable evidence from police reports and to use coercive interrogation techniques. These omissions require the City's motion to be summarily denied.

To the extent the City purports to challenge some of Plaintiff's theories, it generally ignores his strongest allegations and, while paying lip service to the plausibility standard, really tries to hold Plaintiff to the burden of proof required at trial. Plaintiff's theories easily satisfy the low threshold of plausibility at this early stage, before Plaintiff has had any opportunity to obtain discovery. The City's motion should be denied.

## STANDARD OF REVIEW

A Rule 12(b)(6) motion must be denied if the complaint includes "enough facts to state a claim to relief that is plausible on its face," that is, enough factual allegations, taken as true, "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "[I]n determining whether a complaint states a claim that is plausible, the court is required to proceed on the assumption that all the [factual] allegations in the complaint are true

… [e]ven if their truth seems doubtful." *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (citation and quotation marks omitted). "Given that the plausibility requirement does not impose a probability requirement at the pleading stage … a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." *Id.* (citation and quotation marks omitted).

The Court must construe the complaint liberally and accept all facts alleged on information and belief when they are "peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible," *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citations omitted). This is especially true for *Monell* claims because "courts are mindful of the Second Circuit's observation that '[i]t is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage.'" *Goode v. Newton*, 2013 WL 1087549, at *7 (D. Conn. Mar. 14, 2013) (Arterton, J.) (internal citations omitted); *see also Est. of Osuna v. County of Stanislaus*, 392 F. Supp. 3d 1162, 1174 (E.D. Cal. 2019) ("It is a rare plaintiff who will have access to the precise contours of a policy or custom prior to having engaged in discovery, and requiring a plaintiff to plead its existence in detail is likely to be no more than an exercise in educated guesswork."). Direct evidence of a defendant's intent, motive, or knowledge is rarely available to plaintiffs before discovery, and "it is sufficient to allege facts from which [the relevant mental state] on the part of the defendants reasonably may be inferred." *Safepath Sys. LLC v. N.Y.C. Dep't of Educ.*, 563 F. App'x 851, 857 (2d Cir. 2014) (cleaned up). Finally, if the plausibility of plaintiff's *Monell* claim is a "close question … the benefit of the

doubt should be resolved in nonmovant plaintiff's favor." *Dixon v. City of Syracuse*, 493 F. Supp. 3d 30, 38 (N.D.N.Y. 2020) (citation omitted).

## STATEMENT OF FACTS

The following facts, taken from the Amended Complaint and presumed to be true, establish the circumstances of Galarza's investigation and prosecution and the bases for his *Monell* claim.

### A. The Galarza Investigation

When Magdiel Rivera, Jr. and Luis Velez were murdered on October 15, 1999, Lt. Lula, a supervisor who served as the lead detective, and Sgt. Ingrassia were assigned to investigate. Dkt. 66 (Amd. Compl.) ¶¶ 19, 27–29. The detectives soon had several suspects from the Bridgeport drug trafficking world in which Rivera and Velez had been active players, including Jose Alvarado, Roberto Hernandez, Edwin Bonilla, and Jose Arciniega. *Id.* ¶¶ 32–46. Sgt. Ingrassia had heard that Plaintiff dealt drugs with some of the suspects and pulled him over in a pretextual traffic stop to pressure him to assist with the investigation. *Id.* ¶¶ 47–50. When Galarza refused, Ingrassia threatened to frame him for the murders. *Id.* ¶¶ 50–52.

Over the next two-and-a-half years, Sgt. Ingrassia and Lt. Lula carried out that threat. They did so by fabricating evidence through coercive interrogations and secret promises to witnesses. They motivated Roberto Hernandez and Jose Alvarado to falsely accuse Galarza by playing each of them a doctored tape they had prepared which made it seem, falsely, that Galarza was cooperating against them, feeding these men information about the crime, and threatening to charge them with the murders and take away their children unless they implicated Galarza. *Id.* ¶¶ 164–70, 187–94. They secretly offered Jesus Lugo, Alan Lane, Carlos Hernandez, Steven Necaise, Rolando Pesquera, and Rafael Colon consideration, including sentencing reductions, continuances, and other forms of leniency, in exchange for their testimony against Galarza, and

then coached them with crime scene evidence to help them make up false accounts that would seem plausible. *Id.* ¶¶ 36–40, 53–64, 86–92, 125–32, 149–152, 164–70, 175–79, 187–94, 208–15, 228–33. They manufactured false or materially misleading reports and other police documentation which omitted the witnesses' initial exculpatory statements as well as how the inculpatory statements described therein had been coerced or induced with secret promises of leniency or other benefits. *Id.* ¶¶ 55, 65, 86–88, 129–30, 136, 169–71, 178–79, 182, 196, 200–01, 203, 212–14, 230–32, 263.

Lula and Ingrassia also hid evidence and fabricated inculpatory statements. For example, Lula never disclosed Ramon DeJesus's handwritten, sworn statement providing Galarza with a complete alibi on the night of the murders. *Id.* ¶¶ 96, 99–101. In the statement, DeJesus swore that Galarza said in disbelief, "get out of here, get out of here," when he learned of the murders. *Id.* ¶¶ 97–99. But, in an intra-office memorandum, Lula lied and wrote that DeJesus had actually said, "get out of there," as if he was urging someone to flee because he had been involved in the crime. *Id.* ¶¶ 103–104. Nor did Lula disclose a report documenting that Luis Sostre said that his cousin, Thomas Garcia, knew that Jose Arciniega—not Galarza—had committed the Rivera-Velez murders. *Id.* ¶¶ 111–13. Ingrassia failed to record that he stopped Galarza's car under a false pretext, threw him to the ground, searched his car, and threatened to frame him if he refused to cooperate. *Id.* ¶¶ 48–52. They never, as the assigned detectives, disclosed witness Carlos Hernandez's prior perjury, that a plaintiff named Rusty Rodriguez was suing Lula and Ingrassia for their misconduct in bringing about his wrongful murder charge, or prior disciplinary findings against Lula and another officer who testified at Galarza's trial. *Id.* ¶¶ 238–45, 248, 250–52, 283.

Galarza was arrested, charged, and, ultimately, convicted and sentenced to life without the possibility of parole based upon the evidence and testimony Lula and Ingrassia manufactured

using these egregious techniques—all without the benefit of the powerful impeachment and exculpatory evidence that the detectives suppressed. *Id.* ¶¶ 198–206, 253–76.

Based upon these and other facts, Galarza alleges that the Individual Defendants subjected him to (1) malicious prosecution, in violation of his Fourth and Fourteenth Amendment rights (Count I, *id.* ¶¶ 303–06); (2) unreasonable seizure and denial of a fair trial due to evidence fabrication, in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments (Count II, *id.* ¶¶ 307–14); and (3) suppression of *Brady* material, in violation of the Fifth, Sixth, and Fourteenth Amendments (Count III, *id.* ¶¶ 315–23). Galarza also alleges that the Individual Defendants failed to intervene to prevent these constitutional violations, as well as several additional claims under state law. Counts IV, VI–IX, *id.* ¶¶ 324–29, 563–85.

### B. *Monell*

The Amended Complaint shows that these violations were caused by the unlawful written policies and practices of the Bridgeport Police Department ("BPD") as well as the deliberate indifference of its policymakers to such unlawful acts when they occurred.

#### 1. Bridgeport's Unlawful *Brady* Policies and Practices

BPD had unlawful policies and practices of violating *Brady* in several ways.

First, BPD's written *Brady* policy only required disclosure of "exculpatory evidence," without mention of impeachment material. *Id.* ¶¶ 491–92. That is, BPD's policy was to ignore the requirement the Supreme Court established in *Giglio v. United States,* 405 U.S. 150 (1972), that, under *Brady*, impeachment evidence must be timely disclosed.

Second, the Amended Complaint alleges, through a clear admission by a BPD sergeant in another case, that it was normal practice for a detective to write a letter to a cooperator's prosecutor seeking leniency or other benefits without disclosing it to the prosecutor who would call the cooperator as a witness. *Id.* ¶¶ 500–01, 506.

Third, BPD maintained an express policy of omitting impeachment and exculpatory information from police reports by defining as "irrelevant and immaterial" information that failed to supply "proof of criminal violations [and] . . . substantiate[] the elements of the crime being investigated." *Id.* ¶¶ 342(b), 488. In other words, BPD's policy was to only include information in police documentation that inculpated suspects while omitting as irrelevant information that tended to exculpate them. This policy caused BPD officers to prepare materially misleading documents which concealed *Brady* information.

The Amended Complaint alleges several high-profile incidents from 1994 to 2003 where withheld *Brady* material—sometimes from multiple witnesses in a single case—led to censure by the Connecticut Supreme Court, a jury verdict, a million-dollar jury verdict, case dismissals, and the reversals of murder convictions. *Id.* ¶¶ 418, 502, 509–10, 524–26, 533–34, 541–44. Despite the notice that these incidents provided BPD that serious *Brady* violations had occurred, neither supervisors nor policymakers took any remedial action, thereby revealing that the conduct was BPD's accepted practice. *Id.* ¶¶ 420–22, 504, 516–18, 520–23, 528, 537–39. Lt. Lula described BPD's non-disclosure policy on Facebook, while still a member of BPD: "Office wisdom: If at first you don't succeed, remove all evidence you ever tried!" *Id.* ¶¶545–46. Multiple BPD officers responded in support. *Id.* ¶¶ 547–48.

Furthermore, by not investigating, disciplining, or properly training officers to comply with *Brady*, BPD's policymakers were deliberately indifferent to the recurrence of *Brady* violations. *Id.* ¶¶ 333(c)–336(e). Indeed, the *Brady* violations in Galarza's case follow the exact pattern required by the City's policies, described by its supervisors' statements, and evidenced by its past practices: The Individual Defendants withheld impeachment information from their

reports, and from prosecutors, including information about cooperators' benefits, and exculpatory evidence as well.

### 2. Bridgeport's Unlawful Evidence Fabrication Policies and Practices

BPD's aforementioned policy of omitting information favorable to a suspect from official police reports was also a policy to create false or materially misleading evidence, since any report that omitted such information would appear far more incriminating to the suspect than the full truth. *Id.* ¶¶ 342(b), 488.

Consistent with BPD's policy, the Amended Complaint alleges at least nine separate incidents of false reporting other than the numerous examples in this case, resulting in a criminal investigation, *id.* ¶ 451–452, substantial settlements, *id.* ¶¶ 460, 467, 474–75, 482–83, jury verdicts, *id.* ¶¶ 465–66, 532–35, and other egregious incidents, *id.* ¶¶ 238–42, 433–34, 477–78. None of the officers responsible for these incidents were disciplined despite the clear notice of apparent misconduct, and many were promoted. *Id.* ¶¶ 435, 437, 440, 443, 455, 458–59, 461, 469–72, 476, 479, 484, 537. In 2003, a special master condemned BPD's practice of filing "late, incomplete, and inaccurate reports." *Id.* ¶ 486.

The City also followed an express written policy instructing officers to coerce statements from suspects and witnesses. It required officers to "reduce [subjects'] feeling of security," make them feel "trapped, both physically and mentally," refuse to accept protestations of innocence or lack of knowledge, falsely threaten them, provide them with details of the crime, and, when they feel most vulnerable, minimize their involvement and create a feeling of reciprocity—all techniques that were highly likely to produce false statements. *Id.* ¶¶ 378–384.

Consistent with BPD's instruction, Defendant Lula spoke openly about threatening people to force cooperation, which he did in the Galarza investigation. *Id.* ¶¶ 239–241.

The Amended Complaint outlines at least a dozen apparent instances in which BPD officers deployed similarly coercive tactics, consistent with BPD's policy, between 1991 and 2003. In one instance, a jury found that officers falsely arrested a civilian for refusing to consent to a warrantless search and cooperate in an investigation, *id.* ¶ 389, conduct remarkably similar to Lula's threat to Galarza. It also recounts civil settlements in cases that included officers holding a gun to someone's head, ordering another person to make a false accusation, sending a plaintiff a threatening letter, and attempting to convince an officer to testify falsely. *Id.* ¶¶ 393–96, 405–06. It describes the dismissal of a criminal case when it emerged that an officer lied to a defendant by telling him a videotape incriminated him, when it was in fact exculpatory, to induce a false confession. *Id.* ¶¶ 417. It alleges that multiple witnesses lied in multiple murder trials because officers threatened or offered them benefits, *id.* ¶¶ 415, 423, and that officers coerced additional witnesses who recanted between 1998 and 2001, *id.* ¶¶ 408 (Satawhite), 410 (Flores), 412 (Coover), 413 (Luke and Lyle Jones), 425 (Rodriguez). BPD did not in any of these instances attempt to address the apparent misconduct of its employees, demonstrating that the misconduct was committed pursuant to BPD's policies and practices and also that policymakers were deliberately indifferent to such misconduct. Id. ¶¶ 390–92, 397–98, 400, 403–04, 407, 409, 411, 412, 414, 416, 420–22, 424, 427–28.

### 3. Bridgeport's Practice of, and Deliberate Indifference to, Initiating Arrests and Prosecutions Without Probable Cause (Malicious Prosecution)

The Amended Complaint alleges that the Individual-Defendants initiated or caused the initiation of Galarza's prosecution without probable cause, and that this conduct followed BPD's practice of arresting people and initiating prosecutions without this minimum legal basis. *Id.* ¶¶ 198–204, 333–336. The Amended Complaint describes more than a dozen cases where BPD's willingness to arrest and initiate prosecutions without probable cause came to light, resulting in

criminal case dismissals, civil settlements, and jury verdicts. *Id.* ¶¶ 242, 389, 408, 410, 412, 413, 415, 417, 482, 509–14, 524–26, 530–33, 541–43. The officers responsible were not disciplined but often promoted. *Id.* ¶¶ 409, 411, 412, 414, 416, 420–21, 427–28, 484, 516–18, 520–23, 528, 537. An officer also testified that she received no Fourth Amendment training whatsoever. *Id.* ¶ 390.

#### 4. BPD's Deliberate Indifference to Investigative Misconduct Generally

The Amended Complaint alleges that BPD's pervasive misconduct was facilitated by a fundamental breakdown in internal accountability characterized by systemic failures in training, supervision, and discipline, all tinged by pervasive racism and a code of silence. The absence of virtually *any* discipline for investigative misconduct of any and all kinds predictably resulted in the pervasive misconduct, of many kinds, that occurred in this case.

##### *a.* Policymakers knew that investigative misconduct plagued BPD.

As alleged in the Amended Complaint, the City had ample notice of widespread investigative misconduct by its personnel. There were nearly twice as many misconduct complaints filed between just 2001 and 2003 as there were officers in BPD. *Id.* ¶ 350. This grim statistic exemplified BPD's longstanding failure to promptly investigate and discipline officers and contributed to the extension of the *Barros* consent decree, first entered in 1973, too long after Galarza's investigation. *Id.* ¶¶ 348–51. The City was also put on notice by multiple lawsuits, settlements, court decisions, jury verdicts, collapsed criminal cases, and newspaper articles reporting on police misconduct before and, in some cases, shortly after the misconduct that occurred in this case. *Id.* ¶¶ 242, 243, 345, 349, 352, 389, 390, 393–396, 405, 408, 410, 412, 415, 418, 421, 439, 441–442, 445–446, 452–453, 468, 470–471, 473, 482, 489–490, 501–502, 509, 514–515, 524, 527, 533–36, 543. Two decades-long federal consent decrees involving misconduct by BPD officers put the City on further notice of deep-rooted unconstitutional

practices. *Id.* ¶¶ 344–54. The fundamental failures in BPD training, supervision, and discipline documented as part of these consent decrees and otherwise were jarring. *Id.* ¶¶ 339(b)–(f). And senior officials including the Chief of Police, the State's Attorney, and the President of the Board of Police Commissioners publicly acknowledged a "code of silence" which, in tandem with deep-seated white supremacist attitudes, likely emboldened officers to violate defendants' constitutional rights without fear of consequences. *Id.* ¶¶ 358–76, 549–60.

*b.* **Despite knowing that misconduct was rampant, policymakers failed to train, supervise, and discipline officers.**

In virtually every case of misconduct described in the Amended Complaint, including but not limited to withholding *Brady* material, fabricating evidence, and initiating prosecutions without probable cause, BPD employees were not disciplined. *Id.* ¶¶ 246, 391, 397, 403, 407, 409, 411–12, 414, 416, 420–21, 424, 427, 435, 440, 443, 445, 455, 467, 470–72, 476, 479, 481, 484, 504, 516, 521–523, 528, 537. Instead, they were often promoted—or, like the Individual Defendants in the Galarza investigation, already were supervisors themselves. *Id.* ¶¶ 398–401, 404, 428, 437, 458, 461, 463, 516–519, 537–38. Despite the clear signals about the need for change, the City did not provide adequate training on proper interrogation techniques, report-writing, or *Brady*. *Id.* ¶¶ ¶¶ 338, 389–392, 534–539. The lack of training is startling: one BPD officer has testified that she received no training about the Fourth Amendment *at all*. *Id.* ¶ 390.

## ARGUMENT

## I. Because the City Fails to Dispute Many of Plaintiff's Legal Theories, Its Motion Must be Denied.

"The elements of a *Monell* claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Agosto v. New York City Dept. of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020). Plaintiffs satisfy *Monell* causation by

"demonstrat[ing] that through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Id.* at 98 (citation omitted and emphasis in original).

The existence of a municipal policy or custom can be established in at least four ways: (1) a formal, express "policy statement, ordinance, regulation or decision" officially endorsed by the municipality, *Turpin v. Mailet*, 619 F.2d 196, 199 (2d Cir. 1980); (2) conduct directed by a municipal official with policymaking authority—i.e., "authorized decisionmakers" or "those who establish governmental policy," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986); (3) unconstitutional "custom or usage," "even though such a custom has not received formal approval," *id.* at 484 n.10 (internal citation omitted); or (4) constitutional violations resulting from a municipality's "deliberate indifference" to the constitutional violations. *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (citation omitted).

"A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims." *Tahbaz*, 778 F. Supp. 3d 480 at 492 n.5 (citation omitted). As a result, the Court "need only sustain Plaintiff's *Monell* claim on a single theory of liability" and, if Plaintiff's theory is sufficient, "it need not address the merits of the *Monell* claim under alternative theories of liability." *DiPippo v. Cnty. of Putnam*, 2019 WL 1004152, at *12 (S.D.N.Y. Feb. 28, 2019); *see also Lynch v. Town of Amherst*, 2026 WL 1758176, at *2 (W.D.N.Y. June 18, 2026) (same and listing cases).

Here, the City has not challenged five of Galarza's theories of *Monell* liability: (1) its practice of, and deliberate indifference to, the risk of maliciously prosecuting people, Dkt. 66 ¶¶ 333–36, (2) its written policy of withholding impeachment material, *id.* ¶¶ 487, 492–93, (3) its written policy of omitting impeachment and exculpatory information from reports, *id.* ¶¶ 487–488, (4) its written policy on coercing statements, *id.* ¶¶ 384–88, and (5) its white supremacist

culture, *id.* ¶ 362–376. Because the City must show that Galarza has not pled *any* plausible *Monell* theory, its failure to contest even one of his legal claims—let alone, as here, many of his legal theories—requires denial of the City's motion.

In reply, the City may not address these ignored theories because "[a]rguments may not be made for the first time in a reply brief." *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993).

## II. The Amended Complaint Plausibly Pleads That the City is Liable Under *Monell* for *Brady* Violations.

The Amended Complaint plausibly states that the City is liable under *Monell* for *Brady* violations under four theories: (1) an express policy theory; (2) a practice theory; (3) a deliberate-indifference failure-to-discipline or supervise theory; and (4) and a deliberate-indifference failure-to-train theory.

### A. An express written policy caused Galarza's *Brady* violations.

BPD's only policy on *Brady* limited the disclosure requirement to "exculpatory evidence," in violation of *Giglio v. United States.* 405 U.S. 150, 154 (1972); Dkt. 66 ¶ 491–92. The Individual Defendants directly implemented this policy by systematically withholding impeachment information, including the coercive tactics and secret cooperation deals they used to motivate the cooperating witnesses to testify against Galarza. *See* pp. 4 – 5, *supra*. They also suppressed Carlos Hernandez's prior perjury; the Rusty Rodriguez notice of claim; evidence of Ingrassia's pretextual traffic stop of and threat against Galarza; and virtually all impeachment information from their 30-page investigation report and Galarza's arrest warrant. *Id.* ¶ 48–52, 198–202, 203–05, 238–245, 283–84. This theory, as noted above, is uncontested by the City in its motion papers.

### B. Three BPD practices caused Galarza's *Brady* violations.

The City also does not challenge many of Plaintiff's most powerful allegations about BPD's unlawful widespread *Brady* practices that led to the suppression of evidence in this case.

The actions of a subordinate municipal employee may provide the basis for municipal liability where the employee's unconstitutional conduct is "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992). "In other words, there must be sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse." *Lucente v. County of Suffolk*, 980 F.3d 284, 298 (2d Cir. 2020) (cleaned up). The Second Circuit has found, on *summary judgment* and *judgment as a matter of law*, that plaintiffs made a sufficient showing where just one unchecked officer repeatedly caused harm, *Lucente*, 980 F.3d at 298–301, and where only one person fell victim to harm, *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 63 (2d Cir. 2014). The key questions in both cases, as summarized by *Lucente*, were "whether the supervisory personnel with such alleged knowledge are sufficiently senior, and whether the pattern of unconstitutional conduct by [the individual defendant] and alleged inaction by supervisory personnel was sufficiently persistent and widespread, to allow an inference of policymaker acquiescence that would trigger *Monell* liability." *Lucente*, 980 F.3d at 307. For *Lucente*, lieutenants, with mere knowledge of misconduct, were sufficiently senior to deny summary judgment. *Id.* at 306–07.

Here, Galarza alleges that BPD had three practices of suppressing *Brady* material: First, BPD had a practice of withholding from prosecutors, and therefore from the defense, information about the benefits that cooperators received. Second, BPD more generally had a practice of withholding impeachment material. Third, BPD had a practice of withholding exculpatory information. Any of these practices on its own sufficiently pleads a *Monell* claim. Considered together, they are mutually reinforcing and make the causal link between condoned police practice and the *Brady* violations in this case even more plausible.

These three practices were more widespread in every way than the practices described in *Lucente* or *Matusick*: more employees perpetrated them than the single officer in *Lucente*, more people fell victim to them than the single victim in *Matusick*, and supervisors did not just acquiesce in the pattern of misconduct as they did in *Lucente* and *Matusick*. Here. Lula, a lieutenant and supervisor himself, Dkt. 66 ¶ 27, actively participated in them and modeled them as BPD's practice for lower-level employees. Furthermore, unlike in *Lucente* and *Matusick*, Galarza has plausibly pleaded these allegations without the benefit of discovery and despite the difficulty of proving "suppression of evidence." *Williams v. City of Hartford*, 2026 WL 309602, at *14 (D. Conn. Feb. 5, 2026) (Russell, J.). These practices are further described in the following sections.

1. **BPD had a practice of withholding letters about cooperators' benefits.**

A practice can be established through a single police officer's testimony describing the municipality's "standard procedure." *Torcivia v. Suffolk County*, 17 F.4th 342, 355–56 & n.20 (2d Cir. 2021); *see also Jones v. City of New York*, 603 F. App'x 13, 15 (2d Cir. 2015) (police officer's deposition testimony acknowledging "[t]hat is what we do" "could support a finding of custom or policy under *Monell*").[1] In 1998, just one year before the investigation into the Rivera-Velez murders, a BPD sergeant testified at a hearing that it was normal practice to write a letter to a cooperator's prosecutor without disclosing it to the prosecutor who would call the cooperator as a witness. Dkt. 66 ¶¶ 500–501. Lt. Lula confirmed this practice, acknowledging that he did not

[1] Other courts have relied upon similar testimony to uphold *Monell* claims. *See, e.g.*, *Ferrari v. County of Suffolk*, 2013 WL 4017022, at *10 (E.D.N.Y. Aug. 6, 2013) (prosecutor's legal arguments were "consistent with the training she received"), *rev'd on other grounds*, 845 F.3d 46 (2d Cir. 2016); *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1030 (7th Cir. 2006) (police officer's conduct was "consistent with 'policies and practices of the Galesburg police department'"); *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013) (officer's belief about departmental policy was "consistent with City policy").

discuss with Galarza's prosecutor what cooperators against Galarza had "going on in their respective cases." Dkt. 66 ¶ 506.

In 2000, around when Lula and Ingrassia were investigating the Rivera-Velez murders, the Connecticut Supreme Court in *Floyd* excoriated a prosecutor's failure to turn over records about a witness's likely expectation of leniency as "inexcusable." There, a BPD sergeant testified that he had also withheld a letter about a cooperator to a prosecutor in another office. Dkt. 66 ¶¶ 499–502. BPD did not investigate or discipline the sergeant for this *Brady* violation, indicating that such behavior represented a condoned practice and thus BPD's policy. *Id.* ¶ 504.

Consistent with this policy and practice, Lt. Lula and Sgt. Ingrassia withheld various communications and promises to communicate with prosecutors in other offices and judges on behalf of cooperators who testified against Galarza. Dkt. 66 ¶¶ 131, 137–46, 266, (Alan Lane), 215–222, 267 (Carlos Hernandez), 183–84 (Jesus Lugo), 233–236 (Steven Necaise), and 152–155, 268 (Rafael Colon). They even secretly sought benefits for potential witnesses who never testified against Galarza. *See, e.g.*, *id.* ¶¶ 88–92 (Rolando Pesquera). Causation is plausible, to say the least.

### 2. BPD had a written policy and practice of withholding all impeachment information.

As mentioned *supra*, BPD had a written policy requiring disclosure of only exculpatory, and not impeachment, evidence. *Id.* ¶¶ 492–93. This allegation alone, which the City ignores, states a plausible claim that BPD's written policies caused the violations of Galarza's rights, considering that much of the withheld *Brady* material in this case was impeachment material. Indeed, the pervasiveness of the *Giglio* violations by several senior level detectives is further evidence that the practice was accepted and widespread.

In 1994, the Connecticut Supreme Court reversed two murder convictions because BPD had failed to turn over impeachment evidence, Dkt. 66 ¶¶ 509–510. In 2001, the prosecution of Leonel Diaz collapsed after the defense discovered a BPD sergeant's undisclosed police report that included four witness statements that impeached the prosecution's witnesses, Dkt. 66 ¶¶ 524–526. But none of the officers suffered any consequence for the misconduct in these cases and many were subsequently promoted. *Id.* ¶¶ 516–18, 520–23; 528. BPD's failure to take any remedial action after learning about these violations shows that policymakers condoned them and they were consistent with BPD's policy.

Consistent with this BPD policy and practice, in the Galarza prosecution, Lt. Lula and Sgt. Ingrassia never disclosed impeachment information that Lula and Ingrassia had been accused of framing another person for murder using similar techniques shortly before Galarza, *id.* ¶¶ 238–45, that Lula was charged with repeating a slur, *id.* ¶¶248, 251–52, and that another testifying officer had been charged with failing to use sound judgment, *id.* ¶¶ 250–52. They also failed to disclose each cooperator's inconsistent statements, how Lula and Ingrassia fabricated nearly every cooperator's statement, *id.* ¶¶ 196, 200–01, 203, 263 (Jose Alvarado); 171, 200–01, 203 (Roberto Hernandez), 129–30, 136, 200–01 (Alan Lane), 55, 65, 212–13 (Carlos Hernandez), 182 (Jesus Lugo); 86–88 (Rolando Pesquera), and, as previously discussed, the promises made to these witnesses and the benefits they received in exchange for their cooperation. The City does not dispute that these pervasive *Giglio* violations were material and contributed to the verdict.[2]

In sum, Galarza has plausibly alleged that BPD had a policy and a widespread practice of withholding impeachment evidence. A written policy blessed it, supervisors, including two

---

[2] The City references the Individual Defendants' misconduct in the Rodriguez case but ignores the argument that their failure to disclose information about it violated Galarza's *Brady* rights. Dkt. 70-1 at 12–13.

sergeants and a lieutenant, modeled it for lower-level employees and followed the practice themselves, a murder case collapsed because of it and the Connecticut Supreme Court reversed convictions because of it. Yet, no supervisor did anything to stop it; instead, they supported it. It is certainly plausible to infer that such policies and practices were a contributing cause of Galarza's wrongful conviction.

3. **BPD had a practice of withholding exculpatory information.**

Officers, including supervisors, withheld not just impeachment information but also exculpatory information, often in the same cases. In the 1994 Connecticut Supreme Court reversal and the 2001 collapse prosecution described above, BPD also withheld exculpatory evidence, Dkt. 66 ¶¶ 509–10, Dkt. 66 ¶¶ 524–26. But there were many other cases that provided BPD with notice that BPD ignored.

In 1999, a jury returned a million-dollar verdict after finding that BPD officers had withheld clearly exculpatory information and a local newspaper, outraged, urged the City to reform the practices. Dkt. 66 ¶¶ 533, 535–36. In a 2003 case the Second Circuit called "shocking," the prosecution was forced to dismiss a case after discovering that BPD had withheld a video recording that clearly exonerated a defendant in a robbery case, letting the defendant languish in jail for months. Dkt. 66 ¶¶ 417–18, 541–543. None of the officers suffered any consequences for the misconduct in these cases and many were subsequently promoted. *Id.* ¶¶ 420–21, 516–18, 520–23, 528, 537–38. This creates the plausible inference that the challenged conduct conformed to official policy and widespread practice.

The unconstitutional practice of withholding exculpatory evidence affected this case. Lt. Lula and Sgt. Ingrassia withheld a statement that supported Galarza's alibi, *id.* ¶¶ 95–101, and another statement that supported a third-party defense, *id.* ¶¶ 111–13. Moreover, Lula, while still employed by BPD, appeared to joke with others about BPD's practice of withholding

exculpatory evidence about suspects BPD investigated but never successfully charged. Dkt. 66 ¶ 545.

Galarza has thus adequately alleged a widespread practice of withholding exculpatory evidence. A jury, a newspaper, and the Connecticut Supreme Court criticized it; supervisors in multiple cases, including this case, repeatedly followed it; and Lula joked openly about it. As was the case with the other unlawful practices, BPD did nothing to stop it and allowed it to cause Galarza's wrongful conviction.

#### 4. The City ignores Galarza's most powerful allegations and misconstrues *Connick v. Thompson*.

The City attempts to dismiss the widespread *Brady* practice theories by arguing that Galarza failed to plead enough similar acts of misconduct. Dkt. 70-1 at 16.[3] Specifically, it focuses on the 1994 Connecticut Supreme Court case, the 2000 Connecticut Supreme Court case, the 2001 collapsed prosecution, and the 2003 dismissed criminal case and asserts that they are distinguishable because they involved "different officers, different supervisors, and different contexts." Dkt. 70-1 at 16. This argument is wrong.

As an initial matter, the City's ill-conceived argument *supports* Galarza's widespread practice theories. The fact that this misconduct occurred with different officers, different supervisors, and different contexts shows how widespread—not limited—the practice was. Moreover, the argument ignores the allegations about policy, officer testimony, Lula's statement, a million-dollar jury verdict, and the pervasive misconduct committed in this case.

The City heavily relies on the Supreme Court's decision in *Connick v. Thompson,* 563 U.S. 51 (2011), Dkt. 70-1 at 16, but that decision has no application here. In *Connick*, the jury

[3] Citations are to the page numbers automatically created by the Case Management/Electronic Case Files system and listed at the top of the document.

rejected the plaintiff's unlawful practice theory concerning prosecutor's *Brady* violations but held the municipality liable solely on a deficient training theory, and so only that theory of liability was before the Supreme Court. *Connick*, 563 U.S. at 68 & n.10. Reasoning that prosecutors are presumed to know their *Brady* obligations, the Court held, 5–4, that absent a history of prior similar violations, a district attorney need not use his office's scarce resources on training that he had no notice was needed. The Court concluded there was insufficient evidence of notice to support the jury's verdict and reversed.

But here, Galarza's theories of unlawful policy and practice and failure to discipline are distinct from the narrow prosecutor training issue in *Connick*. Unlawful policy and practice theories have different elements and proof requirements from a deficient training claim, where *Monell's* proof standard is highest, *see Connick*, 563 U.S. at 61; this is why the Second Circuit has not applied *Connick* to such theories of proof. [4] Indeed, as shown above, unlawful policy and condoned practice cases do not require any particular number of prior violations. Nor does *Connick*'s analysis of the evidence needed to require a policymaker to train *prosecutors* apply in a case, such as this, involving *police,* for, as the Court itself explained, "attorneys, unlike police officers, are equipped with the tools to find, interpret, and apply legal principles," and they are subject to professional discipline for ethics violations, including potential disbarment, *id*. at

[4] The Second Circuit has rejected the invitation to apply *Connick*'s high failure-to-train standard to other *Monell* theories. Indeed, in their appellate briefing, the defendant in *Lucente* mistakenly treated plaintiff's manifest practice case as a failure-to-train deliberate indifference case. It cited the same "pattern of similar constitutional violations" language from *Connick*, and ignored both the "manifest practice" test and *Matusick* completely. Brief for Defendants-Appellees at 27, *Lucente v. County of Suffolk*, No. 19-347 (2d Cir. Aug. 5, 2019), Dkt. 86. As explained above, the Second Circuit decided the case for the plaintiff under the appropriate "manifest practice" standard and *Matusick*. District courts around the country have similarly limited *Connick* to failure-to-train cases. *See, e.g.*, *Stern v. City of New York*, 2015 WL 918754, at *5 (E.D.N.Y. Mar. 3, 2015) (finding "Defendants' reliance on *Connick*…misplaced" because "the Supreme Court framed its entire analysis in *Connick* in the failure-to-train context" and "this is not a failure-to-train case"); *Archie v. Covington County*, 2021 WL 1182370, at *7 (M.D. Ala. Mar. 29, 2021) (rejecting *Connick* because it "applies to claims for failure to train subordinates, not to claims for failure to supervise"); *Poventud v. City of New York*, 2015 WL 1062186, at *16 (S.D.N.Y. Mar. 9, 2015) (holding that *Connick* does not apply to failure-to-supervise or failure-to-discipline theories).

1363–64. For this additional reason, district courts around the country have refused to apply *Connick* to non-lawyers.[5] Finally, and of critical importance, *Connick* involved a post-trial challenge to the sufficiency of the plaintiff's proof at *trial,* not whether, as here, his pleading, before he has obtained any discovery, contains allegations that are *plausible.*[6]

Finally, even *Connick* does not define the concept of "similarity" as narrowly as the City does here. *Connick* involved the withholding of the results of blood-evidence testing, but the Court did not require that prior cases also involve such results, just the withholding of "physical or scientific evidence of *any kind*." 563 U.S. at 62–63 (emphasis added). Other cases also define similarity by general categories.[7] Here, a policy or practice to withhold *Brady* material of all kinds, or impeachment material, or promises made to witnesses, or exculpatory material would predictably lead to the varied violations that occurred in this case; *Connick*'s categorization

---

[5] *See, e.g.*, *Farvardin v. Santos*, 2014 WL 7150023, at *9 (E.D. Pa. Dec. 15, 2014) (refusing to apply *Connick* because "*Connick* involved the training of prosecutors, not police officers"); *Aguilar v. City of S. Gate*, 2013 WL 300914, at *4 (C.D. Cal. Jan. 25, 2013) ("The City cannot seriously contend that its police officers are like the skilled lawyers in *Connick,* so consequently that decision does little to shed light on the appropriate resolution of … this Motion."); *Cristini v. City of Warren*, 2012 WL 5508369, at *9 (E.D. Mich. Nov. 14, 2012) (refusing to apply *Connick* because "it has nothing to do with *Brady* violations by police officers").

[6] *See Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 738 (S.D.N.Y. 2012) (declining to apply *Connick* to a motion to dismiss); *Trujillo v. City & Cnty. of Denver*, 2017 WL 1364691, at *5 (D. Colo. Apr. 14, 2017) ("[T]he evidentiary strictness applied in *Connick* is not appropriate for this Court to apply in the present posture, where the question is only whether Trujillo's pleadings adequately state a claim."); *Maldonado v. City of Hammond, Ind.*, 2015 WL 1780133, at *2 (N.D. Ind. Apr. 20, 2015) ("But reliance at this stage on *Connick* is misplaced since it was decided after a full trial on the merits and is about sufficiency of *proof* rather than sufficiency of *pleading.*") (emphasis in original).

[7] *See, e.g., Lucente*, 980 F.3d 284 at 301 (2d Cir. 2020) (considering a guard's "fraternizing" with incarcerated people in a jail sexual assault *Monell* case because "each instance of alleged prior misconduct with female inmates need not be identical to those alleged here, or even rise to the level of sexual harassment, to have probative value on the issue of whether the recipient of that information (including a policymaker) would have had at least some level of notice that the municipal employee was engaging in unconstitutional sexual harassment of female inmates, especially when combined with the other evidence in the record.). Similarly, in the summary judgment context, the court in *Morant* found evidence about a "practice of suppressing exculpatory and impeachment evidence from the prosecution," as opposed to a more specific sub-practice, sufficient. *Morant v. City of New Haven*, 2025 WL 2821260, at *31 (D. Conn. Oct. 3, 2025) (Nagala, J.). And, in the motion to dismiss context, the court in *Williams* found allegations about the suppression of general exculpatory evidence specific enough. *Williams v. City of Hartford*, 2026 WL 309602, at *14 (D. Conn. Feb. 5, 2026).

approach, arising from a training case involving a single violation, simply has no application here.

### C. Policymakers were deliberately indifferent to *Brady* violations.

In addition to Galarza's policy and practice theories, the Amended Complaint alleges two distinct deliberate indifference theories: failure to supervise or discipline, and failure to train. Defendant's motion fails to show these theories are not plausible.

#### 1. Policymakers were deliberately indifferent to the need to supervise or discipline BPD officers with respect to *Brady*.

"To prove [] deliberate indifference, the plaintiff must show that [1] the need for more or better supervision to protect against constitutional violations was obvious" and "[2] there was no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995). "The means of establishing deliberate indifference will vary given the facts of the case and need not rely on any particular factual showing." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 128 (2d Cir. 2004).

In some cases, "a single, isolated act of brutality might be sufficient to allow a factfinder to infer deliberate indifference if the use of force were so extreme as to leave no doubt that [the policymaker] consciously chose not to act." *Id.* at 129. Wrongful convictions meet this standard. As Judge Chatigny has found, "the way to assess the *Monell* claim is not to look at it statistically…, [but]…to look at this as an airplane crash. I don't think *Monell* permitted the City to wait for more wrongful convictions in homicide cases brought about through due process violations caused by its own policy and practice before it was obliged by law to act to avoid liability under *Monell*." Transcript of Ruling Denying Summary Judgment at 14, *Jackson v. City of New Haven*, No. 3:19-CV-0388 (RNC) (D. Conn. Feb. 15, 2024), Dkt. 267.

In other cases, "[a]n obvious need may be demonstrated through proof of repeated complaints of civil rights violations." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995). For this theory, "there is no requirement that complaints result in a formal finding of misconduct for such complaints to support findings of failure to supervise." *Morant v. City of New Haven*, 2025 WL 2821260, at *30 (D. Conn. Oct. 3, 2025) (Nagala, J.) (citing cases). "There is no bright line rule for how many complaints of civil rights violations is sufficient to show the need for more supervision, nor is there a bright line rule for how recent those complaints must be." *Lewis v. City of New Haven*, 2017 WL 101304, at *5 (D. Conn. Jan. 10, 2017) (Underhill, J.) (citation omitted).

In the *Brady* context, fewer examples may suffice because "plaintiffs face particular challenges given that this form of misconduct involves, by definition, suppression of evidence" and "[v]ictims of *Brady* violations may not even know that exculpatory information was withheld from them." *Williams v. City of Hartford*, 2026 WL 309602, at *14 (D. Conn. Feb. 5, 2026) (Russell, J.). The same holds true for other forms of investigative misconduct, such as coercive interrogation tactics or false police reports, because the constitutional violation is inherently difficult to discover.

In addition to notice, the Plaintiff must allege that the City "made no meaningful attempt to forestall or prevent the unconstitutional conduct." *Amnesty Am.*, 361 F.3d at 127 (cleaned up). In assessing this element of the test, the court may be "mindful" that "much of the crucial information about how the municipality investigated complaints or disciplined bad actors is not available to the public," which favors the non-moving party at the pleading stage. *Lewis*, 2017 WL 101304, at *6.

Courts view both prongs—the need for action and the failure to act—holistically: they consider "allegations together" and view the policymaker's "conduct as a whole rather than as a series of unconnected acts." *Amnesty Am.*, 361 F.3d at 128–29. In other words, courts should consider not how the policymaker reacts to any single, isolated allegation of misconduct, but instead how a policymaker reacts in response to the entire situation, including to repeated allegations of misconduct of which the policymaker has notice.

In applying these standards, the court in *Williams v. City of Hartford*, a wrongful conviction case based on just *Brady* violations, denied the city's motion to dismiss because the plaintiff alleged that: (1) an audit found "widespread problems in the division responsible for officer misconduct," the absence of written *Brady* policies, missing case files, and improper documentation practices; (2) the withholding of two pieces of *Brady* evidence by three City officers, including a supervisor, in plaintiff's case; (3) and six *Brady*-related violations in other cases, without providing any more detail about what the violations were. 2026 WL 309602, at **9–14.

In applying the higher standard for summary judgment, the court in *Morant* denied the city's motion for summary judgment as to the plaintiff's *Brady* and other allegations, and allowed the case to go to trial, because the plaintiff identified seven lawsuits "wherein [the defendant police department's] detectives allegedly fabricated evidence, coerced witness statements, *withheld exculpatory evidence* or otherwise engaged in misconduct, resulting in the wrongful prosecution or conviction of innocent persons." 2025 WL 2821260 at *30 (emphasis added). The court further noted, in relation to Morant's *Brady* and other misconduct claims, that there was testimony about a "blue wall of silence" and evidence that the defendant city's "officers themselves engaged in criminal misconduct, but they were not disciplined for such

activities." *Id.* at *31. "Taken together," as *Amnesty America* requires, the court found that the evidence "could permit a reasonable jury to conclude that the City had notice of the need of greater supervision and discipline related to its officers' *Brady* obligations and interview tactics, yet failed to take meaningful steps to investigate, remedy or prevent the unconstitutional conduct." *Id.*

Here, the Amended Complaint, in granular detail, paints the picture of a police department in obvious need of greater discipline and supervision with respect to *Brady* violations and related types of due process and fair trial violations. The message could hardly have been clearer: In 1999, after a million-dollar verdict involving *Brady* violations and evidence fabrication, the *Connecticut Post* published an editorial entitled, "Plaintiff deserves every cent of award," and told its readers, "True, city taxpayers will ultimately have to foot the bill, but maybe this fiasco will show police officials that officers need better training and supervision." Dkt. 66 ¶ 535. Presciently, the editorial concluded, "reforms must take place before another innocent citizen suffers needlessly at the hands of those who are supposed to protect and serve." *Id.* ¶ 536.

Policymakers ignored this clarion call and failed to investigate any of the officers responsible for the million-dollar verdict. *Id.* ¶ 537. Indeed, the City never properly investigated or disciplined any of the officers who engaged in any of the practices that victims, courts, newspapers, and the 1999 lawsuit decried. *Id.* ¶¶ 420–22, 504, 516–18, 520–23, 528, 537–39. Investigations of hundreds of civilian complaints remained incomplete, even though an entire consent decree existed to make sure the City took these civilian complaints seriously, *id.* ¶ 349, and this overall indifference to discipline likely contributed to the Defendants' decisions not to disclose evidence in this case. Some officers, as in *Morant,* even violated *criminal* laws without losing their jobs or facing any consequences at all, *id.* ¶¶ 454–55, 520–23, 402–03, 478–79. The

code of silence and white supremacist culture that BPD policymakers tolerated or even encouraged only emboldened officers further. Instead of investigating and addressing these issues, the City, to use Judge Chatigny's metaphor, just waited for the next plane crash: Mr. Galarza's wrongful conviction and his loss of more than twenty years of his life.

The City devotes a single paragraph to Galarza's deliberate indifference *Brady* claim—and mischaracterizes it. The failure to discipline paragraph incorrectly states that the Amended Complaint merely "recites generalized statements about the Department's discipline system." Dkt. 70-1 at 18. As explained above, the Amended Complaint identifies over a dozen instances of officers avoiding investigation or discipline for specific instances of egregious misconduct. *See* pp. 10 – 11, *supra*. The numerous and striking general indictments of BPD's disciplinary system, made by people in and outside of BPD, pp. 11, 18, 25 – 26, *supra*, add to the deliberate indifference theory's plausibility and must be considered together with the specific cases where BPD had notice and did nothing. *Amnesty Am.*, 361 F.3d at 128–29.

The City adds another paragraph about the code of silence and claims that a generalized code of silence theory fails for *Monell* purposes. Dkt. 70-1 at 20–21. This paragraph, however, misconstrues the Amended Complaint and the law. The President of the Board of Police Commissioners, the State's Attorney, the police of chief, a jury and the court-appointed special master all acknowledged and criticized BPD's code of silence. Dkt. 66 ¶¶ 556–59. Yet, BPD allowed the practice to flourish. *Id.* ¶¶ 552, 560. It is certainly plausible that the Code contributed to the *Brady* violations against Galarza because the Individual Defendants knew that the code of silence would protect them. Courts have regularly recognized this theory. *See, e.g.*, *Sledd v. Lindsay*, 102 F.3d 282, 289 (7th Cir. 1996) (finding that it was "error to dismiss this [the *Monell*] part of the case solely on the pleadings" where the plaintiff had alleged that a code of silence and

other practices "hurt him in particular, by making the officers believe their actions would never be scrutinized"). A court in this District has also recognized how this practice may add strength to a deliberate-indifference failure-to-supervise theory. *Morant v. City of New Haven*, 2025 WL 2821260, at *31 (D. Conn. Oct. 3, 2025) (Nagala, J.) (citing testimony about a strong "blue wall of silence" in support of its conclusion that plaintiff's *Brady* and "interview tactics"-related failure-to-supervise/discipline theory survived summary judgment); *see also Jeffes v. Barnes*, 208 F.3d 49, 62 (2d Cir. 2000) (finding that a code of silence was a practice or custom that constituted the municipality's standard operating procedure).

The City also incorrectly implies that the Amended Complaint does not identify the policymakers who tolerated the misconduct. Dkt. 70-1 at 22. The Amended Complaint clearly states: "The failure to properly instruct, train, supervise, and/or discipline employees with regard to the constitutional obligations enumerated in ¶ 333 was the fault of policymaking officials for the Defendant City—including but not limited to the Police Commissioners, Police Chief, and their designees." Dkt. 66 ¶ 336. Plaintiff is entitled to discovery, including a Rule 32(b)(6) deposition and document disclosure, to be able to identify with more particularity how policymaking authority was distributed amongst these BPD leaders. No more can be required of plaintiff in the pre-discovery stage, and the City does not cite a case that holds otherwise.

Finally, the City incorrectly argues that Galarza must show that policymakers "knew of the specific misconduct at issue, or a sufficiently similar pattern of misconduct." Dkt. 70-1 at 22. This argument mistakenly assumes that the failure-to-train requirement for a "notice of a prior pattern of similar *Brady* violations" applies to the failure-to-discipline or failure-to-supervise context. *Jimenez v. City of New York*, 2026 WL 2617389, at *19 (2d Cir. Sept. 4, 2026). The Second Circuit, however, has explained that failure-to-train and failure-to-supervise theories

"require different showings in order to establish deliberate indifference," and so "must be analyzed independently, rather than evaluated collectively." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 127 (2d Cir. 2004).

As explained above, even if a similarity requirement does apply, consistent with *Connick's* broad definition of similarity (scientific evidence of "any type"), the appropriate categories are "*Brady* material," "impeachment material," or "exculpatory material" – further specification, certainly at this stage, cannot be required. Indeed, for a failure-to-supervise or discipline case, a court in this District, even at summary judgment, only required evidence of past *Brady* violations generally, as opposed to evidence of a specific type of *Brady* violation. *Morant*, 2025 WL 2821260 at *31.

2. **Policymakers were deliberately indifferent to the need to train officers about *Brady*.**

To make out a failure-to-train-theory, a plaintiff must show that: (i) "a policymaker knows to a moral certainty that her employees will confront a given situation"; (ii) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or … there is a history of employees mishandling the situation"; and (iii) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992) (cleaned up). At this stage of the litigation, Galarza need not "establish also that defendant breached its duty to act by failing to make meaningful efforts to address the risk of harm to plaintiffs." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007). The City does not address the *Walker* standard. By failing to do so, it appears to concede its three prongs.

Galarza readily meets *Walker*'s requirements, which is all he needs to do at this stage. *First*, City policymakers obviously knew that in most cases, detectives would come across

exculpatory and impeachment information about witnesses and would have to decide what to disclose.

*Second*, disclosing *Brady* material presented detectives with a "difficult choice." In *Walker*, the Second Circuit held, "[W]e do not think that in 1971, just seven years after *Brady* was decided, that the *Brady* standard was so obvious or easy to apply as to require, as a matter of law, no training or supervision." 974 F.2d at 300. During the operative period in Galarza's case, there was even greater confusion for BPD detectives. These detectives weren't merely befuddled by a recent Supreme Court decision, but *misdirected* by their own agency's written materials, which implicitly regarded *Brady* material as "irrelevant" and implied that officers need not even disclose impeachment material at all. Dkt. 66 ¶¶ 488, 492. This unconstitutional training provided to non-lawyers certainly made their decision more difficult.

The Amended Complaint has also satisfied *Walker*'s alternative requirement for the second prong. As explained above, *see* pp. 13 – 19, *supra*, BPD officers have a history of improperly withholding *Brady* material.

*Third*, *Walker*'s final element is easily satisfied for the *Brady Monell* theory: *Walker* itself held that "withholding *Brady* material will virtually always lead to a substantial violation of constitutional rights." 974 F.2d at 300.

Instead of grappling with *Walker*'s controlling test, the City cites a string of non-motion-to-dismiss cases and argues that the Amended Complaint has failed to identify the deficiency in the training.[8] Dkt. 70-1 at 21. This argument fails to appreciate the difference between a motion to dismiss and summary judgment and incorrectly assumes that Galarza must allege a specific

[8] *Connick v. Thompson*, 563 U.S. 51 (2011) (post-trial); *City of Canton v. Harris*, 489 U.S. 378 (1989) (post-trial); *Turpin v. Mailet*, 619 F.2d 196 (2d Cir. 1980) (post-trial); *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113 (2d Cir. 2004) (summary judgment); *Reynolds v. Giuliani*, 506 F.3d 183 (2d Cir. 2007) (summary judgment).

deficiency in the training. As *Amnesty America*, a case the City cites, explains: "Because the district court had dismissed Walker's case at the motion to dismiss stage, rather than on summary judgment, we did not require him to identify a specific deficiency in the . . . training program or to establish a causal link between the lack of training and the misconduct." 361 F.3d at 130 n.10. It justified this distinction because "[i]t is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage . . . ." *Id.* As a result, Galarza need not allege a specific deficiency in training or, as the City suggests he must, disprove all other causes of his injury, such as officers' bad intentions. Dkt. 70-1, at 23–24.

Even if Mr. Galarza were required to plead in detail how the City failed to act and how this failure specifically caused Mr. Galarza's constitutional violations, the Amended Complaint does just this. Mr. Galarza alleged that the City failed to provide any training on interrogation, report writing, and *Brady*, even after the many acts of misconduct and notice described above. As explained above, the "training" that they did provide caused—rather than avoided—constitutional violations. This lack of proper training caused Galarza's constitutional violations. Dkt. 66 ¶ 461.

## III. The Amended Complaint Plausibly Pleads That the City is Liable Under *Monell* for Evidence Fabrication.

The Court may deny the motion solely on the uncontested theories or on the *Brady* theories and need not even decide Galarza's evidence fabrication *Monell* theories. *See* pp. 12 – 13, *supra*. However, if the Court reaches these additional theories, the Amended Complaint has stated a plausible claim that the City is liable under *Monell* for fabricating evidence. Galarza provides four types of evidence-fabrication *Monell* theories: (1) an express policy theory; (2) a practice theory; (3) a deliberate-indifference failure-to-supervise or discipline theory; and (4) a

deliberate-indifference failure-to-train theory. The Amended Complaint plausibly states all these theories.

### A. Express written policies caused detectives to fabricate evidence against Galarza.

First, BPD, in a policy about report writing, defined as "'irrelevant and immaterial' witness information that failed to supply 'proof of criminal violations [and] . . . substantiate[] the elements of the crime being investigated.'" *Id.* ¶¶ 488. This policy is patently unconstitutional because an officer fabricates evidence when her "material omissions render an otherwise true statement false." *Morse v. Fusto*, 804 F.3d 538, 548 (2d Cir. 2015).[9] Galarza thus plausibly alleges an express policy *Monell* theory. This policy sanctioned the detectives' decisions not to disclose all of the impeachment material referenced *supra* at 4 – 5, including the coercive and misleading tactics they used to fabricate evidence, the promises of consideration they made in exchange for testimony against Galarza, and other evidence of the cooperating witnesses' unreliability and the detectives' bias against Galarza. It went further, though, by commanding the detectives to fail to document and/or disclose exculpatory evidence that did not fit their narrative of the crime, including the DeJesus and Sostre statements exculpating Galarza and implicating Alvarado and Arciniega. *Id.* ¶¶ 93–106, 111–17.

Second, the City had an unconstitutional written interrogation policy that was highly likely to produce false, coerced, or otherwise unreliable statements and testimony. *Id.* ¶ 384. Here, Lt. Lula and Sgt. Ingrassia followed it by fabricating at least seven statements, deploying all the tactics prescribed by the policy. *Id.* ¶¶ 187–94 (Jose Alvarado); 164–70 (Roberto Hernandez); 175–79 (Jesus Lugo); 125–32 (Alan Lane); 53–64, 209–11 (Carlos Hernandez); 228–34 (Steven Necaise); 36–40, 149–152 (Rafael Colon); and 86–92 (Rolando Pesquera). As

---

[9] This policy also violates *Brady* if, as here, the officer never discloses the *Brady* material.

noted *supra* at 13 – 14, the City does not challenge that this express interrogation policy existed, violated the Constitution, or caused Galarza's injuries. To the extent that they address this express policy allegation at all, it is to describe it as "boilerplate" without even citing the eleven paragraphs, including an extensive quotation of the policy itself, in the Amended Complaint. *Compare* Dkt. 66 ¶¶ 377–88 *with* Dkt. 70-1 at 13.

**B. Three BPD practices caused detectives to fabricate evidence against Galarza.**

BPD had a practice of fabricating evidence generally, which was instantiated through three interrelated practices: (1) omitting material information from reports; (2) coercing witnesses; and (3) writing false information in reports. These practices all caused Galarza to suffer constitutional violations causing his wrongful conviction. As with *Brady*, each of these practices individually is sufficient to state a *Monell* claim, but together the sufficiency is further heightened.

**1. BPD had a policy and practice of fabricating evidence by writing reports with material omissions.**

In addition to the aforementioned material omissions policy, *see supra* at 31, Lt. Lula's and Sgt. Ingrassia's testimony supports an inference that the City maintained a manifest practice of not writing impeachment or exculpatory information in police reports. Lt. Lula testified that he would not include exculpatory information in arrest warrants, in direct contravention of the law, *Golino v. City of New Haven,* 950 F.2d 864, 871 (2d Cir. 1991), and Sgt. Ingrassia testified that supervisors reviewed warrants and the only supervisor requirement for warrants he identified was proof of probable cause. Dkt. 66 ¶¶ 489–90. The City ignores this written policy and the officers' testimony completely.

Lt. Lula and Sgt. Ingrassia followed this practice by omitting material information from their reports about nearly every cooperator. *Id.* ¶¶ 196, 200–01, 203, 263 (Jose Alvarado); 129–

30, 136, 200–01, 203 (Alan Lane); 55, 65, 212–13 (Carlos Hernandez); 171, 200–01, 203 (Roberto Hernandez); 182 (Jesus Lugo); 232 (Steven Necaise); and 86–88 (Rolanda Pesquera). The City does not contest that these were constitutional violations or that the Amended Complaint alleges that the supervisors led, rather than stopped, this misconduct, *Lucente*, 980 F.3d at 306–07 (denying summary judgment because a lieutenant could be a sufficiently senior supervisor).

Other BPD officers followed this same practice and supervisors acquiesced in their misconduct. As previously noted, in 1999, a jury awarded a man over a million dollars after officers omitted exculpatory information from a report, and the *Connecticut Post* published an editorial about the verdict and urged BPD to change. Dkt. 66 ¶¶ 532–536. The City failed to discipline anyone. *Id.* ¶¶ 537–39. Its motion ignores this case entirely.

In 2002, Lula and Ingrassia omitted impeachment information from a police report, but a key witness recanted and the judge granted a motion for acquittal. Dkt. 66 ¶¶ 238–242, 426. The criminal defendant sued and filed a notice of claim about the misconduct in his case, which BPD Chief received before Mr. Galarza's trial. *Id.* ¶¶ 243–44. Here too, BPD policymakers took no action to investigate or discipline officers for known misconduct, revealing that Lula and Ingrassia's actions were consistent with BPD policy.

Galarza has plausibly alleged an unlawful practice of preparing misleading reports. *See supra,* at 32 – 33, 35 – 37. A policy encouraged the practice; supervisors, including a lieutenant and a sergeant, testified about it; a jury, a newspaper, and a notice of claim that the Chief received all decried it; and the supervisors carried out this practice here by omitting impeachment and exculpatory information in reports about nearly every cooperator in this case. Despite all this, BPD did *nothing* to stop it. Instead, they promoted the culprits (who were in the

same "classes" as the Individual Defendants, *see id.* ¶¶ 458–59, 537–38) and acquiesced in the practice. This caused Galarza's wrongful conviction.

### 2. BPD had a policy and practice of fabricating evidence by coercing and improperly motivating witnesses.

The City does not contest that the coercive interrogations in the Rivera-Velez investigation, all of which were followed the City's express coercive interrogation policy, violated the constitution or even explain why they do not plausibly allege a manifest practice modeled—rather than stopped—by supervisors. *Lucente*, 980 F.3d at 306–07 (denying summary judgment because a lieutenant could be a sufficiently senior supervisor). Thus, Galarza need not allege further acts to support the theory.

Galarza does, however, provide further examples of officers implementing BPD's policy on coercive interrogations. Dkt. 66 ¶¶ 417–418 (a 2003 "shocking" case, according to the Second Circuit, where a prosecutor dismissed a case after learning that an officer lied to a defendant and tried to convince him to falsely confess), 423 (a 2003 murder trial where a witness lied after an officer fed him information and offered to help him with a pending case if he testified), 415 (a 2003 murder trial where a witness lied because officers told him, if he lied, "[h]e could go home."); 405–406 (1994 settlement where employees and officers attempted to convince another officer to testify falsely); 393–396 (1994 settlement against officer who pointed a gun at someone's head to coerce a false statement); 389 (1991 jury verdict against officers for falsely arresting someone for refusing to cooperate in an investigation); 359(a) (30 to 40 officers in 1980 closed business, ticketed legally parked cars, and illegally searched apartments to coerce "someone [to] call downtown" with information about a crime). The Amended Complaint also alleges that officers coerced additional witnesses based on recantations in 1998, 2000, and 2001.

Dkt. 66 ¶¶ 408 (Satawhite), 410 (Flores), 412 (Coover), 413 (Luke Jones and Lyle Jones), 425 (Rodriguez).

### 3. BPD had a practice of fabricating evidence by writing false information in reports.

BPD had a practice of including affirmatively false information in police reports. Indeed, during a 1997 trial, an officer and two of her supervisors testified that writing false information in a police report did not even violate the City's policies. Dkt. 66 ¶¶ 469–471.

Lt. Lula and Sgt. Ingrassia followed this practice as well when they reduced all the cooperator statements they *coerced* into writing and thereby created police reports with false information. For one witness, Lula even rewrote a statement to make an exculpatory statement sound inculpatory. *Id.* ¶¶ 97–99, 103. As with the other theories, the City fails to acknowledge this testimony or the misconduct in Galarza's case.

Galarza provides many additional examples of officers writing false information in police reports. *Id.* ¶¶ 482 (2003 lawsuit about false information in police report), 239 (sometime in between 1999 and 2002 Lula, Ingrassia, and other detectives included false information in a police report), 477 (1998 order from a lieutenant to write false information in a police report to coverup misconduct), 473–75 (1998 lawsuit and then settlement where an officer falsely charged a defendant to coverup misconduct), 447–60 (1992 settlement where officers filed false police reports and a sergeant covered it up), 359(b) (1990 case where officer covered up misconduct), 432–439 (1988 settlement of a case with false information in a police report), 442 (1990 criminal case where officers inaccurately documented seized property). The problem with providing inaccurate information in police reports was so pervasive that even BPD itself, as part of a

consent decree, had submitted inaccurate reports to a court-appointed special master. Dkt. 66 ¶ 486.[10]

Together, these allegations allege a sufficiently widespread practice: An officer and supervisors testified that they thought it did not violate BPD's policy; supervisors and officers followed it more than a dozen times; the City settled cases about it; and BPD itself followed it. Nevertheless, BPD did nothing to stop it. The culprits rose to leadership positions in BPD—including one who became the lieutenant in charge of the Detective Bureau during part of the Rivera-Velez investigation, *id.* ¶ 462, and another who also supervised a part of the investigation, *id.* ¶ 464. BPD allowed the practice to cause Mr. Galarza's wrongful conviction.

The City does not address this argument specifically. Instead, it provides a general argument about all the practice theories. Those arguments fail to persuade for the reasons provided above but five arguments warrant brief further discussion.

First, the City discounts lawsuits and settlements because they lack a finding of liability. Dkt. 70-1 at 14, 17. But, as the Second Circuit observed in *Lucente*, "an inference of a municipal policy can be drawn from circumstantial evidence, including evidence that the municipality had notice of but repeatedly failed to make any meaningful investigation into *allegations* of unconstitutional conduct." 980 F.3d at 307 (cleaned up) (emphasis added).

[10] Relatedly, the Amended Complaint also alleges that high-ranking officials, including a lieutenant and a captain, had lied while on-duty and that officers tried to convince others to testify falsely. Dkt. 66 at ¶¶ 478, 480, 405–06, 467. The Court may consider these allegations of the practice, like the related misconduct in *Lucente*, because there the court considered a wide range of misconduct in its analysis, including off-duty conduct and conduct that did not even violate the Constitution. *Lucente*, 980 F.3d at 298–301.

Second, the City mistakenly argues that the Court may not consider events that post-date Plaintiff's wrongful conviction. However, courts recognize that post-incident evidence sheds light on practices in existence at the time of the incident.[11]

Third, the City attempts to discount earlier misconduct that occurred at most fifteen years before the investigation into the Rivera-Velez murders began. Dkt. 70-1 at 15. This argument ignores the fact that in *Lucente* the Second Circuit considered misconduct that predated the challenged misconduct by seventeen years. *Lucente*, 980 F.3d at 298–301.

Fourth, the City tries to distinguish other cases because the fabrication occurred in different contexts. Dkt. 70-1 at 15. This argument, however, supports Galarza's theory because it shows how widespread the problem was. Moreover, it incorrectly assumes that the Court may only consider identical instances of misconduct as evidence of a practice. It does not fully appreciate *Lucente* where the Second Circuit considered a wide range of misconduct in a jail guard sexual assault case, including complaints of off-duty sexual harassment and complaints of mere fraternizing on-duty. 980 F.3d at 298–301.

Fifth, the City argues that the string of recantations are "bare allegations … without any well-pleaded factual basis for concluding that the recanted statements were caused by coercive police interrogation." Dkt. 70-1 at 15. This characterization decontextualizes them. Here, these recantations did not occur in a vacuum but in a department with a written coercive interrogation

[11] *See Parkinson v. Desormeau*, 2024 WL 4973490, at *5 (E.D.N.Y. Dec. 4, 2024) ("[g]iven that plaintiffs allege 'an actual, albeit informal, policy' as a basis for their *Monell* claim, '[s]ubsequent or contemporaneous conduct can be circumstantial evidence of the existence of preceding municipal policy or custom'") (citations omitted); *Floyd v. City of New York*, 813 F. Supp. 2d 417, 449 (S.D.N.Y. 2011), *on reconsideration*, 813 F. Supp. 2d 457 (S.D.N.Y. 2011) (considering subsequent conduct as evidence of a policy and finding that "[e]ven if plaintiffs' evidence of quotas or pressure post-dates the last stop alleged in the Complaint, plaintiffs allege an ongoing pattern that includes, but is not limited to, the specifically alleged incidents"); *Jones v. Town of East Haven*, 493 F. Supp. 2d 302, 331–32 (D. Conn. 2007) (Thompson, J.) (subsequent conduct "is probative for purposes of showing the existence of a municipal policy or custom"), *reversed on other grounds*, 691 F.3d 72 (2d Cir. 2012); *Gentile v. Cnty. of Suffolk*, 926 F.2d 142, 151 (2d Cir. 1991) (post-incident ratification permits inference that unlawful policy existed at the time of the violation of the plaintiff's rights).

policy and an entire prosecution, Galarza's, built on coercion and manipulation. In light of this, it is plausible that the officers in those cases also followed the coercive interrogation policy and that the witnesses recanted to avoid lying under oath.

### C. Policymakers were deliberately indifferent to the need to supervise, discipline and train officers to prevent evidence fabrication.

City policymakers were deliberately indifferent to the need to supervise or discipline, as demonstrated by the inaction described above. *Lewis*, a wrongful conviction case involving coerced statements, is instructive. 2017 WL 101304, at *5. In *Lewis*, the court denied a motion to dismiss a claim based on a failure-to-supervise theory because the complaint alleged that the defendant city did not conduct an investigation after (1) three complaints about coercion in the plaintiff's case; (2) a complaint about coercion before the plaintiff's case; (3) a complaint about coercion after the plaintiff's case; (4) two "contemporaneous complaints" about two other officers using coercive interrogation tactics; and (5) the chief hindering a witness tampering investigation after the plaintiff's conviction. *Id.*

Here, the allegations are substantially stronger. In addition to the evidence fabrication violations and notice described above, written policies required coercive interrogations and material omissions from police reports; officers, including two supervisors, testified that it did not even violate BPD's policies to write false information in a police report; and there were multiple jury verdicts finding the City liable for misconduct related to fabricating evidence, such as falsely arresting someone for refusing to cooperate in an investigation, writing false information in a police report, and omitting material information from a police report, Dkt. 66 ¶¶ 389, 468–71, 530–34. Despite all this, the City failed to even investigate officers for fabricating evidence and sent a clear signal to the Individual Defendants that they could do so without facing consequences. In Galarza's case, they still have not faced any repercussions.

Plaintiff's failure-to-train theory for evidence fabrication also satisfies *Walker*'s three-part test.

*First*, City policymakers obviously knew that in most cases, detectives would question suspects and witnesses, and memorialize those interactions in reports.

*Second*, conducting and memorializing interviews presents detectives with a "difficult choice." Detectives acting in good faith will not necessarily appreciate the importance of complete documentation. Moreover, written training, which regarded *Brady* material as "irrelevant," affirmatively misdirected detectives.

The same is true for interrogations. Even a detective determined to act in good faith must navigate the line between tactics that extract the truth from a reluctant interviewee and tactics that coerce an initially truthful interviewee to tell a lie that fits the law-enforcement narrative. The official training, which encouraged officers to use insecurity, discomfort, dominance, false information, and a "feeling of reciprocity" to secure statements, also led detectives astray rather than making the lawful choice "easier." Dkt. 66 ¶ 384.

The Amended Complaint has also satisfied *Walker*'s alternative requirement for the second prong. As explained above, BPD officers have a history of improperly writing reports and interrogating suspects. *See* pp. 32 – 37, *supra*.

*Third*, making the wrong choice when conducting or memorializing an interrogation or interview is likely to result in constitutional violations. At the time of the Galarza investigation, detectives in Bridgeport and elsewhere commonly used an inherently coercive interrogation technique described in the Amended Complaint. They did this despite the common knowledge at the time that these deceptive and psychologically coercive interrogation techniques caused false statements. Dkt. 66 ¶¶ 378–82 (State's Attorney for Fairfield County, the Supreme Court, and

leading academics all warned of the dangers of misapplying coercive and misleading interrogation practices well before the Galarza investigation).

Omitting exculpatory and impeachment material from police reports ensures that such material goes undiscovered and is equally likely to result in constitutional violations. Creating signed statements which purport to be complete and verbatim records, but which in fact omit the coercion under which the statement was made, is evidence fabrication.

The City does not address these arguments. Instead, it provides a general argument about all the deliberate indifferent theories. Dkt. 70-1, at 18–22. Those arguments fail to persuade for the reasons provided above.

## CONCLUSION

For the foregoing reasons, the Court should deny the City's motion to dismiss.

Dated: September 15, 2026 Respectfully submitted,

**LAW OFFICES OF JOEL B. RUDIN, P.C.**
/s/ Joel B. Rudin
Joel B. Rudin (ct25097)*
David E. Rudin (ct209360)*
Sam Thypin-Bermeo (ct209359)*
Sam Kuhn (ct209361)*
Partha Sharma (ct209362)*
152 West 57th Street, 8th Floor
New York, New York 10019
Telephone: (212) 752-7600
*Admitted *pro hac vice*

**THE LAW OFFICE OF KENNETH ROSENTHAL**
*/s/ Kenneth Rosenthal*
Kenneth Rosenthal (ct05944)
One Audubon Street, 3rd Floor
New Haven, Connecticut 06511
Telephone: (203) 285-8545

*Attorneys for Plaintiff Luis Galarza*