**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| LUIS GALARZA,<br><br>Plaintiff,<br><br>- against -<br><br>THE CITY OF BRIDGEPORT; LYNN KERWIN, THOMAS LULA, AND VINCENT INGRASSIA, Individually and in Their Official Capacities as Bridgeport Police Officers,<br><br>Defendants. | ) | **Case No. 3:26-cv-00588 (VDO)** |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT CITY OF BRIDGEPORT'S MOTION TO BIFURCATE TRIAL AND STAY DISCOVERY OF PLAINTIFF'S *MONELL* CLAIM**

# TABLE OF CONTENTS

TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

STATEMENT OF FACTS .......... 5

ARGUMENT .......... 12

I. The City Fails to Identify Compelling Circumstances that Outweigh the Benefits of a Joint Trial and Fails to Show Good Cause for Deciding the Bifurcation Issue Now. .......... 12

A. Trial bifurcation is only appropriate in exceptional cases "for convenience, to avoid prejudice, or to expedite and economize," with the burden of persuasion on the movant. .......... 12

B. Bifurcation would not avoid two trials here because there's no realistic possibility a first jury would find that no violation of Plaintiff's constitutional rights occurred. .......... 13

C. Trial bifurcation would not significantly limit the evidence presented at the first trial while requiring wasteful repetition of the same testimony at the second trial. .......... 15

D. Bifurcation would create difficult jury and trial management concerns. .......... 18

E. Bifurcation would unfairly prejudice Plaintiff in numerous ways, including delay, added expense, and enabling the Defendants to defeat liability through inconsistent defenses. .......... 19

F. The Court has trial management tools to avoid unfair prejudice to the Defendants from a joint trial. .......... 21

G. The City's motion to bifurcate trial is premature. .......... 23

II. The City Fails to Show Good Cause for a Protective Order to Bifurcate or Stay Discovery. .......... 23

CONCLUSION .......... 29

# TABLE OF AUTHORITIES

**Cases**

*Askins v. Doe No. 1*,
727 F.3d 248 (2d Cir. 2013) .......... 14

*Awalt v. Marketti*,
2012 WL 1161500 (N.D. Ill. Apr. 9, 2012) .......... 19, 20

*Barrett v. Orange Cnty. Hum. Rights Comm'n*,
194 F.3d 341 (2d Cir. 1999) .......... 14

*Batista-Reyes v. Paul*,
188 F.4th 141 (2d Cir. 2026) .......... 11

*Blyden v. Mancusi*,
186 F.3d 252 (2d Cir. 1999) .......... 13, 18

*Brady v. Maryland*,
373 U.S. 83 (1963) .......... 5

*Byrne v. Yale Univ.*,
2020 WL 5258998 (D. Conn. Sept. 3, 2020) (Bryant, J.) .......... 12

*Cadle v. City of Chicago*,
2015 WL 6742070 (N.D. Ill. Nov. 2, 2015) .......... 25, 27

*Caterpillar, Inc. v. Williams,*
482 U.S. 386 (1987) .......... 13

*Charles v. Johnson*,
18 F.4th 686 (11th Cir. 2021) .......... 16

*City of W. Haven v. Hartford Ins. Co.*,
221 Conn. 149 (1992) .......... 15

*Conservation L. Found. v. Shell Oil Co.*,
2023 WL 4706815 (D. Conn. July 24, 2023) (Farrish, J.) .......... 25

*Crawley v. City of Syracuse*,
2018 WL 3716782 (N.D.N.Y. Aug. 3, 2018) .......... 24

*D'Arrigo v. Gloucester City*,
2007 WL 4440222 (D.N.J. Dec. 17, 2007) .......... 22

*Dempsey v. City of Rochester*,
2025 WL 3291822 (W.D.N.Y. Nov. 26, 2025) .......... 14, 16

*DePaul v. Kimberly-Clark Corp.*,
2025 WL 2256307 (D. Conn. Aug. 7, 2025) (Dooley, J.) .......... 24

*Duggan v. Vill. of New Albany*,
2009 WL 2132622 (S.D. Ohio July 10, 2009) .......... 27

*Fair v. Kohler Die & Specialty Co.*,
228 U.S. 22 (1913) (Holmes, J.) .......... 13

*Ferrante v. Metro-N. Commuter R.R.*,
2007 WL 1793447 (S.D.N.Y. June 18, 2007) .......... 12, 23

*Garcia v. Ramirez*,
2021 WL 1253448 (N.D. Ill. Apr. 5, 2021) .......... 22

*Hope v. Pelzer*,
536 U.S. 730 (2002) .......... 16

*Horn v. City of New Haven*,
No. 18-cv-1502 (KAD) (D. Conn. Dec. 18, 2025) (Dooley, J.) .......... 18

*Hurt v. Vantlin*,
2019 WL 6828153 (S.D. Ind. Dec. 13, 2019) .......... 17

*Intersong-USA, Inc. v. CBS, Inc.*,
1985 WL 441 (S.D.N.Y. Mar. 21, 1985) .......... 12, 13

*Jackson v. City of Cleveland*,
2022 WL 17089769 (N.D. Ohio Nov. 21, 2022) .......... 28

*James v. City of Los Angeles*,
2024 WL 3467771 (C.D. Cal. Feb. 15, 2024) .......... 22

*Jeanty v. County of Orange*,
379 F. Supp. 2d 533 (S.D.N.Y. 2005) .......... 22

*Jimenez v. City of New York*,
2026 WL 2617389 (2d Cir. Sept. 4, 2026) .......... 20

*John Wiley & Sons v. Book Dog Books, LLC*,
298 F.R.D. 184 (S.D.N.Y. 2014) .......... 24

*Kee v. City of New York*,
12 F.4th 150 (2d Cir. 2021) .......... 13

*Lee v. Edwards*,
101 F.3d 805 (2d Cir. 1996)........................................................................................ 16

*Lewis v. City of Albany Police Dep't*,
547 F. Supp. 2d 191 (N.D.N.Y. 2008)........................................................................ 17

*Lopez v. New York*,
2021 WL 2739058 (S.D.N.Y. July 1, 2021)........................................................... 26, 27

*Martinez v. Robinson*,
2002 WL 424680 (S.D.N.Y. Mar. 19, 2002)................................................................ 23

*Mattsson v. Pat McGrath Cosms. LLC*,
2022 WL 1658516 (S.D.N.Y. May 25, 2022)............................................................... 13

*McKinley v. Trattles*,
732 F.2d 1320 (7th Cir. 1984)...................................................................................... 17

*Miller v. Am. Bonding Co.*,
257 U.S. 304 (1921)...................................................................................................... 12

*Monell v. Department of Social Services,*
436 U.S. 658 (1978)........................................................................................................ 1

*Morant v. City of New Haven*,
2026 WL 1108118 (D. Conn. Apr. 23, 2026) (Nagala, J.)........................................... 17

*Morien v. Munich Reinsurance Am., Inc.*,
270 F.R.D. 65 (D. Conn. 2010) (Smith, M.J.)............................................................... 25

*Morse v. Fusto*,
804 F.3d 538 (2d Cir. 2015)........................................................................................ 14

*Moss v. Hollis*,
1990 WL 138531 (D. Conn. June 29, 1990) (Dorsey, J.).............................................. 24

*Newman v. Berkley*,
2021 WL 1948460 (C.D. Ill. May 15, 2021)................................................................ 27

*Okin v. Vill. of Cornwall-on-Hudson Police Dep't*,
577 F.3d 415 (2d Cir. 2009)........................................................................................ 16

*Owen v. City of Independence*,
445 U.S. 622 (1980)...................................................................................................... 14

*Parmar v. City of Aurora*,
2021 WL 1662719 (D. Colo. Apr. 28, 2021) ... 19

*Pavlovich v. City of New York*,
1992 WL 230472 (S.D.N.Y. Aug. 31, 1992) ... 23

*Pavone v. Gibbs*,
1997 WL 833472 (E.D.N.Y. Sept. 29, 1997) ... 22

*Real v. Bunn-O-Matic Corp.*,
195 F.R.D. 618 (N.D. Ill. 2000) ... 22

*Schoolcraft v. City of New York*,
133 F. Supp. 3d 563 (S.D.N.Y. 2015) ... 22

*Scott v. City of Tulsa*,
795 F. Supp. 3d 1351 (N.D. Okla. 2025) ... 21

*Simmons v. City of Chicago*,
2017 WL 3704844 (N.D. Ill. Aug. 28, 2017) ... 17

*Small v. City of New York*,
2022 WL 1261739 (S.D.N.Y. Apr. 28, 2022) ... 15

*Soto v. Gaudett*,
862 F.3d 148 (2d Cir. 2017) ... 14

*Stanley Works Israel Ltd. v. 500 Grp.*,
2018 WL 1960112 (D. Conn. Apr. 26, 2018) (Haight, J.) ... 24, 25

*Staton v. Connecticut*,
2009 WL 4250064 (D. Conn. Nov. 20, 2009) (Hall, J.) ... 23

*Sunbelt Corp. v. Noble, Denton & Assocs.*,
5 F.3d 28 (3d Cir. 1993) ... 21

*Svege v. Mercedes-Benz Credit Corp.*,
329 F. Supp. 2d 283 (D. Conn. 2004) (Kravitz, J.) ... 12, 13

*Terrell v. Childers*,
1996 WL 385310 (N.D. Ill. July 3, 1996) ... 22

*United States v. Rodriguez*,
496 F.3d 221 (2d Cir. 2007) ... 10

*Wyatt v. City of Lackawanna*,
2024 WL 945956 (W.D.N.Y. Feb. 6, 2024) ........ 27

*Wyatt v. Cole,*
504 U.S. 158 (1992) ........ 4

**Other Authorities**

Fed. R. Civ. P. 42 ........ 12

Fed. R. Civ. P. 42,
advisory committee's note to 1966 amendment ........ 12

Standing Order on Scheduling in Civil Cases,
Order No. CTAO-18-21A (D. Conn. July 30, 2018) ........ 24

**INTRODUCTION**

Plaintiff Luis Galarza spent decades in prison due to the unconstitutional conduct of three Bridgeport Police Department ("BPD") officers named in this lawsuit: Lt. Thomas Lula, Sgt. Vincent Ingrassia, and Capt. Lynn Kerwin. The lawsuit alleges that their misbehavior was caused by the reprehensible policies and practices of the BPD and thus, under *Monell v. Department of Social Services,* 436 U.S. 658 (1978), the City of Bridgeport is liable as well.

On September 1, 2026, the City moved to bifurcate the trial of the non-*Monell* claims from the trial of the *Monell* claim and to stay *Monell* discovery unless and until the individual claims are resolved in Plaintiff's favor. Its principal rationale is that a joint trial would unfairly prejudice the individuals, none of whom have moved against the Amended Complaint and none of whom initially moved for bifurcation, and that *Monell* discovery should be delayed because the outcome of the initial trial may make it unnecessary. Belatedly, the individuals, without elaboration, have asked to join in the City's motion.

The Defendants' motion should be denied. Any decision to bifurcate trial is premature and, in any case, their arguments for bifurcation and a stay are specious.

The City's main argument for trial bifurcation is that the evidence that would be introduced solely on the *Monell* claim at a joint trial would unfairly prejudice the Individual Defendants. But the City's motion is premature. A judicial determination of the order of trial ordinarily considers the claims and defenses that have survived summary judgment and that the parties actually intend to go forward with, as well as the specific evidence the parties will seek to introduce in support of their claims. At the present time, Defendant's motion to dismiss the *Monell* claim is unresolved; virtually no document discovery, and no depositions, have occurred; no factual issues have been sharpened or narrowed through summary judgment; and no *in limine* motions have been filed. We have confidence that this Court, like the courts in Connecticut that

have recently tried similar *Monell* claims together with individual claims after denying bifurcation motions, can protect all parties' rights through its pretrial and trial rulings.

The City's motion fails to consider that there are numerous trial issues other than *Monell* for which the *Monell* evidence would be necessary. For example, the City has not asked to bifurcate Plaintiff's state law claims for negligence and indemnification, but these claims bring into play the BPD's policies and practices, including the adequacy of its training, supervision and discipline of its employees. Regarding indemnification, the jury will have to consider whether the Individual Defendants acted consistently with or violative of municipal policy and training. Similarly, BPD policies, practices, and training also must be considered by the jury in determining whether to assess punitive damages on the individuals. Thus, the *Monell* evidence would be before the same jury anyway. Bifurcation would offer no benefit.

The City's second rationale for bifurcation is that the *Monell* claim would not have to be adjudicated if the jury at a first trial finds that Plaintiff's rights were not violated at all, but they make no showing that this is likely to happen and, in fact, the likelihood of it happening is virtually nil. As we show below, Plaintiff already has the necessary evidence to establish *Brady* violations, evidence fabrication, and malicious prosecution. The City ignores that the State Attorney's Office *consented* to vacate Mr. Galarza's conviction due to *Brady* violations that the detectives and trial prosecutor have *admitted* in their testimony. Meanwhile, documentary proof shows that the detectives prepared materially misleading documentation of their investigation, and Plaintiff already has detailed statements from several of the trial witnesses against him that police coerced them to falsely accuse Mr. Galarza. It is extraordinarily unlikely that a jury will find that none of Plaintiff's fair trial rights were violated. Bifurcation will not avoid a *Monell* trial, but just needlessly and unfairly delay it.

The Defendants' motion appears to assume that "bifurcation" would mean two trials before two separate juries, but such a process would raise serious Seventh Amendment concerns that Defendants fail to consider. Plaintiff is constitutionally entitled to have his claims determined by one jury and not have the first jury's findings second-guessed by a second jury. The City doesn't appear to realize that it would be bound by the first jury's determinations of facts bearing on its defense of the *Monell* claim. Nor apparently has it considered the burden it would place on the Court to make sure that no issues come up at the second trial that might lead to inconsistent findings.

While another possibility would be a sequential trial of individual and *Monell* issues before the same jury, that would be impossible if *Monell* discovery has been stayed. Even if it is not stayed, a sequential trial would still be a logistical nightmare. As with two trials, depending on how the claims are divided up for trial, the City might have no standing to participate at the first phase, yet it would be bound by the jury's findings. On the other hand, if claims and defenses are tried at the first trial that require consideration of policy and practice evidence, there would be no purpose to the bifurcation. There would also be serious jury management issues. If the jury was told that it would only have to return to consider the *Monell* claim if it made findings in Plaintiff's favor at the initial phase of the trial, it would be prejudicially predisposed to find for the defense. If it was not told of the bifurcation, then how would the parties evaluate jurors for their receptivity to the municipal claims that they might ultimately have to consider? How would the Court protect against jurors who cannot remain for such a lengthy overall trial or resent being surprised that they must stay for a second round? Meanwhile, the Court would have to constantly rule on evidentiary objections that proffered evidence should only be admitted at

the other phase, and the jury likely would have to hear repetition of testimony, from the same witnesses, at both phases.

As for the City's application for a stay of *Monell* discovery, it fails to establish good cause for deviating from the presumptive rule that all pretrial discovery must be conducted together. The City's main argument is that *Monell* discovery might prove unnecessary because Plaintiff's rights were not violated at all, but as we already have discussed, there is literally *no possibility* that a jury will reach such a conclusion and much of the *Monell* discovery would also be relevant to Plaintiff's other claims. A stay also would lead to nonstop litigation of whether document discovery or deposition questioning is on the wrong side of the line, requiring constant requests for judicial intervention at which the Court would have to repeatedly consider the complex interplay between the state and the federal claims.

Finally, staying *Monell* discovery would be grossly unfair to Plaintiff. It would indefinitely delay his ability to question witnesses about their memories of 25-year-old (or more) policies, practices, training, and specific occurrences. The old saying that delay benefits the defense because witnesses die or their memories fade is especially applicable here. It would also require Plaintiff to take multiple overlapping depositions of the same witnesses. Ultimately, a stay would substantially delay final resolution of Mr. Galarza's case and delay for years his desire to put his trauma behind him.

*Monell* liability is intended to permit aggrieved individuals to expose the unlawful or deliberately indifferent policies of a municipality and to hold it accountable, not only so that a Plaintiff will be compensated, but also so that the municipality will be forced to change its ways. *See, e.g.*, *Wyatt v. Cole,* 504 U.S. 158, 161 (1992) (purpose of § 1983 to "deter" future constitutional violations). Our Amended Complaint shows that Bridgeport, for decades, has

looked the other way while its police violate individual rights, enforce the law in a racially discriminatory manner, and protect each other with a code of silence. Sunlight, to quote Justice Brandeis, is the greatest disinfectant. The City should not be allowed through the shield of bifurcation to protect itself from the sun.

## STATEMENT OF FACTS

### Procedural History of the Case

On November 1, 2001, Lula and Kerwin signed an arrest warrant, charging Galarza with capital murder, Dkt. 66 (Amd. Compl.) ¶ 198. In 2003, the State tried him and sought the death penalty. *Id.* ¶¶ 253–54. The case turned on the testimony of six jailhouse informants: Alan Lane, Carlos Herndnez, Rafael Colon, Robert Hernandez, Jesus Lugo, and Steven Necaise. *Id.* ¶ 255. The jury found Galarza guilty on two counts of murder and not guilty on two counts of felony murder. *Id.* ¶ 272. A week later, the jury denied the State's request for the death penalty, relieving him of the specter of being killed by the State after nearly two years of suffering. *Id.* ¶ 275. On September 12, 2003, after reaffirming his innocence, Galarza was sentenced to life in prison without any hope of parole. *Id.* ¶ 276.

Consistent with his innocence, Galarza filed a total of seven appeals and collateral attacks seeking to overturn his conviction. *Id.* ¶ 288. Finally, on November 30, 2023, after a state habeas corpus hearing at which evidence was presented of recantation and perjury on the part of key State's witnesses and a series of *Brady* violations were proven, the State's Attorney in Bridgeport joined in a motion to vacate Galarza's conviction which stipulated that his constitutional rights under *Brady v. Maryland*, 373 U.S. 83 (1963), had been violated, and the court granted it. Kuhn Decl. ¶¶ 3–4. On April 18, 2024, upon the Bridgeport State's Attorney consent, the court dismissed the case. Dkt. 66 ¶¶ 293–98.

Galarza initiated this action on April 16, 2026, Dkt. 1, and filed an Amended Complaint on July 21, 2026, Dkt. 66. The Amended Complaint contains a total of six state and federal causes of action against the Individual Defendants, as well as two state law claims and a *Monell* claim against the City. *Id.* ¶¶ 303–585. The City filed a motion to dismiss only Count V, the *Monell* claim, Dkt. 70-1; the Individual Defendants did not move at all.

In the instant motion, the City, joined later by the Individual Defendants, moved to bifurcate trial and stay discovery on just the *Monell* claim, Count V. *See* Dkts. 74, 79, 78, 80. The Defendants did not attach any exhibits to their motion.

**<u>The Claims and Allegations in the Complaint and the Evidence to Prove Them</u>**

In his Amended Complaint, against the Individual Defendants, Galarza brings federal claims of malicious prosecution (Count I), evidence fabrication (Count II), violation of *Brady* (Count III), and failure to intervene (Claim IV), and state claims of negligent infliction of emotional distress (Count VI) and negligence (Count VII). Against the City, he has brought a federal *Monell* claim (Count V), a state indemnification claim (Count VIII), and a state direct action claim alleging negligent policies, training and supervision (Count IX). These claims arise from the same nucleus of facts: the wrongful investigation and prosecution of Galarza and the City's role in this injustice.

The case began when Magdiel Rivera, Jr. and Luis Velez were murdered on October 15, 1999, and Lula and Ingrassia were assigned to investigate. Dkt. 66 ¶¶ 19, 27–29. As the Amended Complaint shows, the detectives soon had several suspects from the Bridgeport drug trafficking world in which Rivera and Velez had been active players, including Jose Alvarado, Roberto Hernandez, Edwin Bonilla, and Jose Arciniega. *Id.* ¶¶ 32–46. Ingrassia had heard that Plaintiff dealt drugs with some of the suspects and pulled him over in a pretextual traffic stop to

pressure him to assist with the investigation. *Id.* ¶¶ 47–50. When Galarza refused, Ingrassia threatened to frame him for the murders. *Id.* ¶¶ 50–52.

Over the next two-and-a-half years, Ingrassia and Lula carried out that threat. They did so by fabricating evidence through coercive interrogations and secret promises to witnesses. They motivated Roberto Hernandez and Jose Alvarado to falsely accuse Galarza by playing each of them a doctored tape they had prepared which made it seem, falsely, that Galarza was cooperating against them, feeding these men information about the crime, and threatening to charge them with the murders and take away their children unless they implicated Galarza. *Id.* ¶¶ 159–70, 187–94. They secretly offered Jesus Lugo, Alan Lane, Carlos Hernandez, Steven Necaise, Rolando Pesquera, and Rafael Colon consideration, including sentencing reductions, continuances, and other forms of leniency, in exchange for their testimony against Galarza, and then coached them with crime scene evidence to help them make up false accounts that seemed plausible. *Id.* ¶¶ 53–64, 86–92, 125–32, 149–52, 164–70, 175–79, 183–84, 187–95, 208–11, 215–20, 228–33. They manufactured false or materially misleading reports and other police documentation which omitted the witnesses' initial exculpatory statements as well as how the inculpatory statements described therein had been coerced or induced with secret promises of leniency or other benefits. *Id.* ¶¶ 55, 65, 86–88, 129–30, 136, 169–71, 178–80, 182–83, 185–86, 196, 200–01, 203, 212–14, 230–32, 262–63.

Lula and Ingrassia also hid evidence and fabricated inculpatory statements. For example, Lula never disclosed Ramon DeJesus's handwritten, sworn statement providing Galarza with a complete alibi on the night of the murders. *Id.* ¶¶ 96, 99–101. In the statement, DeJesus swore that Galarza said in disbelief, "get out of here, get out of here," when he learned of the murders. *Id.* ¶¶ 97–99. But, in an intra-office memorandum, Lula lied and wrote that DeJesus had actually

said, "get out of there," as if he was urging someone to flee because he had been involved in the crime. *Id.* ¶¶ 103–104. Nor did Lula disclose a report documenting that Luis Sostre said that his cousin, Thomas Garcia, knew that Jose Arciniega—not Galarza—had committed the Rivera-Velez murders. *Id.* ¶¶ 111–13. Ingrassia failed to record that he stopped Galarza's car under a false pretext, threw him to the ground, searched his car, and threatened to frame him if he refused to cooperate. *Id.* ¶¶ 48–52. The detectives never disclosed witness Carlos Hernandez's prior perjury, that a plaintiff named Rusty Rodriguez was suing Lula and Ingrassia for their misconduct in bringing about his wrongful murder charge, or prior disciplinary findings against Lula and another officer who testified at Galarza's trial. *Id.* ¶¶ 238–45, 248, 250–52, 283.

Galarza was arrested, charged, and, ultimately, convicted based upon the evidence and testimony Lula and Ingrassia manufactured, without the benefit of the powerful impeachment and exculpatory evidence that the detectives suppressed. *Id.* ¶¶ 198–206, 253–76.

Galarza makes these allegations based on direct and circumstantial evidence, some of it conclusive, already in his possession. For example, regarding cooperator Alan Lane, a state prosecutor, Richard Colangelo, based in Stamford, Connecticut, testified that Lane received consideration for his cooperation against Galarza, precisely as requested in a letter he received from Defendant Lula before Galarza's trial. Kuhn Decl. ¶¶ 5–6. Galarza's prosecutor, C. Robert Satti, Jr., testified that he never saw the letter, Kuhn Decl. ¶¶ 7, and Lula admitted under oath he never even discussed it with any Bridgeport prosecutor. Kuhn Decl. ¶ 8. Lane then testified falsely at trial, uncorrected by anyone, that he had not received any consideration for his testimony. Kuhn Decl. ¶ 9. Lane stated to a private investigator in 2024 that when he pleaded guilty to first-degree robbery in 2001, he knew that his initial sentence of nine years in prison but that, due to his cooperation, it would be reduced to three years. Kuhn Decl. ¶ 10. Shortly after

testifying at Galarza's trial, Lane's sentence in fact was reduced to three years pursuant to the joint motion by his lawyer and Colangelo. Kuhn Decl. ¶¶ 11–12.

Lula admitted his involvement in a similar deal with Stamford prosecutor Colangelo concerning cooperator Rafael Colon and that he never discussed with Galarza's prosecutor Satti what witnesses "had going in [sic] in their respective cases." Kuhn Decl. ¶¶ 13–14. An undisclosed report to Kerwin further confirms this admission. Kuhn Decl. ¶ 15. Colon then received a substantial sentencing benefit: all but three years of his 10-year sentence for narcotics violations were suspended. Kuhn Decl. ¶ 16. At Galarza's trial, he claimed that he received early release because of his "good behavior." *Id***.** No evidence that Lula interceded on his behalf and obtained leniency for him was elicited. *Id*.

There is also clear evidence that a third cooperator, Carlos Hernandez, received undisclosed benefits for his cooperation. Before Galarza's trial, one of the assigned detectives, Defendant Ingrassia, wrote Hernandez's sentencing judge a letter in support of Hernandez's request for a stay of his sentencing so that he could later receive sentencing credit for cooperating against Galarza. Kuhn Decl. ¶ 17. Satti denied knowledge of this letter during a subsequent habeas hearing. Kuhn Decl. ¶ 18. In fact, Judge Underhill reduced Hernandez's federal Guidelines sentence by 9-13 years after being informed of his cooperation against Galarza. Kuhn Decl. ¶ 19 (plea agreement noting exposure of 188 to 235 months), Kuhn Decl. ¶ 20 (transcript of sentencing to 78 months).

Additional evidence clearly suggests that Steven Necaise and Jesus Lugo received undisclosed sentencing benefits. Necaise told Plaintiff's private investigator he received "approximately 5 years off his sentence in exchange for providing his statement." Kuhn Decl. ¶ 21. Necaise had contacted the BPD from jail weeks after his first-degree assault conviction, for

which he faced 27 to 35 years in prison. Kuhn Decl. ¶ 22. On July 16, 2003, about one month after testifying against Galarza, Necaise was sentenced to 20 years—seven less than the minimum of his sentencing exposure. Kuhn Decl. ¶ 23. Docket information for Jesus Lugo shows that he also received a sentence modification in exchange for his false testimony. Less than two months after testifying against Galarza, Lugo's 10-year robbery sentence, which required him to serve at least 3 ½ years, was fully suspended and he was released from custody. Kuhn Decl. ¶ 24. The detectives' efforts to secure these cooperation agreements were excluded from the detectives' reports and not elicited at trial. Kuhn Decl. ¶¶ 25–29.

A fourth piece of undisclosed *Brady* information involved third-party culpability evidence. On August 17, 2001, Lula wrote a report, reviewed by Kerwin but never disclosed to Satti, containing information pointing to Jose Arciniega as the killer. Kuhn Decl. ¶ 30. Lula did not put this report in the Galarza case file and it was never disclosed to Galarza's prosecutor even though it contained "information potentially leading to admissible evidence favorable to the defense." *United States v. Rodriguez*, 496 F.3d 221, 226 n.4 (2d Cir. 2007).

The record of evidence fabrication is also strong. Jose Alvarado and Roberto Hernandez each separately disclosed how Lula and Ingrassia threatened to prosecute them and take away their children if they refused to implicate Galarza. Kuhn Decl. ¶¶ 31–33. Jose Alvarado testified that, to cause him to manufacture a false story, the Individual Defendants showed him crime scene pictures of how the shooting had occurred, played a doctored tape recording which falsely made it appear that Galarza had called the FBI to accuse him, and "scare[d]" him by telling him he would be charged with the murders and that they would take his children away from him. Kuhn Decl. ¶ 31. In an affidavit sworn soon after Galarza's trial, Roberto Hernandez described the detectives threatening him in the same way they threatened Alvarado, then helped him

fabricate a story by showing him photographs depicting how the victims' bodies were arranged at the crime scene. Kuhn Decl. ¶ 33.[1] Years later, Jesus Lugo revealed that "detectives also gave him specific information and pieces relevant to the murders and what took place that night that he would have never known." Kuhn Decl. ¶ 34. Another affidavit sworn by Roberto Hernandez in 2003 corroborates that Lugo falsely implicated Galarza with information fed by the detectives. Kuhn Decl. ¶ 35. Steven Necaise disclosed that the detectives "tr[ied] to lead [him]" about the alleged location of the murder weapon and that "portions of his prior statement were influenced by information provided to him during question[ing]." Kuhn Decl. ¶¶ 21, 36.

Lula's 30-page report, which summarized the entire case, omitted all this materially significant impeachment information: the threats, the promises of benefits, and the feeding of information. Kuhn Decl. ¶ 37.

The Amended Complaint alleges, in great detail, how the *Brady* violations, fabricated evidence, and prosecution of Plaintiff without probable cause resulted from the unlawful policies and practices of the BPD as well as the deliberate indifference of its policymakers to such unlawful acts. Defendant City's motion to bifurcate concedes that "Plaintiff is already in possession of a significant amount [of *Monell* evidence] … as a result of their own investigation or . . . consent decrees" in two long-term class-action cases. Deft. Mem. 10.

[1] Based on information and belief, Roberto Hernandez passed away sometime after giving this statement. His statement, however, would be admissible under the residual exception set forth in Fed. R. Evid. 807. *See Batista-Reyes v. Paul*, 188 F.4th 141, 156 (2d Cir. 2026) (admitting recantation under the residual exception set forth in Fed. R. Evid. 807).

# ARGUMENT

## I. The City Fails to Identify Compelling Circumstances that Outweigh the Benefits of a Joint Trial and Fails to Show Good Cause for Deciding the Bifurcation Issue Now.

### A. Trial bifurcation is only appropriate in exceptional cases "for convenience, to avoid prejudice, or to expedite and economize," with the burden of persuasion on the movant.

"For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues . . . ." Fed. R. Civ. P. 42(b). "In the Second Circuit, bifurcation is the exception, not the rule." *Post Univ. v. Learneo, Inc.*, 2026 WL 413862, at *2 (D. Conn. Feb. 15, 2026) (Oliver, J.) (internal citation and quotation marks omitted). *See also* Fed. R. Civ. P. 42(b) advisory committee's note to 1966 amendment ("[S]eparation of issues for trial is not to be routinely ordered.").

"[T]he moving party bears the burden of establishing that bifurcation is warranted." *Byrne v. Yale Univ.,* 2020 WL 5258998, at *13 (D. Conn. Sept. 3, 2020) (Bryant, J.) (citation omitted). "[T]he circumstances justifying bifurcation should be particularly compelling and prevail only in exceptional cases." *Post Univ.*, 2026 WL 413862, at *2 (citation and quotation marks omitted). "Separate trials should not be ordered unless such a disposition is clearly necessary." *Intersong-USA, Inc. v. CBS, Inc.*, 1985 WL 441, at *2 (S.D.N.Y. Mar. 21, 1985) (internal citation and quotation marks omitted). The party seeking bifurcation "bears the burden of establishing" the necessity for it, *Ferrante v. Metro-N. Commuter R.R.*, 2007 WL 1793447, at *2 (S.D.N.Y. June 18, 2007), "on the basis of the substantial benefits that it can be expected to produce," *Svege v. Mercedes-Benz Credit Corp.*, 329 F. Supp. 2d 283, 284 (D. Conn. 2004) (Kravitz, J.).

"[T]he general practice [of trial courts] is to try all the issues in a case at one time[.]" *Miller v. Am. Bonding Co.*, 257 U.S. 304, 308 (1921). The reasons are obvious: A "jury is

entitled to hear all of the evidence and deliberate over all of the issues in the case at one time." *Svege*, 329 F. Supp. 2d at 284; *see also Mattsson v. Pat McGrath Cosms. LLC*, 2022 WL 1658516, at *3 (S.D.N.Y. May 25, 2022) (collecting Second Circuit case law holding the same). Single trials are more efficient, lessening "the delay, expense and inconvenience to all concerned." *Intersong-USA, Inc.*, 1985 WL 441, at *2 (internal citation and quotation marks omitted). Moreover, it has long been accepted under the well-pleaded complaint rule that the Plaintiff is "the master of the claim," *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 392 (1987), and may "decide what law he will rely upon," *Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913) (Holmes, J.).

Under the Seventh Amendment, "issues may be divided and tried separately, but a given issue may not be tried by different, successive juries." *Blyden v. Mancusi*, 186 F.3d 252, 268 (2d Cir. 1999). Trying cases with overlapping evidence in front of two different juries may result in reversable error. *See id*. at 257.

**B. Bifurcation would not avoid two trials here because there's no realistic possibility a first jury would find that no violation of Plaintiff's constitutional rights occurred.**

The City's entire motion rests on the premise that a jury will find that Plaintiff suffered no constitutional violation at the hands of the Individual Defendants, and thus there will be no basis for a *Monell* trial. Dkt. 74 at 7–8. But the City undertakes no analysis of the evidence in this case to show that any such possibility is realistic.

In fact, as the above Statement of Facts show, *see* pp. 5 – 11, *supra,* Plaintiff already has virtually bullet-proof evidence that serious *Brady* violations occurred, and strong evidence as well that witness statements and detectives' documentation of their investigation was fabricated and that without such evidence there was no probable cause. *See Kee v. City of New York*, 12 F.4th 150, 168 (2d Cir. 2021) (tort of evidence fabrication occurs when officers cause the

creation of false information that they forward to prosecutors and that leads to the deprivation of the plaintiff's liberty); *Morse v. Fusto*, 804 F.3d 538, 548 (2d Cir. 2015) (police fabricate evidence when they omit material information from a report that makes it misleading). Even before discovery, Plaintiff can prove that his Fourth Amendment (malicious prosecution) and Sixth and Fourteenth Amendment fair trial rights (*Brady,* evidence fabrication) were violated.

The City suggests that a jury verdict in the individual defendants' favor would necessarily obviate the need for a *Monell* trial, *see* Mem. at 6–7, but this is not so. The individuals could win on the basis that they did not act intentionally because they were not trained in the law or that their actions were not objectively unreasonable and thus protected by qualified immunity, but Galarza's constitutional rights could still have been violated. Unlike individuals, "the entity itself is not allowed to assert that defense." *Soto v. Gaudett*, 862 F.3d 148, 162 (2d Cir. 2017) (citing *Owen v. City of Independence*, 445 U.S. 622, 638 (1980)). To hold that a municipality "escapes liability for the tortious conduct of its police officers because the individual officers are entitled to qualified immunity would effectively extend the defense of qualified immunity to municipalities, contravening the Supreme Court's holding in *Owen.*" *Askins v. Doe No. 1*, 727 F.3d 248, 254 (2d Cir. 2013). Furthermore, "under *Monell*[,] municipal liability for constitutional injuries may be found to exist even in the absence of individual liability, at least so long as the injuries complained of are not solely attributable to the actions of named individual defendants." *Barrett v. Orange Cnty. Hum. Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999).

Courts in this Circuit have denied bifurcation on this basis. *See, e.g.*, *Dempsey v. City of Rochester*, 2025 WL 3291822, at *7 (W.D.N.Y. Nov. 26, 2025) (rejecting bifurcation motion because "it is by no means clear that a jury verdict in favor of the individual defendants would

obviate the need for a trial on municipal liability"); *Small v. City of New York*, 2022 WL 1261739, at *12 (S.D.N.Y. Apr. 28, 2022) (denying reconsideration of a denial of trial bifurcation for the same reason).

**C. Trial bifurcation would not significantly limit the evidence presented at the first trial while requiring wasteful repetition of the same testimony at the second trial.**

The policy and practice evidence that Defendants seek to keep out of a first trial by bifurcating Plaintiff's *Monell* claim would come in anyway because it would be relevant to Plaintiff's state law claims against the City for negligence and indemnification, to punitive damages regarding the individual defendants, and to whether those defendants are entitled to qualified immunity. If the *Monell* claim is bifurcated, the same evidence would then be introduced at the second trial. Bifurcation thus is pointless, and it would greatly prolong the litigation for no legitimate purpose while wasting time and causing significant expense.

The Defendants have only sought to bifurcate Plaintiff's *Monell* claim, not his state law claims against the City. The latter include Galarza's Ninth Cause of Action claiming the City's negligent policies, and its inadequate training, supervision and discipline of its employees, caused the Individual Defendants to violate Galarza's constitutional rights, and his Eighth Cause of Action for indemnification because their actions were within the scope of their duties.

The negligence claim mirrors the *Monell* claim but requires proof of negligence instead of intentionality or deliberate indifference. Thus, all the *Monell* evidence regarding policy, practice, training, and failure to supervise and discipline would come in but with reference to a lesser *mens rea* standard with respect to the policymakers.

The indemnification claim is similar. The City would escape its obligation to indemnify only if it could show that the individual defendants acted willfully or wantonly. *City of W. Haven v. Hartford Ins. Co.*, 221 Conn. 149, 156–57 (1992). So, like the punitive damages issue,

evidence of what the City's policies were as well as the training (if any) that the officers received thus would be central to this claim.

Even if *all* municipal claims, state as well as federal, were bifurcated, the evidence would still overlap. Much of the *Monell* evidence would still be relevant to the individual defendants' defense of qualified immunity, which they have asserted in their answers. The Second Circuit has held that a court "may examine statutory or administrative provisions . . . to determine whether an individual had fair warning that his or her behavior would violate the victim's constitutional rights." *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 433–34 (2d Cir. 2009). These may include government regulations, *see Hope v. Pelzer*, 536 U.S. 730, 743–45 (2002); the officer's training, *see Okin*, 577 F.3d at 437 (2d Cir. 2009); and police policies and procedures, *see Charles v. Johnson*, 18 F.4th 686, 702 (11th Cir. 2021). To determine whether the individual defendants here had prior notice of the legal duties they violated, the jury will have to consider Bridgeport's published or de facto policies and practices and the officers' training. It was for this very reason and others that the court in *Dempsey v. City of Rochester* denied bifurcation. 2025 WL 3291822 at *6 ("[T]he individual defendants' intent to invoke a qualified immunity defense makes their training relevant to the issue of individual liability.").

BPD's policies, training, and practices also would be relevant, with respect to the claims against the Individual Defendants, to show their bad intent and liability for punitive damages. "Punitive damages are available in a § 1983 action when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996) (internal quotation marks and citation omitted). Courts have regularly found that an individual's knowing

violation of policies, practices, and training is relevant to punitive damages. *McKinley v. Trattles*, 732 F.2d 1320, 1326 (7th Cir. 1984) (considering "violation of administrative regulations of which the defendant was aware"); *Hurt v. Vantlin*, 2019 WL 6828153, at *8 (S.D. Ind. Dec. 13, 2019) ("[E]vidence regarding Defendants' violations of customs, practices, procedures, or guidelines of the [police department] is directly relevant to Defendants' knowledge, malice, and whether they acted reasonably in the investigation."); *Simmons v. City of Chicago*, 2017 WL 3704844, at *4 (N.D. Ill. Aug. 28, 2017) (same).

Finally, Galarza will be entitled to present evidence about the Individual Defendants' prior similar misconduct under F. R. Evid. 404(b) to show motive and intent, among other issues, and to impeach their credibility. *See Morant v. City of New Haven*, 2026 WL 1108118, at *23 (D. Conn. Apr. 23, 2026) (Nagala, J.) ("[E]vidence of individual Defendant's misconduct in other cases will likely be admissible under FRE 404(b)(2)."). In this regard, the Amended Complaint alleges that Lula and Ingrassia fabricated and improperly withheld evidence in the investigation of Rusty Rodriguez and that the City did nothing to stop them from doing it again in Galarza's case. Dkt. 66 ¶¶ 238–42, 425–29. It also alleges that, pursuant to Departmental custom or practice, Lula engaged in racially biased law enforcement practices. *Id.* ¶¶ 344–76. *See also, e.g., Lewis v. City of Albany Police Dep't*, 547 F. Supp. 2d 191, 199–201 (N.D.N.Y. 2008) (admitting evidence of prior uses of force against Black suspects by defendant officer for purposes of both officer's intent and *Monell* claim for failure to supervise).

In sum, bifurcation would not meaningfully, or at all, limit the proof at the first trial but would result in such evidence coming in at both trials. The same exhibits would be introduced and discussed at both trials and many witnesses would have to testify twice.

### D. Bifurcation would create difficult jury and trial management concerns.

Under the Seventh Amendment, "issues may be divided and tried separately, but a given issue may not be tried by different, successive juries." *Blyden v. Mancusi*, 186 F.3d 252, 268 (2d Cir. 1999). Here, as we have shown, much of the evidence of the underlying conduct and its relation to municipal policies and practices would have to be presented at each trial, but this would build in potential Seventh Amendment error. *See id.* at 257 (reversing a jury verdict and finding, in a civil rights case, that the plaintiff's "Seventh Amendment right to a jury trial was violated by allowing the damages phase juries to revisit many of the same issues as were considered by the liability jury"). Bifurcation would build into the case the recurring issue of respecting the first jury's factual determinations while permitting the parties to fully litigate the *Monell* claim and defenses at the second trial.

The difficult jury management issues that would arise were well-summarized by Judge Dooley in the recent *Vernon Horn* case, where she denied bifurcation:

> What would you -- one of the logistical nightmares, frankly, is I don't think you can pick a jury and tell them this case is being tried in phases. You can't tell them that whether they've got more work to do depends on their decision in the first instance. So they can't know that. But they do have to know how long they're going to be needed.. . . And with all of these sort of moving parts and contingencies, that is also very difficult to figure out. And the one thing that I have learned is that if you keep a jury longer than you told them you're going to need them, you lose jurors.

Hearing Tr. at 30, *Horn v. City of New Haven*, No. 18-cv-1502 (KAD) (D. Conn. Dec. 18, 2025), Dkt. 396. Indeed, bifurcation would place an immense burden on the Court. Resolving objections to evidence and questioning on the basis that it should be precluded at one trial and only be permitted in the other, as Judge Dooley observed, would require "hairsplitting," would be "very complicated," and would "really sort of muck up what I try to have as a smooth and efficient trial." *Id*. at 32. "[W]e could be having sidebars every five minutes." *Id*.

**E. Bifurcation would unfairly prejudice Plaintiff in numerous ways, including delay, added expense, and enabling the Defendants to defeat liability through inconsistent defenses.**

Plaintiff spent 23 years in prison and has a compelling interest in resolving his lawsuit expeditiously so that he can obtain compensation for the destruction of his life and try to put his trauma behind him. The delay that bifurcation would cause would unfairly frustrate this interest.

Bifurcation of the *Monell* claim would delay the *Monell* phase for years: until after discovery, summary judgment, trial, and even appeal of the verdict resolving the first phase. Then Plaintiff would have to start up all over again. The defendants would have to be deposed a second time concerning their knowledge of policy, custom, and practice and how it impacted their behavior. Witnesses to municipal policies, and concerning the other incidents of misconduct (the underlying events as well as whether misconduct was investigated or disciplined) would be even less likely to recall them after further years of delay: it's difficult enough already that the events in this case are 25 years old. Expensive experts would have to be paid twice. Indeed, the burden on Plaintiff's counsel would be enormous: to devote hundreds if not thousands of additional hours on a contingency fee basis for many more years, while defense counsel reap large hourly fees paid for by the taxpayers. With two rounds of discovery, dispositive briefing, and trial, involving many of the same witnesses, it "is more likely that bifurcation would only frustrate the purposes that Rule 42(b) is meant to promote." *Awalt v. Marketti*, 2012 WL 1161500, at *12 (N.D. Ill. Apr. 9, 2012).

Indeed, the burdens of bifurcation would discourage most Plaintiffs' lawyers from bringing *Monell* claims in the future. *See, e.g., Parmar v. City of Aurora*, 2021 WL 1662719, at *1 (D. Colo. Apr. 28, 2021) (denying bifurcation where plaintiff argued he "does not have the resources to undertake a years-long fight over [] individual liability, and then should [p]laintiff prevail, begin another legal battle against the municipality"). This would defeat Section 1983's

purposes of exposing and remedying unlawful governmental policies and practices and deterring future unconstitutional behavior. *Awalt*, 2012 WL 1161500, at *13 (denying trial bifurcation because, *inter alia*, "[d]eterrence is a well-founded part of our system of tort liability and a proper objective of bringing suit") (citing Supreme Court case law).

Bifurcation also would be enormously unfair and prejudicial to Plaintiff by permitting the defendants to pursue inconsistent defenses. At the first trial, the individual defendants could contend they are blameless, or their culpability should be minimized, because they were merely following policy, practice, or training, or, conversely, that policymakers left them in the dark and they were unaware of their constitutional obligations. Even if they did not fully escape liability, a jury might sympathize and award reduced damages. Plaintiff would be handicapped from effectively contesting this defense because, under Defendant's bifurcation proposal, he would be precluded from obtaining full *Monell* discovery. Meanwhile, at a second trial, the City not only would argue that Plaintiff is bound by the first jury's damages award but could take an entirely different tack on policy and practice: it could deny the existence of the policies and practices the individuals claimed justified or excused their behavior.

The problem of inconsistency would be particularly difficult for Plaintiff's *Brady* claim. It is an "unresolved issue" in the Second Circuit whether a police officer's violation of *Brady* must be intentional for civil liability to apply. *Jimenez v. City of New York*, 2026 WL 2617389, at *18 (2d Cir. Sept. 4, 2026). The individuals might defend on the basis that they were unaware of their *Brady* obligations and escape liability, or they might assert qualified immunity by contending that their conduct was not objectively unreasonable. Then, at a second trial, the City might defend by attempting to prove that the officers were trained in or otherwise did understand their *Brady* obligations. Indeed, the City already has argued, in their motion to dismiss, that the

individual defendants' conduct in this case was independent of policy, practice, and training and thus the City is not liable. *See* Deft. Memorandum in Support of Dismissal, Dkt 70-1 at 18–22.[2] The only fair way to adjudicate the *Brady* liability issue is to have all the evidence pertaining to the individual officers' knowledge and intent, including all the evidence of the policies, practices and training they were exposed to, at one trial, before one jury, so that such jury may determine the issues of intent, causation, and apportionment of blame.

Indeed, the apportionment issue is another example of the potential for inconsistency. At the first trial, the individual defendants could contend that the City is to blame for a percentage of their liability, but at a second trial the City could seek to fully apportion blame to the Individuals for their "independent" acts. The results might be inconsistent. Apportionment is a defense that should be determined at a unitary trial by a jury that has received all the relevant evidence, not by juries at separate trials that have received only some of that evidence.

Where, as here, there is a real danger of inconsistent results, courts rightfully disfavor severing claims. *See, e.g.*, *Sunbelt Corp. v. Noble, Denton & Assocs.,* 5 F.3d 28, 34 (3d Cir. 1993) ("To grant severance here would place each defendant in the position of being able to defend by asserting the absent party's negligence."); *Scott v. City of Tulsa*, 795 F. Supp. 3d 1351, 1355 (N.D. Okla. 2025) (applying this logic to a wrongful conviction case).

**F. The Court has trial management tools to avoid unfair prejudice to the Defendants from a joint trial.**

Defendants argue broadly that the Plaintiff will present evidence of unrelated misconduct by other officers and that the jury will impermissibly consider this as propensity evidence. Dkt. 74 at 5–6. The City's mere presentation of "broad, conclusory, and boilerplate assertions of

[2] Citations are to the page numbers automatically created by the Case Management/Electronic Case Files system and listed at the top of the document.

undue prejudice," *Garcia v. Ramirez*, 2021 WL 1253448, at *2 (N.D. Ill. Apr. 5, 2021), alone is insufficient to overcome the judicial preference for a "single trial on the merits of all the contested issues and claims of the parties" over "their piecemeal adjudication," *Terrell v. Childers*, 1996 WL 385310, at *14 (N.D. Ill. July 3, 1996). As the court in *Pavone v. Gibbs* said, "[T]here is no limiting principle to defendants' argument. If defendants were granted the relief they seek on this record based only upon speculation and their generalized assertion of prejudice, then the trial of virtually any civil rights action against a municipality and its individual employees would require bifurcation." 1997 WL 833472, at *2 (E.D.N.Y. Sept. 29, 1997).

Even if the City had shown some specific prejudice the Individual Defendants would suffer at a unitary trial, such "prejudice could be cured by 'carefully crafted' limiting instructions." *D'Arrigo v. Gloucester City*, 2007 WL 4440222, at *3 (D.N.J. Dec. 17, 2007) (quoting *Jeanty v. County of Orange*, 379 F. Supp. 2d 533, 549–50 (S.D.N.Y. 2005)); *see also James v. City of Los Angeles*, 2024 WL 3467771, at *1 (C.D. Cal. Feb. 15, 2024) (denying the defendants' motion to bifurcate trial because "any risk of prejudice can b[e] cured by a limiting instruction"); *Schoolcraft v. City of New York*, 133 F. Supp. 3d 563, 571 (S.D.N.Y. 2015) (denying motion to bifurcate where "there will be significant overlap between the evidence" in support of individual liability and *Monell* claims and any prejudice can be mitigated through limiting instructions); *Real v. Bunn-O-Matic Corp.*, 195 F.R.D. 618, 621 (N.D. Ill. 2000) ("[Prejudice] . . . can be remedied with cautionary warnings, limiting instructions, special verdict forms, and other instructions to the jury."). On the other hand, the extraordinary delay and expense inherent in bifurcation "cannot be remedied except by denying separate trials." *Id.* The Defendants have not explained why this Court could not craft jury instructions, like courts around the country, that protect against spillover prejudice.

### G. The City's motion to bifurcate trial is premature.

Even if the above factors did not weigh heavily against bifurcating trial, denying the motion would be appropriate because it is premature. As explained, *see* p. 12, *supra,* the party seeking bifurcation "bears the burden of establishing that separate trials will further convenience or avoid prejudice." *Ferrante v. Metro-N. Commuter R.R.*, 2007 WL 1793447, at *2 (S.D.N.Y. June 18, 2007). Here, the Defendants have moved to bifurcate trial before receiving or responding to any *Monell* discovery request. No dispositive motions have been decided. As a result, it is unclear what claims and defenses will go to trial and what evidence will support them. No *in limine* motions have been filed sharpening issues for trial and permitting the Court to weigh whether evidentiary rulings and limiting instructions would suffice to afford all parties a fair trial. Thus, at the very least, "the defendant[] ha[s] not met this burden because [its] motion is premature." *Martinez v. Robinson*, 2002 WL 424680, at *2 (S.D.N.Y. Mar. 19, 2002). *See also Pavlovich v. City of New York*, 1992 WL 230472, at *3 (S.D.N.Y. Aug. 31, 1992) (denying a bifurcation motion as premature); *Staton v. Connecticut*, 2009 WL 4250064, at *4 (D. Conn. Nov. 20, 2009) (Hall, J.) (same).

## II. The City Fails to Show Good Cause for a Protective Order to Bifurcate or Stay Discovery.

The City's motion at first seeks to bifurcate discovery until after the claims against the individual defendants have been "resolved," Dkt. 74 at 2, which presumably would mean staying *Monell* discovery until after trial (likely after an appeal). Later, the City suggests staying *Monell* discovery until after determination of summary judgment motions. *Id.* 74 at 9. In either case, the City's reasons for delaying *Monell* discovery are the same unpersuasive ones that it proffers for bifurcating the trial: to avoid unnecessary work and to avoid prejudice to the individual defendants inherent in a joint trial. Neither rationale justifies the requested stay.

"A request for a stay of discovery is treated as a request for a protective order under Rule 26(c)." *Stanley Works Israel Ltd. v. 500 Grp.*, 2018 WL 1960112, at *2 (D. Conn. Apr. 26, 2018) (Haight, J.). As the party seeking the stay, Defendants bear "the burden of demonstrating specifically" how the discovery sought "is overly broad, burdensome[,] or oppressive by submitting affidavits or offering evidence revealing the nature of the burden." *John Wiley & Sons v. Book Dog Books, LLC*, 298 F.R.D. 184, 186 (S.D.N.Y. 2014) (internal quotation marks and citations omitted). As with the bifurcation of trial, discovery "[b]ifurcation is the exception rather than the rule." *Crawley v. City of Syracuse*, 2018 WL 3716782, at *4 (N.D.N.Y. Aug. 3, 2018).

Here, the City's motion would stay discovery until the non-*Monell* part of the case is fully resolved or determined at summary judgment, but under this District's Local Rules, even "a motion to dismiss shall not result in a stay of discovery or extend the time for completing discovery." Standing Order on Scheduling in Civil Cases at ¶ 2(b), Order No. CTAO-18-21A (D. Conn. July 30, 2018). This is because, "Had the Federal Rules contemplated that a motion to dismiss under Fed. R. Civ. P. 12(b)(6) would stay discovery, they would contain such a provision." *Moss v. Hollis*, 1990 WL 138531, at *1 (D. Conn. June 29, 1990) (Dorsey, J.). "[I]t is not the practice of this Court to stay discovery upon the filing of a motion to dismiss," *DePaul v. Kimberly-Clark Corp.*, 2025 WL 2256307, at *2 (D. Conn. Aug. 7, 2025) (Dooley, J.), and it is less the practice to do so pending some future summary judgment motion premised upon discovery that has not as yet even occurred.

Courts consider the following factors when determining whether to stay discovery pending the resolution of dispositive motions: (1) "Whether the defendant has made a strong showing that the plaintiff's claim is unmeritorious"; (2) "The breadth of discovery and the burden

of responding to it"; and (3) "The risk of unfair prejudice to the party opposing the stay." *Morien v. Munich Reinsurance Am., Inc.*, 270 F.R.D. 65, 67 (D. Conn. 2010) (Smith, M.J.).

"Hyperbolic words used to characterize an unspecified burden," *Cadle v. City of Chicago*, 2015 WL 6742070, at *2 (N.D. Ill. Nov. 2, 2015), and "threadbare assertions of expense or burden," are inadequate, *Thomas v. L. Offs. of Steven Cohen*, 2024 WL 21547, at *4 (W.D.N.Y. Jan. 2, 2024).

Defendant's motion is filled with "hyperbolic words," but it fails to address the three factors governing whether a court should grant a stay. It contains no discussion of the strength of the evidence of a constitutional violation, let alone the requisite "strong showing that the plaintiff's claim is unmeritorious." It generally asserts that complying with *Monell* discovery would be unduly burdensome but fails to demonstrate that this is so. And it fails to analyze "[t]he risk of unfair prejudice to the party opposing the stay," dismissing any such concern with the observation that Plaintiff, eventually, would obtain his discovery. *See* Dkt. 74 at 7–10.

In reality, as we have shown, Plaintiff's evidence that his constitutional rights were violated is exceedingly strong and thus there is virtually no chance that the need for *Monell* discovery will be mooted by a judicial or a jury finding to the contrary. The State's Attorney *conceded Brady* violations and the individual defendants do not challenge the Amended Complaint's allegations against them. In this district, discovery stays have been denied where the movant failed to show that a Plaintiff's claims were "wholly unmeritorious," *Stanley Works Israel Ltd. v. 500 Grp.*, 2018 WL 1960112, at *3 (D. Conn. Apr. 26, 2018) (Haight, J.); *Conservation L. Found. v. Shell Oil Co.*, 2023 WL 4706815, at *3 (D. Conn. July 24, 2023) (Farrish, J.) (same), but here Plaintiff's individual claims are unquestionably *meritorious.* Plaintiff is entitled to show that the City is at least partly to blame for the individual defendants'

actions. Staying *Monell* discovery would not help the City avoid *unnecessary or undue* disclosure, but it would enable the City to delay *necessary* disclosure. Meanwhile, the requested stay would clearly prejudice Plaintiff (the third factor) by forcing him to potentially undertake the expense and delay of repetitive depositions, two summary judgment motions, and two trials.

Besides being necessary to the fair litigation of Plaintiff's claims, *Monell* discovery would not be *unduly* burdensome. "The examination of governmental policy and custom necessary to prove up a *Monell* claim is not, under the law, an independent harm against which the Court must protect; it is a consequence of the standards set forth by the Supreme Court for the establishment of municipal liability." *Lopez v. New York*, 2021 WL 2739058, at *2 (S.D.N.Y. July 1, 2021). The City does not show that such discovery in this case would be unusually burdensome; rather, it admits the contrary.

As the City itself points out, *see* Dkt 74. at 10, Plaintiff, through his attorneys' pre-filing research, already has compiled a great deal of *Monell* evidence, as is evident from the extraordinarily detailed Amended Complaint, thereby significantly lightening the City's load. As for what the City would still have left to do, searching through municipal records to produce policy and training materials is ordinary for civil litigation and would not be oppressive or burdensome here. Defendant concedes it would probably have to do this anyway because such material is relevant to other issues in the case. *Id.* at 9–10.

As for the issue of departmental discipline for bad acts in other cases, which is relevant to Plaintiff's claims of condoned practice and deliberate indifference, the City, on the one hand, in its motion to dismiss, complains that Plaintiff has cited too few prior similar cases, but now complains that searching for them would be too burdensome. We suspect there will be no burden to produce at all because there was little if any discipline. As for the underlying police files, if

they have not been destroyed, they should be readily accessible, scannable, and reviewable. Again, this is ordinary in civil litigation and is inherently necessary for *Monell* litigation: Defendant makes no showing that any of this would be overly difficult or time-consuming.

Defendant can move for a protective order against specific discovery demands if it believes the discovery Plaintiff seeks is unduly burdensome or disproportionate to the needs of the case. Instead, it moves in a vacuum, even before it has been served with a *Monell* document request, without any showing of undue burden.

While staying *Monell* discovery would not relieve the City of any unfair burden, it would greatly burden the Court to resolve disputes "about whether Plaintiff[']s discovery requests relate to his *Monell* claim or to his other claims." *Cadle v. City of Chicago*, 2015 WL 6742070, at *2 (N.D. Ill. Nov. 2, 2015). In *Lopez v. City of New York*, the court rejected the "assumption that discovery relevant to *Monell* can be neatly divided and separated from discovery relevant to the claims against the individuals." 2021 WL 2739058, at *2 (S.D.N.Y. July 1, 2021). "[B]ecause the lines between these claims are somewhat blurred . . . , any bifurcation of discovery would inevitably lead to more litigation about where the line between permissible discovery and deferred discovery would be drawn." *Duggan v. Vill. of New Albany*, 2009 WL 2132622, at *4 (S.D. Ohio July 10, 2009).

The requested stay would also unfairly burden Plaintiff by forcing him to re-depose witnesses about the overlapping topics during each phase of discovery. Courts have regularly recognized this burden. *See, e.g.*, *Wyatt v. City of Lackawanna*, 2024 WL 945956, at *3 (W.D.N.Y. Feb. 6, 2024) ("To delay consideration of *Monell* issues could necessitate recalling certain witnesses, thus adding further complexity to the Plaintiff's already-challenging situation."); *Newman v. Berkley*, 2021 WL 1948460, at *2 (C.D. Ill. May 15, 2021) ("[S]taying

discovery on the *Monell* Claims may result in deposing the same third-party witnesses a second time on additional issues in the *Monell* Claims."). Re-deposing witnesses "usually imposes exponentially higher costs for all parties because of the need to get back up to speed (typically performing the same work multiple times) and due to commitments in other matters." *Jackson v. City of Cleveland*, 2022 WL 17089769, at *2 (N.D. Ohio Nov. 21, 2022).

Staying discovery would also deprive the parties and the Court of information necessary to make a *timely* evaluation of whether the *trial* should be bifurcated. The appropriate time to do so would be after *all* discovery has been completed and *all* claims and defenses have been reviewed on summary judgment. However, if *Monell* discovery is stayed, the Court will not be able to decide the order of the trial until such discovery has been completed, delaying any trial for additional years.

## CONCLUSION

For the above reasons, the Court should deny the Defendants' motion to bifurcate trial and to stay *Monell* discovery.

Dated: October 6, 2026

Respectfully submitted,

**LAW OFFICES OF JOEL B. RUDIN, P.C.**
/s/ Joel B. Rudin
Joel B. Rudin (ct25097)*
David E. Rudin (ct209360)*
Sam Thypin-Bermeo (ct209359)*
Sam Kuhn (ct209361)*
Partha Sharma (ct209362)*
152 West 57th Street, 8th Floor
New York, New York 10019
jbrudin@rudinlaw.com
david@rudinlaw.com
samtb@rudinlaw.com
skuhn@rudinlaw.com
psharma@rudinlaw.com
Telephone: (212) 752-7600
Fax: (212) 980-2968
*Admitted pro hac vice

**THE LAW OFFICE OF KENNETH ROSENTHAL**
*/s/ Kenneth Rosenthal*
Kenneth Rosenthal (ct05944)
One Audubon Street, 3rd Floor
New Haven, Connecticut 06511
krosenthal@gs-lawfirm.com
Telephone: (203) 285-8545

*Attorneys for Plaintiff Luis Galarza*